## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Court. No. 23-00191 |

### ORDER

Upon consideration of the Rule 56.2 motion of Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, "Plaintiffs"), all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED**, that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is **GRANTED**; and it is further

**ORDERED**, that the final results of the United States Department of Commerce set forth in *Forged Steel Fluid End Blocks from Italy: Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 55,010 (Aug. 14, 2023), and its accompanying Issues and Decision Memorandum and calculation memoranda, is remanded for disposition in a manner consistent with the opinion of the Court.

SO ORDERED.

Date:_____          Signed:_____
     New York, New York                              Stephen Alexander Vaden, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS, ) ) ) ) | |
| Plaintiffs, ) | Court. No. 23-00191 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade (the "Court" or "CIT"), Plaintiffs Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons hereby move for judgment on the agency record in the above-referenced action. For the reasons set forth in Plaintiffs' Memorandum of Law in Support of Their Rule 56.2 Motion for Judgment on the Agency Record, Plaintiffs request that this Court hold that the final results of the U.S. Department of Commerce set forth in *Forged Steel Fluid End Blocks from Italy: Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 55,010 (Aug. 14, 2023), and its accompanying Issues and Decision Memorandum and calculation memoranda, is unsupported by substantial evidence on the administrative record and otherwise not in accordance with law, and that the Court therefore remand these final results to Commerce for disposition in a manner consistent with the opinion of the Court.

\*      \*      \*

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W., Suite 400
Washington, D.C. 20006
(202) 567-2304
*mgetlan@cassidylevy.com*

*Counsel to Ellwood City Forge Company,*
*Ellwood Quality Steels Company,*
*Ellwood National Steel Company, and*
*A. Finkl & Sons*

Dated:  March 6, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Court. No. 23-00191 |
| v. | ) ) ) | **NONCONFIDENTIAL VERSION** |
| UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | Proprietary Information Removed from Brackets on pages ii, 1, 7-17, 25-26, 28-29, 32, 34, 36-48. |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
(202) 567-2301
*mgetlan@cassidylevy.com*

*Counsel to Ellwood City Forge Company,*
*Ellwood Quality Steels Company,*
*Ellwood National Steel Company, and*
*A. Finkl & Sons*

Dated:  March 6, 2024

## **Table of Contents**

Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 1

    A.   Administrative Determination Under Review ............................................. 1

    B.   Issues Presented ........................................................................................ 1

    C.   Request for Relief ..................................................................................... 2

STATEMENT OF FACTS ...................................................................................... 3

I.    Commerce Fails to Select the Best Sources for Constructed Value Profit and SG&A Expenses ......................................................................................... 4

II.   Commerce Fails to Adjust for Lucchini's Affiliated Ingot Purchases .................... 7

SUMMARY OF ARGUMENT ................................................................................ 12

ARGUMENT ....................................................................................................... 17

I.    Standard of Review ........................................................................................ 17

II.   Commerce's Inclusion of Inferior Data from Cogne and Ciscato in its Calculation of CV Profit and SG&A Expenses Is Unsupported by Substantial Evidence and Contrary to Law ........................................................................ 19

    A.   Commerce Purported to Apply Its Standard Test and Practice in Evaluating Available Data for its CV Profit and SG&A Expense Calculations, But Commerce's Conclusion Contradicted the Statutory Preference for Producers of FEBs ......................................................................................... 20

    B.   Framed in Terms of Commerce's Four Factors, OMR's and Metalcam's Product Offerings and Customer Base Make Them Superior to Cogne and Ciscato ............................................................................................ 23

        1.   Commerce's Application of the Product Specificity Factor was Arbitrary and Contravened its Stated Preference for Producers of Identical Merchandise ............................................................................. 24

        2.   Commerce Failed to Address Petitioners' Record-Based Arguments Demonstrating that the Product Specificity Factor Favors OMR and Metalcam Over Cogne and Ciscato ....................................................... 26

        3.   The Customer Specificity Factor Favors OMR and Metalcam Over Ciscato ....... 28

4.    Without Explanation, Commerce Relied on Partially Translated Financial Statements from Ciscato ............................................................................ 30

III.    Commerce Misapplied the Statute and Failed to Identify Substantial Evidence for its Market Price Benchmark of FEB-Grade Stainless Steel Ingots ............................................ 32

A.    Commerce's Analytical Framework for Rejecting the Only Product-Specific Benchmark on the Record Was Legally Erroneous, and Commerce's Failure to Assess the Relative Importance of Product Specificity Renders its Analysis Unsupported by Substantial Evidence ........................................................................ 32

1.    The Authorities on which Commerce Relied Do Not Support Commerce's Rigid Analysis; the Exclusion of [                    ] U.S. Purchase Data Without Further Analysis Was Legally Erroneous ................................................. 34

2.    Even if a Preference for Italian Prices Were a Reasonable Tiebreaker, Commerce Nevertheless Erred in Failing to Consider the Merits of a Product-Specific Benchmark ................................................................ 36

B.    Commerce's Acceptance of Lucchini's Untimely Information Contravened Commerce's Instructions and Regulations, and Commerce's One-Sided Adjustment to the Benchmark Value Was Distortive and Unsupported by Substantial Evidence ......................................................................................... 40

1.    Commerce Acted Contrary to Law and Prejudiced Petitioners in Accepting Lucchini's Untimely Sixth Market Price Submission............................................. 40

2.    Even if Lucchini's Untimely Information Were Accepted on the Record, Commerce's Adjustment Was Unreasonable, Distortive, and Reaffirms the Importance of Selecting a Product-Specific Benchmark ....................................... 46

CONCLUSION......................................................................................................................... 48

## <u>Table of Authorities</u>

Page(s)

<u>Statutes</u>

19 U.S.C. § 1516a(b)(1)(B) ............................................................................................17

19 U.S.C. § 1677(15)(B) ................................................................................................32

19 U.S.C. § 1677b(e) ...................................................................................................4, 20

19 U.S.C. § 1677b(e)(2)(A) .......................................................................................20, 21

19 U.S.C. § 1677b(e)(2)(B)(i) ........................................................................................20

19 U.S.C. § 1677b(e)(2)(B)(ii) .......................................................................................20

19 U.S.C. § 1677b(e)(2)(B)(iii) .................................................................................20, 21

19 U.S.C. § 1677b(f)(1)(A) ............................................................................................34

19 U.S.C. § 1677b(f)(2) ........................................................................................... *passim*

19 U.S.C. § 1677b(f)(3) ...................................................................................................7

19 U.S.C. § 1677f(i)(3)(A) ........................................................................................18, 30

19 U.S.C. § 3512(d) ........................................................................................................17

<u>Regulations</u>

19 C.F.R. § 351.301(c)(1)(i) ...........................................................................................45

19 C.F.R. § 351.301(c)(1)(ii) ..........................................................................................45

19 C.F.R. § 351.301(c)(1)(v) ..........................................................................................46

19 C.F.R. § 351.301(c)(5) .....................................................................................9, 41, 45

19 C.F.R. § 351.301(c)(5)(ii) ..........................................................................................45

19 C.F.R. § 351.302(d)(1)(i) ...........................................................................................41

19 C.F.R. § 351.303(e).....................................................................................................31

Court Decisions

*Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295 (Ct. Int'l Trade 2006) ............................................................................................. 23

*Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347 (Ct. Int'l Trade 2023) ............................................................................ 15, 33, 35

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ................................................................................................. 17, 18

*Diamond Sawblades Mfrs. Coal. v. Hyosung D & P Co.*, 809 F.3d 626 (Fed. Cir. 2015) ......................................................................................................... 36

*Diamond Sawblades Mfrs. Coal. v. United States*, 38 Ct. Int'l Trade 1545 (2014) .............................................................................................................. 35

*Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) .............................................................................................................. 31

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ............................ 18, 28, 38

*Geum Poong Corp. v. United States*, 163 F. Supp. 3d 669 (Ct. Int'l Trade 2001) .............................................................................................................. 26

*Husteel Co. v. United States Steel Corp.*, 180 F. Supp. 3d 1330 (Ct. Int'l Trade 2016) ....................................................................................................... 23

*Husteel Co. v. United States Steel Corp.*, 710 F. App'x 890 (Fed. Cir. 2018) ............................ 23

*Husteel Co. v. United States*, 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ....................... 42, 45-46

*Hyundai Steel Co. v. United States*, 2023 WL 8715719 (Ct. Int'l Trade Dec. 18, 2023) ......................................................................................................... 20, 23

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 589 F. Supp. 3d 1195 (Ct. Int'l Trade 2022) .............................................................................. 41

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ....................................................................................................... 20

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ....................................................... 17-18

*LG Chem, Ltd. v. United States*, 534 F. Supp. 3d 1386 (Ct. Int'l Trade 2021) ............................ 34

*Mannesmannrohren-Werke AG v. United States*, 77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999) ....................................................................................................... 33

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ...................................................................................................................18

*Mid Continent Steel & Wire v. United States*, 519 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) .........................................................................................................23

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) ..................................................................................................... *passim*

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) .............................................................................18, 31

*New Am. Keg v. United States*, 2021 WL 1206153 (Ct. Int'l Trade Mar. 23, 2021) ...................................................................................................................30

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ..............................18, 30, 39, 46

*NTSF Seafoods Joint Stock Co. v. United States*, 2022 WL 1375140 (Ct. Int'l Trade Apr. 25, 2022) ....................................................................................30

*PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) .........................................................................................15, 33, 35, 36

*Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) .........................................................................................................33

*Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1397 (Ct. Int'l Trade 2021) .........................................................................................................21

*SKF USA Inc. v. United States,* 263 F.3d 1369 (Fed. Cir. 2001)......................................19, 26, 31

*SKF USA Inc. v. United States*, 332 F.3d 1370 (Fed. Cir. 2003).................................................31

*SKF USA Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011).................................................31

*Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300 (Fed. Cir. 2010) ..................................................................................................................20-21

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) ................................................46

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................18

*Viraj Grp. v. United States*, 476 F.3d 1349 (Fed. Cir. 2007)......................................................33

Administrative Determinations

*Certain Oil Country Tubular Goods from Saudi Arabia*: *Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 41,986 (July 18, 2014) ............................................................................................24

*Fluid End Blocks from China, Germany, India, and Italy*, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021)................................................................................................3

*Forged Steel Fluid End Blocks From Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020)....................................26

*Forged Steel Fluid End Blocks from Italy: Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 55,010 (Aug. 14, 2023) ........................................................................................... *passim*

*Forged Steel Fluid End Blocks From Italy: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 44,500 (July 23, 2020) ...........................................................................................26

*Forged Steel Fluid End Blocks From Italy: Preliminary Results and Rescission of Antidumping Duty Administrative Review in Part; 2020–2021*, 88 Fed. Reg. 7,686 (Feb. 6, 2023) ................................................. 5-6

Other Legislative Materials

S. Rep. 103-412 (1994)......................................................................33

Court Rules

USCIT Rule 56.2 ................................................................................1

Other Materials

Black's Law Dictionary (10th ed. 2014)...........................................42

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Ellwood City Forge Co., Ellwood Quality Steels Co., Ellwood National Steel Co., and A. Finkl & Sons (together collectively, "Petitioners") submit the following memorandum of law in support of their motion for judgment on the agency record.  Because the respondent in this administrative review had no home market sales of the foreign like product, Commerce was constrained to rely upon constructed normal value.  However, the constructed value that Commerce calculated was substantially depressed by Commerce's choice of constructed value SG&A expense and profit amounts, and by Commerce's failure to meaningfully analyze the price Lucchini paid to its affiliate for steel ingots comprising [     ] of forged steel fluid end block ("FEB") production costs.  Multiple errors undermine each decision, and each requires remand to correct Commerce's misunderstandings of law and to address Petitioners' evidence-based arguments.

## STATEMENT PURSUANT TO RULE 56.2

### A.  Administrative Determination Under Review

This action contests the final results of Commerce's first antidumping administrative review in the FEBs from Italy antidumping proceeding.  *Forged Steel Fluid End Blocks from Italy: Final Results of the Antidumping Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 55,010 (Aug. 14, 2023) (Appx0003304-0003305), and accompanying Issues and Decision Memorandum ("Final IDM") (Appx0003279-0003303) and final calculation memoranda (Appx0087460-0087651) (together collectively, the "*Final Results*").

### B.  Issues Presented

1.  Where record evidence demonstrated that two sources of constructed value selling, general, and administrative ("SG&A") expense and profit data satisfy all four factors that Commerce uses to evaluate such sources, whereas two other

sources lacked substantial evidence of product- and/or customer-specificity and were otherwise only partly translated, did Commerce utilize the "best" data sources when including the two inferior sources in its calculations?

2.  Did Commerce support its selection of the "best" constructed normal value ("CV") profit and SG&A expense data sources with substantial evidence where Commerce failed to address Petitioners' evidence-based arguments regarding two sources' lack of product- and/or customer-specificity and the incompleteness of the English translation?

3.  Where Commerce selected a market price benchmark for an unknown <u>non</u>-FEB, non-stainless steel ingot instead of a benchmark for the specific stainless steel grade consumed in FEB production without explaining how the unknown <u>non</u>-FEB product could yield a more accurate comparison, was Commerce's selection supported by substantial evidence?

4.  Where Commerce discounted its unknown <u>non</u>-FEB ingot benchmark price to account for FEB-specific logistics based on untimely new factual information, while omitting to account for logistical expenses, was Commerce's adjusted benchmark lawful and supported by substantial evidence?

## C.  Request for Relief

Plaintiffs request that this Court hold Commerce's *Final Results* unlawful and otherwise unsupported by substantial evidence, and remand Commerce's determination with instructions to revise Commerce's calculations of Lucchini's constructed value SG&A expenses and profit, as well as the market price benchmark for FEB-grade ingots, and recalculate Lucchini's dumping margin.

NONCONFIDENTIAL VERSION

## STATEMENT OF FACTS

Forged steel FEBs are produced from specific grades of steel ingot, which is then cut into blocks, open-die forged to achieve the desired microstructure, and finished by, *e.g.*, boring holes, heat treating, or coating.  These FEBs are generally purchased by original equipment manufacturers for incorporation into the "fluid end" of hydraulic well service pumps used in oil and gas extraction.  As these pumps generate up to 20,000PSI, FEBs are subject to extremely high pressure while in use, and can easily crack, abrade, and fail if not produced to exacting specifications.  *Fluid End Blocks from China, Germany, India, and Italy*, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021) at I-14 to I-22 (grade 15-5PH and 17-4PH stainless steel is most commonly used); *see also, e.g.*, Lucchini Response to Section A of Initial Questionnaire (Apr. 18, 2022) at Appx0080071-0080072, Ex. A-29 (Appx0081644-0081650) ("Lucchini AQR").[1]  Given FEBs' specialized characteristics and high-stress application, it was critically important to the accuracy of Commerce's dumping margin that it closely scrutinize each component of constructed normal value.  But Commerce failed to do so.  Commerce diluted its CV profit and SG&E expense amounts with inferior data and failed to meaningfully test Lucchini's purchases of FEB-grade ingots from affiliates under the "transactions disregarded" provision of the statute.

Petitioners' administrative case brief raised significant issues affecting Commerce's antidumping calculations.  Unfortunately, Commerce's *Final Results* largely failed to engage with Petitioners' arguments and evidence.  Instead of rigorously assessing the relative merits of competing sources for CV SG&A expense and profit data by reference to Commerce's four

---

[1] Where a confidential version of a record document exists, Plaintiffs herein cite only the confidential joint appendix.

judicially-endorsed factors and selecting the best among them, Commerce instead reached a decision that was internally inconsistent and compromised data from superior sources by including inferior data.  (**Section I**).  Likewise, Commerce favored country-specificity over product-specificity selecting a non-FEB ingot benchmark market price for Lucchini's FEB ingot purchases, without explaining what evidence demonstrated that aligning the location of a transaction yielded greater accuracy than aligning the product being purchased.  Commerce compounded this error by relying on untimely new information from Lucchini, without acknowledging its untimeliness, to adjust the non-FEB ingot benchmark price based on logistical considerations specific to Lucchini's FEB ingots.  (**Section II**).

## I.    Commerce Fails to Select the Best Sources for Constructed Value Profit and SG&A Expenses

Lucchini's response to Commerce's initial questionnaire reported no home market or third country sales of the foreign like product during the POR.  Therefore, Commerce's antidumping duty calculations compared U.S. price to constructed normal value.  *See* Prelim IDM at Appx0002926.  Constructed normal value is defined by 19 U.S.C. § 1677b(e), which requires Commerce to include, *inter alia*, amounts for SG&A expenses, as well as profit.

Consistent with Commerce's usual practice, parties to the proceeding were requested to submit potential sources of CV profit and selling expense data.  In response, Petitioners submitted data from Officina Meccanica Roselli O.M.R. S.r.l. ("OMR"), advocating that Commerce use only OMR's data, but also supplying data from Metalcam S.p.A. ("Metalcam") and Cogne Acciai Speciali S.p.A. ("Cogne") as potential alternatives.  Petitioners' CV Profit Response (Sept. 23, 2022) (Appx0085699–0086091).  Petitioners argued by reference to supporting factual information that OMR and Metalcam were, in order of preference, each a better source than Cogne.  *See id.* at Appx0085701–0085706.  Lucchini submitted data for

Asoforge S.R.L ("Asoforge"), FOC Ciscato S.p.A. ("Ciscato"), FOMEC S.p.A. ("FOMEC"), and OFAR S.p.A. ("OFAR"), broadly asserting that these entities all had "operations, products and customer base" similar to Lucchini, without identifying any supporting documentation. Lucchini's CV Profit Response (Sept. 23, 2022) (Appx0001904-0002496).   Lucchini furthermore argued that the record lacked evidence of FEB production by Cogne.  *See id.* at Appx0001907, Ex. CV-10 (Appx0002477-0002491).

Consistent with Commerce's schedule, Petitioners thereafter supplied rebuttal factual information concerning the operations and product lines of Asoforge, Ciscato, FOMEC, and OFAR which established that none of these entities produced FEBs during the POR.  Petitioners' Rebuttal CV Profit Submission (Oct. 4, 2022) (Appx0002497-0002563).  Given the data on the administrative record, Petitioners advocated that the best source of CV profit and SG&A expense data on the record was OMR, with Metalcam's data being the "next most reasonable source," and acknowledging that there was "no direct evidence that Cogne itself produced FEBs during 2021."  Petitioners' Pre-Prelim Comments (Jan. 9, 2022) at Appx0086581-0086595.  With respect to the alternative data sources submitted by Lucchini, Petitioners argued that all were inferior and therefore unusable, insofar as none came from producers of FEBs, and each company's products and customers were dissimilar to those of Lucchini.  *Id.* at Appx0086597-0086604.

Commerce's *Preliminary Results* acknowledged that Asoforge produced dissimilar products and excluded it from the CV profit and SG&A expense calculation, but averaged the CV profit and SG&A expense data from the remaining six producers (*i.e.*, OMR, Metalcam, Cogne, Ciscato, Fomec, and OFAR).  Commerce erroneously stated that all six companies produced FEBs.  *See Forged Steel Fluid End Blocks From Italy: Preliminary Results and*

*Rescission of Antidumping Duty Administrative Review in Part; 2020–2021*, 88 Fed. Reg. 7,686 (Feb. 6, 2023), and accompanying Preliminary Issues and Decision Memorandum ("Prelim IDM") at Appx0002927 (together collectively, the "*Preliminary Results*").

Relying on the same four-factor analysis that Commerce had purported to apply in its *Preliminary Results*, Petitioners' case brief reasserted that OMR and, if necessary, Metalcam, were the only reasonable sources of CV profit and SG&A expense data on the administrative record.  Petitioners' Case Br. at Appx0087338-0087351.  As Petitioners explained, both OMR and Metalcam produced FEBs, none of the other potential data sources produced a single FEB, and OMR and Metalcam otherwise satisfied all of Commerce's four factors.  *See id.* (Appx0087338-0087351).  Put differently, OMR and Metalcam were the best of all potential alternatives insofar as they were the only options that did produce FEBs, and none of the potential alternative sources was superior to OMR or Metalcam with respect to any other factor.  Petitioners furthermore established that Ciscato and OFAR were especially ill-suited to inclusion in the calculation insofar as both had the further defect of selling to a dissimilar customer base.  Therefore, considered in terms of Commerce's ordinary four-factor analysis, all other potential sources were inferior to OMR and Metalcam.

Commerce agreed in its *Final Results* that OMR and Metalcam should continue to be included in the CV profit and SG&A expense calculation, and that Fomec and OFAR should be excluded from that calculation for lack of record evidence that either company produced "identical merchandise," *i.e.*, FEBs.  However, Commerce persisted in including data from Cogne and Ciscato in the CV profit calculation, despite the absence of record evidence that either produced FEBs during the POR.  Final IDM at Appx0003293.

## II.  Commerce Fails to Adjust for Lucchini's Affiliated Ingot Purchases

The grade [                              ] ingots Lucchini used to produce FEBs were produced by its affiliate, Lucchini Industries Srl ("LIND"), and purchased via another affiliate, Lucchini R.S. ("LRS").  Final IDM at Appx0003294, Appx0003298; Lucchini's Initial Section D Questionnaire Response (May 25, 2022) at Appx0082155, Ex. D-3 (Appx0082225-0082231) ("Lucchini DQR").  These ingots make up "about [     ]% of {the} total cost of production" of FEBs.  Lucchini DQR at Appx0082153.  Commerce undertook to assess whether the transfer price Lucchini paid for LIND's FEB ingots "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration," Final IDM at Appx0003297, as contemplated by 19 U.S.C. § 1677b(f)(2).[2]  To facilitate this analysis, Commerce provided Lucchini <u>five separate opportunities</u> to provide market prices for the grade of ingot used in FEB production.  *See* Initial Questionnaire (Mar. 28, 2022) at Appx0001109 (instructing Lucchini to report LIND's sales of "the identical input to unaffiliated customers in {Italy}."); First Supplemental Section D Questionnaire (Aug. 15, 2022) at Q.7.a, Q.8.b (instructing Lucchini to provide, *inter alia*, "documentation to demonstrate the market price of ingots of the same grade as those sold to Lucchini for the production of {subject FEBs}.") (Appx0082998-0083000) ("Commerce 1SDQ"); Second Supplemental Section D Questionnaire at Q.8, 13.c.ii-iii (Oct. 28, 2022) ("Explain whether either LIND or LRS sell stainless steel ingots to unaffiliated customers.  If so, state the total quantity and value of such sales and provide a

---

[2] Commerce references 19 U.S.C. § 1677b(f)(3) in its IDM.  *See* Final IDM at Appx0003297.  This appears to be a clerical error.  Whereas Section 1677b(f)(3) concerns whether a major input procured from an affiliate was obtained for "less than the cost of production," the substance of Commerce's analysis purports to compare Lucchini's affiliate transfer prices to market prices, consistent with the framework of Section 1677b(f)(2).  *See also* Petitioners' Case Br. at Appx0087352.

schedule which breaks down the totals by European standard.") (Appx0086196, Appx0086199-

0086200) ("Commerce 2SDQ"); Third Supplemental Section D Questionnaire at Q.2 (Dec. 16,

2022) (requesting "a market price for stainless steel ingots," as well as several specific revisions

to and clarifications of Lucchini's prior responses concerning [                ] ingot sales)

(Appx0086438) ("Commerce 3SDQ"); Post-Preliminary Request for FEB Ingot Market Price

Data (Jan. 31, 2023) (providing both Plaintiffs and Lucchini an opportunity to "submit new

factual information concerning the market price of stainless steel ingots") (Appx0002929).

Each time, Lucchini either ignored Commerce's request or claimed that it could not

locate such information.  *See* Lucchini DQR at Appx0082154-0082156; Lucchini's First

Supplemental Section D Questionnaire Response (Sept. 8, 2022) at Appx0084140,

Appx0084143-0084144, Exs. SD-7.a (Appx0084241-0084244), SD-8.b (Appx0084376-

0084379) ("Lucchini 1SDQR"); Lucchini's Second Supplemental Section D Questionnaire

Response (Nov. 18, 2022) at Appx0086228-0086229, Appx0086269, Ex. SD2-7.a

(Appx0086330-0086333) ("Lucchini 2SDQR"); Lucchini's Third Supplemental Section D

Questionnaire Response (Dec. 23, 2022) at Appx0086449-0086453, Ex. SD3-2.iv.a

(Appx0086481-0086492) ("Lucchini 3SDQR"); Lucchini's Post-Preliminary Response to

Request for FEB Ingot Market Price Data (Feb. 10, 2023) at Appx0087107-008711. At most,

Lucchini proffered a schedule of its affiliate's sales of [

] to unaffiliated customers.  *See* Lucchini 2SDQR at Ex. SD2-7.a (Appx0086330-

0086333).[3]  Despite Commerce's repeated inquiries, *see* Commerce 2SDQ at Q.8

(Appx0086196); Commerce 3SDQ at Q.2.a.iii (Appx0086438), Lucchini omitted meaningful

---

[3] [

] *See* Lucchini 2SDQR at Ex. SD2-7.a (Appx0086330-0086333).

grade information for a large proportion of the sales reported therein, *see* Lucchini 2SDQR at Appx00086228-0086229, Ex. SD2-7.a (Appx0086330-0086333) (relying on non-specific basket designations such as "carbon, alloy or stainless steel grades," rather than providing information concerning, *e.g.*, alloy contents and physical properties).

Lucchini's fifth foregone opportunity was a post-preliminary request for information issued after the expiration of Lucchini's various supplemental questionnaire response deadlines and after the December 30, 2022, regulatory deadline for "other" new factual information. *See* 19 C.F.R. § 351.301(c)(5). Petitioners were also permitted to respond to this final request. *See* Commerce Request for FEB Ingot Market Price Information (Jan. 31, 2023) (Appx0002929). Petitioners provided two datasets: [          ] purchases of FEB-grade stainless steel ingots. *See* Petitioners' Factual Information Concerning FEB Ingot Market Prices (Feb. 10, 2023) at Appx0086912, Ex. 4 (Appx0087087-0087103), and Eurostat average import unit values for stainless steel in ingot and other primary forms (HTS 7218.10.00), *id.* at Appx0086911, Exs. 2-3 (Appx0086989-0087086). Separately, Petitioners provided factual information concerning the capabilities of [          ], one of LRS's unaffiliated ingot customers. *See id.* at Appx0086911, Ex. 1-A (Appx0086918-0086942).

Commerce permitted the parties one opportunity to rebut "factual information <u>submitted</u> on the market price of stainless steel ingots" in response to Commerce's fifth request. Commerce Request for FEB Ingot Market Price Information (Jan. 31, 2023) (Appx0002929) (emphasis supplied). In response, Lucchini proffered what amounted to an untimely correction of its months-old ingot sales information, claiming for the first time that the FEB-grade stainless steel ingots <u>Lucchini</u> purchased from its affiliate were subject to [

]. *See* Lucchini's "Rebuttal" Factual Information Concerning FEB Ingot

NONCONFIDENTIAL VERSION

Market Prices (Feb. 17, 2023) at Appx0087249-0087254, Exs. 2-4 (Appx0087265-0087290).

Lucchini quantified its estimated [          ] but omitted to quantify the [



                                              ].  *See id.*  Nor did Lucchini definitively state

whether any ingots sold to non-affiliates were subject to similar [                              ].

*See id.* at Appx0087253 (stating only that [

                                     ]); *id.* at Appx0087251 (addressing [

                                                           ]).

Thereafter, Petitioners repeatedly requested that Commerce reject Lucchini's untimely attempt to

modify its prior reporting, in contravention of Commerce's regulations and reporting

instructions.  *See* Petitioners' Request to Reject Untimely Rebuttal (Feb. 23, 2023) at

Appx0087305-0087309; Petitioners' Case Br. at Appx0087355-0087358.  Commerce never

addressed Petitioners' requests, and Petitioners were never provided an opportunity to submit

information in response to Lucchini's belatedly disclosed logistical arrangements.  *See* Final

IDM at Appx0003297-0003301.

     For the first time in the administrative review, Commerce's Final IDM analyzed whether

Lucchini's affiliate-sourced FEB-grade stainless steel ingots were obtained for below-market

prices.  *Id.* at Appx0003297-0003301; *see also* Prelim IDM at Appx0002925-0002926

("Commerce intends to request additional information…and will not be making an adjustment

for these preliminary results").  Commerce reasoned that an ideal benchmark would be an Italian

market price for "the same or similar grade as those consumed in the production of subject

merchandise."  Final IDM at Appx0003299.  But no such benchmark existed on this

administrative record.  As Commerce recognized, the two Italian market prices on the record

were either for "a broad range of products which vary widely in terms of their physical

characteristics and likely prices," *id.* at Appx0003299 (concerning Eurostat data), or that "the record does not contain evidence of the ingot's chemical composition," *id.* at Appx0003300 (concerning [                    ] sales).  Only the third possible benchmark, [                    ] U.S. purchases, concerned "the specific stainless steel grade consumed {by Lucchini} in the production of subject merchandise."  *Id.* at Appx0003298.

Among these three options, Commerce ultimately utilized Lucchini's sales to [          ], considering it the best Italian market option.  *See id.* at Appx0003298-0003301.  Commerce declined to use [                ] product-specific sales data based only on the difference in market.  *See id.* at Appx0003298-0003299.  Commerce did not identify any factual information to support its implicit conclusion that Italian transactions involving an undefined <u>non</u>-FEB, non-stainless grade of steel were a more accurate benchmark for Lucchini's [

                            ] than [

          ].

Finally, Commerce adjusted the [                    ] sales prices downward, based on the untimely factual information Lucchini had proffered in "rebuttal" to Petitioners' Factual Information Concerning FEB Ingot Market Prices.  Commerce's adjustment, which was based broadly on "technical and logistical aspects of" Lucchini's FEB-grade ingot transactions, reduced the price differential from [                    ].  *See* Final IDM at Appx0003301; Final Cost Calculation Memorandum (Aug. 3, 2023) at Attachment II (Appx0087650).[4]  The minute product-specificity of Commerce's adjustment was a striking contrast to Commerce's lack of

---

[4] The unadjusted comparison was [                ] for [                    ] sales, versus [                ] for Lucchini's affiliated purchases.  The adjusted comparison was [          ] for [                ] sales, versus [                ] for Lucchini's affiliated purchases.  *See* Final Cost Calculation Memorandum at Attachment II (Appx0087650).

product specificity in selecting among the benchmark options.  Moreover, because Lucchini omitted to provide information concerning what it described as [                              ], Commerce's adjustment accounted solely for Lucchini's asserted [                    ].  Using the adjusted benchmark, Commerce made no adjustment to Lucchini's affiliated ingot transfer price.

## SUMMARY OF ARGUMENT

Given Lucchini's lack of home market FEB sales, Commerce was required to calculate a constructed normal value to determine Lucchini's dumping margin.  Available record evidence permitted Commerce to calculate a constructed normal value that accurately reflected the unique aspects of FEB production and sales, as well as the market value of major production inputs. However, the constructed normal value calculated by Commerce failed to utilize—and largely failed to consider—the essential parts of the record argued by petitioners.  Consequently, profit and SG&E expense amounts were distorted by Commerce's failure to limit its calculations to the best data sources, while Commerce relied upon the unadjusted prices Lucchini paid to its affiliated supplier to value its single most significant material input into FEB production.  The resulting dumping margin was inaccurate, contrary to law, and unsupported by substantial evidence.

First, regarding CV profit and SG&E expense data, Commerce purported to apply its well-established four-factor analysis in selecting among the seven potential data sources on the administrative record.  This test was endorsed by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") in *Mid Continent*, and weighs (1) product similarity, (2) home market sales, (3) contemporaneity with the POR, and (4) customer base similarity.  Only two sources on the record—Metalcam and OMR—satisfy all four criteria and were thus the best options available.  Every other option was deficient with respect to customer base similarity and/or product similarity, yet Commerce included two such sources—Cogne and Ciscato—in its

calculations. Commerce's inclusion of Cogne and Ciscato was unsupported by substantial evidence and contrary to Commerce's own regulations. (**Section II.A**)

To be clear, this is <u>not</u> a situation wherein Commerce found Cogne and Ciscato superior to Metalcam or OMR with respect to some factor, while finding Metalcam and OMR superior on other factors. With respect to product specificity, for example, Commerce recognized that Metalcam and OMR produced FEBs, and that the statute prefers profit and SG&E expense data sources that reflect "identical merchandise," *i.e.*, FEBs. Yet, without identifying any record evidence that Cogne or Ciscato produced or sold a single FEB during the relevant period, Commerce included their data as well, despite rejecting other data sources based on this defect alone. The arbitrary discrepancy in Commerce's treatment of materially identical sources requires remand. (**Section II.B.1**).

Indeed, Petitioners had specifically argued that the record lacked any evidence of FEB production by Cogne or Ciscato. For example, Petitioners pointed to [

]. Regarding Ciscato, its website indicated a heavy focus on "stampings," a type of non-forged product entirely dissimilar to FEBs, as well as shipbuilding products. Ciscato was subject to Commerce's antidumping duty order on carbon steel flanges, another dissimilar product, and the evidence Lucchini proffered included Ciscato shipments of "glass wool," which are not remotely similar. Commerce's *Final Results* failed to address any of this evidence—which further precludes any finding that Commerce supported the treatment of Cogne or Ciscato as the "best" sources of CV profit and SG&A expense data with substantial evidence. (**Section II.B.2**).

Ciscato was also inferior in terms of customer specificity, which Commerce did not analyze in its *Final Results*, despite the oil and gas industry being subject to unique market

*Confidential Information Removed*
*from Brackets*

trends of special importance in selecting among potential profit and SG&E expense sources. As Petitioners explained, there was no evidence that Ciscato sold forgings of any sort to oil & gas industry customers. Indeed, Ciscato's uniquely diverse non-forged product line was coupled with a sales focus "mainly {on} steel, mining and power generation, naval and earthmoving plants." This was a marked contrast to the specific record evidence establishing Metalcam's [                    ] sales of FEBs to oil and gas customers. Commerce's failure to even address this before treating Ciscato's data as if it were among the best sources requires remand. (**Section II.B.3**).

Furthermore, Commerce's regulations require that non-English documents be fully translated, but Lucchini proffered only a partially translated version of Ciscato's financial documents. The incomplete translation rendered it impossible to discern what proportion of Ciscato's sales concerned forged products and what proportion concerned stampings, which is crucial to assessing the similarity (or dissimilarity) of Ciscato's product and customer bases. Although Petitioners brought this to Commerce's attention, and Federal Circuit has affirmed Commerce's rejection of documentation on this basis, Commerce failed to acknowledge or address this issue in its *Final Results*. (**Section II.B.4**).

Second, regarding Commerce's flawed application of the transactions disregarded rule, Lucchini purchased [        ] its FEB-grade stainless steel ingots from an affiliate. These account for [      ]% of the cost of FEB production. In determining whether to disregard these affiliated transactions, 19 U.S.C. § 1677b(f)(2) instructs Commerce to assess whether the transfer prices "fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." Commerce undertook to do so by comparing Lucchini's transfer price to a benchmark market price. This process was greatly impeded by Lucchini's repeated

refusals to provide <u>any</u> usable benchmark, despite being given five opportunities to do so. Ultimately, it fell to Petitioners to fill this gap. Commerce's selection among and modification of the options on the record were legally and factually erroneous.

Three possible benchmarks were available on the administrative record: domestic purchases of the exact same product in the United States, transactions between [

] for a non-FEB-grade, non-stainless ingot of unknown specifications, and Italian imports of ingot, billet, and other primary forms of various stainless steel grades. Commerce structured its analysis by first categorically excluding all non-Italian sales. But FEB-grade ingots are a recognized commodity that Lucchini's affiliate could have sold in the United States. As the Court of International Trade recently reaffirmed in *Best Mattresses* and *PT Zinus*, Commerce's rigid interpretation of the statute as necessarily requiring Italian prices is erroneous. (**Section III.A.1**).

Contrary to Commerce's approach, the statute cannot reasonably be read as making any Italian price for <u>any</u> product necessarily superior to an exact product match from a non-Italian source. The statute's plain language expresses a preference that the benchmark price be for the "merchandise under consideration." Here, <u>only</u> the <u>non</u>-Italian price was an exact product match (and it was exclusive of all transportation-related expenses). Commerce's benchmark selection falls short of the substantial evidence standard for failing to weigh the relative merits of an Italy-specific benchmark for a different product against the relative merits of a non-Italian, product-specific price. Indeed, whereas Petitioners provided evidence that grade-related price variation can be as high as $3,500/MT even among stainless steel grades, Commerce identified no record evidence of relevant price variations between the U.S. and Italian markets within a given grade.

Commerce's failure to consider relevant arguments and record evidence renders its conclusion unsupported by substantial evidence. (**Section III.A.2**).

Even if Commerce's selection of a non-FEB, non-stainless steel benchmark data source were sustained, its modification of that benchmark value is contrary to law and unsupported by substantial evidence. Commerce reduced the non-FEB, non-stainless steel benchmark price to account for theoretical cost savings associated with logistical arrangements that were calculated [                                                    ]. But the information upon which Commerce relied was untimely, and Commerce acted inconsistent with its regulations in accepting Lucchini's information without ever addressing Petitioners' objections. Specifically, after Petitioners provided information concerning U.S. purchases of FEB-grade ingot; the capabilities of [        ], an unaffiliated Lucchini customer; and Eurostat data for Italian imports of ingot, billet, and other primary forms of various stainless steel grades, Lucchini was afforded an opportunity to rebut, clarify, or correct this information. Instead, Lucchini's "rebuttal" submission disclosed—for the first time—supposedly unique logistical arrangements between Lucchini and its affiliate. This had nothing to do with the information submitted by Petitioners. Lucchini's information should have been submitted in response to Commerce's pre-preliminary supplemental questionnaires, which directly inquired about logistical arrangements related to Lucchini's ingot purchases. Commerce's acceptance of Lucchini's information in violation of its regulations, without ever addressing Petitioners' repeated objections or even allowing Petitioners an opportunity to rebut Lucchini's newly disclosed logistical arrangements, was prejudicial and contrary to law. (**Section III.B.1**).

Even if the untimely factual information were accepted, the adjustment itself (which appeared for the first time in Commerce's *Final Results*) is distortive and unreasonable.

Whereas Lucchini acknowledged that the alleged [                    ] associated with its logistical

arrangements were [                                              ], Commerce gave

Lucchini the benefit of the former without even attempting to account for the latter.  That the

lateness of Lucchini's post-preliminary disclosure of these logistical arrangements limited the

time in which Commerce could pursue supplemental questionnaires underscores the prejudice of

Commerce accepting Lucchini's submission.  Moreover, Commerce's efforts to transform an

unknown non-FEB, non-stainless benchmark price based on [

                    ] underscores the incoherence of Commerce's selection among

the benchmark price options.  Commerce's one-sided adjustment was unsupported by substantial

evidence.  (**Section III.B.2**).

   Given these defects, Commerce's *Final Results* should be remanded with instructions to

revise its CV profit calculation and transactions disregarded analysis.

## ARGUMENT

### I.   Standard of Review

   This Court will "hold unlawful any determination, finding, or conclusion found…to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B).

   To determine whether Commerce's interpretation of a statue is "in accordance with law,"

the court applies the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources

Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  First, a reviewing court must examine

"whether Congress has directly spoken to the precise question at issue."  *Id.* at 842.  "If the intent

of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguous expressed intent of Congress." *Id*. at 842-43.  To discern

Congressional intent, the court must exhaust "all the traditional tools of construction," *Kisor v.*

*Wilkie*, 139 S. Ct. 2400, 2415 (2019), including the "authoritative" Statement of Administrative

Action, *see* 19 U.S.C. § 3512(d).  If "the statute is silent or ambiguous with respect to the

specific issue, the question for the court is whether the agency's answer is based on a permissible

construction of the statute." *Chevron*, 467 U.S. at 843.  However, "genuine ambiguity" is

required before the Court may reach this second step.  *Kisor*, 139 S. Ct. at 2415.

Next, the Court's substantial evidence review examines whether the record contains

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "more than

a scintilla" and "must into account whatever in the record fairly detracts from its weight." *Id*. at

477, 488.  The substantial evidence standard also requires Commerce to "articulate a satisfactory

explanation for its action, including a rational connection between the facts found and the choice

made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S.

29, 43, (1983).  Substantial evidence review essentially requires the Court to determine whether

the evidence and reasonable, evidence-based inferences support Commerce's findings.  *See*

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

In addition, Commerce's determination "must include 'an explanation of the basis for its

determination that addresses relevant arguments{} made by interested parties who are parties to

the investigation or review.'" *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1320 (Fed. Cir.

2009) (quoting 19 U.S.C. § 1677f(i)(3)(A)).  Where "the agency has not considered all relevant

factors, or if the reviewing court simply cannot evaluate the challenged agency action on the

basis of the record before it, the proper course, except in rare circumstances, is to remand to the

agency for additional investigation and explanation." *Fla. Power & Light Co. v. Lorion*, 470

U.S. 729, 744 (1985).

**II. Commerce's Inclusion of Inferior Data from Cogne and Ciscato in its Calculation of CV Profit and SG&A Expenses Is Unsupported by Substantial Evidence and Contrary to Law**

Despite the availability of CV profit and SG&A expense data from two Italian producers of identical merchandise, OMR and Metalcam, Commerce included data from two non-FEB producers, Cogne and Ciscato, in its calculation. This is not a "reasonable methodology" that would mimic the preferred method of selecting a domestic producer of identical merchandise as closely as possible, because rather than basing its calculation solely upon the "best" source(s) for CV profit and SG&A expense data, Commerce diluted superior data with inferior data. (**Section II.A**) For several reasons—any one of which is independently sufficient to require remand—Commerce's CV Profit and SG&A expense calculation cannot be sustained.

Whereas Commerce acknowledged its practice of favoring data from producers of identical merchandise and properly rejected FOMEC and OFAR as producers of merely comparable merchandise, it nevertheless accepted Cogne and Ciscato—despite the absence of substantial record evidence that either produced identical merchandise over a relevant period. Final IDM at 15 & nn.98, 100 (Appx0003293). This unexplained inconsistency in Commerce's identification of the best data sources implicates the principle that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States,* 263 F.3d 1369, 1382 (Fed. Cir. 2001). (**Section II.B.1**). Commerce furthermore ignored Petitioners' arguments and record evidence demonstrating the dissimilarity of Cogne's and Ciscato's product offerings to those of Lucchini (**Section II.B.2**), that oil & gas forgings were not a substantial proportion of Ciscato's sales (**Section II.B.3**), and that Ciscato's financial statements were not completely translated, in contravention of Commerce's clear regulatory requirements (**Section II.B.4**). The Court cannot sustain Commerce's determination where, as here, "Commerce failed to consider record evidence which supports an alternative

19

conclusion." *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1360–61 (Ct.

Int'l Trade 2019).

**A.    Commerce Purported to Apply Its Standard Test and Practice in Evaluating Available Data for its CV Profit and SG&A Expense Calculations, But Commerce's Conclusion Contradicted the Statutory Preference for Producers of FEBs**

Because Lucchini lacked viable sales of the foreign like product in its home market or a

viable third country market, Commerce used CV as normal value in calculating Lucchini's

antidumping margin. *See* 19 U.S.C. § 1677b(e); Prelim IDM at Appx0002926. To calculate CV,

Commerce combines material and production expenses with SG&A expenses, as well as profit.

*See* 19 U.S.C. § 1677b(e). The statute prescribes several methodologies for determining

amounts for SG&A expenses and profit. The "statutorily preferred method" is to use actual

amounts derived from sales of the foreign like product in the home market by the respondent in

question. *Thai I-Mei Frozen Foods Co. v. United States*, 616 F.3d 1300, 1307 (Fed. Cir. 2010)

(endorsing description of 19 U.S.C. § 1677b(e)(2)(A)). Where, as here, data necessary for the

preferred method are not available, the statute provides three alternative methodologies. *See* 19

U.S.C. § 1677b(e)(2)(B)(i)-(iii); Prelim IDM at Appx0002926. Although the statute "does not

provide a hierarchy for selecting among the{m}," *Hyundai Steel Co. v. United States*, 2023 WL

8715719, at *6 (Ct. Int'l Trade Dec. 18, 2023), the overarching "objective is to find a good proxy

(or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales

price for the particular merchandise," *Mid Continent Steel & Wire, Inc. v. United States*, 941

F.3d 530, 542 (Fed. Cir. 2019).

Commerce utilized the third of these alternative methodologies ("Option (iii)"): "the

amounts incurred and realized for selling, general, and administrative expenses, and for profits,

based on any other reasonable method..." 19 U.S.C. § 1677b(e)(2)(B)(iii); Prelim IDM at

Appx0002926.  Plaintiffs accept Commerce's reliance on Option (iii), but challenge Commerce's unreasonable inclusion of inferior data from among the available sources of SG&A expense and profit information, in contravention of Commerce's "primary objectives" of "accuracy and fairness," *Mid Continent*, 941 F.3d at 542.  Simply put, Commerce did not select only the "best" CV profit and SG&A expense data sources on the record.  *See, e.g.*, *Seah Steel Corp. v. United States*, 513 F. Supp. 3d 1367, 1397 (Ct. Int'l Trade 2021) (sustaining Commerce's rejection of nine other CV profit and SG&A expense data sources where "Commerce explained that SeAH's *OCTG I* data were the most accurate because they were the only data available from a Korean producer of sales of OCTG and, with Commerce's exclusion of the dumped sales, they reflected sales made in the ordinary course of trade.").

Consistent with its usual practice when calculating SG&A expense and profit amounts under Option (iii), Commerce purported to evaluate the available sources by reference to the following four factors, which the Federal Circuit endorsed in *Mid Continent*:

> (1) the similarity of the surrogate company's business and products to the respondent's business and products;
>
> (2) the extent to which the surrogate company's sales reflect sales in the respondent's home market;
>
> (3) the contemporaneity of the data; and
>
> (4) the similarity of the surrogate company's customer base to the respondent's customer base.

*Mid Continent*, 941 F.3d at 542–43; *see also* Prelim IDM at Appx0002926-0002927.  These factors reflect Commerce's intent to "look{} to a methodology that mimics the preferred method" under Section 1677b(e)(2)(A).  *Thai I-Mei*, 616 F.3d at 1307; *see also* Final IDM at Appx0003291 ("The specific language of both the preferred and alternative methods show a

preference that the profit and selling expenses reflect: (1) production and sales in the foreign

country; and (2) the foreign like product, *i.e.*, the merchandise under consideration.").

The parties offered seven potential data sources: OMR, Metalcam, Cogne, Ciscato,

FOMEC, OFAR, and Asoforge. *See* Domestic Industry's CV Profit Submission (Sept. 23, 2022)

(Appx0085699-0086091); Lucchini's CV Profit Submission (Sept. 23, 2022) (Appx0001904-

0002496). Commerce rejected data from FOMEC and OFAR, finding "no record evidence to

indicate that {these} compan{ies} produce{} identical merchandise" to FEBs, Final IDM at

Appx0003293; and Commerce rejected data from Asoforge "because record information

indicated that it produced stainless steel bars and ingots which were more akin to the input used

to produce subject merchandise," *id.* at Appx0003292. Commerce found the remaining four

sources (OMR, Metalcam, Cogne, and Ciscato) acceptable, and determined to derive CV profit

and SG&A expenses from a simple average of their data. *See* Final Cost Calculation Memo at

Attachment I (Appx0087649).

Commerce's decisions to reject data from Asoforge, FOMEC, and OFAR and to include

data from OMR and Metalcam were lawful and supported by substantial evidence. However,

Commerce's inclusion of data from Cogne and Ciscato was inconsistent with its treatment of

FOMEC and OFAR, as well as unsupported by substantial evidence given Commerce's failure to

engage with Petitioners' evidence-based critiques and its acceptance of only partially translated

financial statements for Ciscato. Properly applied, the four-factor analysis cited by Commerce

demonstrates that Cogne and Ciscato were not superior to OMR or Metalcam as concerns any

factor. By contrast, OMR and Metalcam were superior to Ciscato on two factors and superior to

Cogne on one factor. As detailed below, Commerce's *Final Results* should be remanded with

instructions to eliminate these inferior and distortive data sources from its CV profit and SG&A expense calculation.

**B.    Framed in Terms of Commerce's Four Factors, OMR's and Metalcam's Product Offerings and Customer Base Make Them Superior to Cogne and Ciscato**

This Court has evaluated Commerce's selection among CV profit and SG&A expense data sources by reviewing the "evidence for {Commerce's} factual determinations under the four criteria" to determine the "best" source(s). *See Mid Continent Steel & Wire v. United States*, 519 F. Supp. 3d 1349, 1358-61 (Ct. Int'l Trade 2021); *see also, e.g.*, *Hyundai Steel Co. v. United States*, 2023 WL 8715719 at *7 (Ct. Int'l Trade Dec. 18, 2023) ("the Court concludes that Commerce's determination that SeAH's third-country profit and selling expenses was the <u>best information available</u> is reasonable…. It appears from the record…that Commerce examined all potential sources of constructed profit and selected the source that <u>best reflected</u> the statutory preferences.") (emphasis supplied); *Husteel Co. v. United States Steel Corp.*, 180 F. Supp. 3d 1330, 1344 (Ct. Int'l Trade 2016), *aff'd*, 710 F. App'x 890 (Fed. Cir. 2018) ("Commerce utilized Tenaris and TMK based on its determination that their data represented <u>the best available CV Profit data</u> because as producers of predominantly OCTG, their business operations and products were most similar to those of NEXTEEL and HYSCO."); *Allied Pac. Food (Dalian) Co. v. United States*, 435 F. Supp. 2d 1295, 1314 (Ct. Int'l Trade 2006) ("Commerce rejected the {CV profit} data sets placed on the record…, justifying the rejection on the grounds that the data sets did not meet one or more of the criteria that Commerce identified. When the data sets are compared according to the record evidence, however, the Nekkanti financial statement data {that Commerce used} appear to be the least satisfactory {option} under the Department's own criteria."). Here, as an initial matter, Commerce did not find that the second (proportion of home market sales) or third (contemporaneity) factor favors any of the four data sources more than any

23

of the others. *See* Prelim IDM at Appx0002927 (describing all relevant data sources as "contemporaneous" and "predominantly reflect{ing} sales (and thus profits) in the Italian market"), *unchanged in* Final IDM at Appx0003290-0003293. Thus, no material distinction exists among OMR, Metalcam, Cogne, and Ciscato with respect to the second and third factors.

However, as detailed below, the first factor (product specificity) favors OMR and Metalcam over Cogne and Ciscato (**Sections II.B.1-2**), and the fourth factor (customer specificity) likewise favors OMR and Metalcam over Ciscato (**Section II.B.3**). Ciscato's financial documentation was, furthermore, not fully translated (**Section II.B.4**). Given the deficiencies affecting Cogne and Ciscato, Commerce's inclusion of data from those two sources unreasonably dilutes relatively more meritorious data from OMR and Metalcam. "More is better" is not a reasonable framework for selecting the "best" source(s). Here, Commerce distorted superior data by needlessly including inferior data.

1. *Commerce's Application of the Product Specificity Factor was Arbitrary and Contravened its Stated Preference for Producers of Identical Merchandise*

As Commerce acknowledged in its *Final Results* and elsewhere, "{t}he specific language of both the preferred and alternative methods show a preference that the profit and selling expenses reflect…the foreign like product, *i.e.*, the merchandise under consideration." Final IDM at Appx0003291; *see also Certain Oil Country Tubular Goods from Saudi Arabia*, 79 Fed. Reg. 41,986 (July 18, 2014) (LTFV Final), IDM Comment 4. Thus, "Commerce has a practice of selecting the financial statements of companies involved in the production and sale of identical merchandise over the financial statements of companies which are involved in the production and sale of comparable merchandise solely." Final IDM at Appx0003292. For example, in a case involving steel nails from Oman, "Commerce determined that the ideal surrogate would be an Omani producer of steel nails." *Mid Continent*, 941 F.3d at 543. Here, "{t}he products

covered by this Order are fluid end blocks" of specified dimensions, tensile strength, and hardness that are "typically used in the manufacture or service of hydraulic pumps," Final IDM at Appx0003280-0003281; thus, the ideal surrogate would be an Italian producer of FEBs.

Commerce correctly recognized that the record of this administrative review contained data for two such producers—OMR and Metalcam.  Final IDM at Appx0003292 ("Metalcam was identified as a producer of fluid end blocks in Commerce's respondent selection memorandum."); Prelim IDM at Appx0002927 (describing OMR as an "Italian producer{} of comparable merchandise (including fluid end blocks…"), *unchanged in* Final IDM at Appx0003292; *see also* Petitioners' Pre-Preliminary Comments at Appx0086584-0086589; Petitioners' Rebuttal Br. at Appx0087420-0087423 (each detailing how OMR's [

]).  However, Commerce deviated from its stated practice by including the financial statements of Cogne and Ciscato, despite failing to identify record evidence that either company produced FEBs during the period covered by their financial statements.

Indeed, Commerce stopped short of stating that either produced <u>FEBs</u>, characterizing Cogne as "a forging company which produces <u>blocks for tools</u>" and Ciscato as "a forging company which produces <u>blocks</u>."  Final IDM at Appx0003293 (citing Petitioners' CV Profit Submission at Ex. 3-C (Appx0086085-0086089); Lucchini's CV Profit Submission at Ex. 7 (Appx0002412-0002428)).  Indeed, immediately after <u>including</u> data for Cogne and Ciscato, Commerce explained that it was <u>rejecting</u> data from OFAR and Fomec because "while record evidence indicates that they are producers of comparable merchandise, there is no record evidence to indicate that either company produces identical merchandise."  Final IDM at Appx0003293 (citing Lucchini's CV Profit Submission at Ex. 7 (Appx0002412-0002428)).  Yet,

the "blocks" produced by Cogne and Ciscato were merely "comparable" merchandise, just like

the products made by OFAR and Fomec.  Commerce's embrace of Cogne and Ciscato based on

generalized "block" production contravenes its stated preference for "identical merchandise" and

was inconsistent with its rejection of OFAR and Fomec.  "{A}gency action is arbitrary when the

agency offers insufficient reasons for treating similar situations differently," *SKF USA*, 263 F.3d

at 1382, and remand is required for Commerce to rectify its inconsistency here.  *See Geum*

*Poong Corp. v. United States*, 163 F. Supp. 3d 669, 679 (Ct. Int'l Trade 2001) (remanding

selection among CV profit sources to address internal inconsistency).

      2.    *Commerce Failed to Address Petitioners' Record-Based Arguments*
            *Demonstrating that the Product Specificity Factor Favors OMR and Metalcam*
            *Over Cogne and Ciscato*

Commerce failed to engage with the substance of Petitioners' arguments concerning

Cogne's and Ciscato's lack of FEB production.  Concerning Cogne, Petitioners explained that

the evidence of FEB production in 2018 on which Commerce had relied in the original

antidumping investigation was absent from the record of the first administrative review and did

not concern 2021.  *See* Petitioners' Case Br. at Appx0087345 (discussing *Forged Steel Fluid End*

*Blocks From Italy: Preliminary Affirmative Determination of Sales at Less Than Fair Value,*

*Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg.

44,500 (July 23, 2020), and accompanying Preliminary IDM at 17 n.74, *unchanged in final*, 85

Fed. Reg. 79,996 (Dec. 11, 2020)).  Petitioners further pointed to [




].  None of this is

addressed in Commerce's *Final Results*, nor does the Exhibit on which Commerce's *Final*

*Results* relies contain any evidence that Cogne produced or sold FEBs in 2021. *See* Petitioners'
CV Profit Submission at Ex. 3-C (Appx0086085-0086089) (containing manufacturer approval
certificate for stainless steel bars and excerpt from Cogne's website which mentions blocks for
tools, but not FEBs); Final IDM at 15 n.98 (Appx0003293).

The defects affecting Ciscato were equally extensive. As with Cogne, the exhibit on
which Commerce relied contains <u>no</u> evidence that Ciscato produced or sold FEBs in 2021. *See*
Lucchini's CV Profit Submission at Ex. 7 (Appx0002412-0002428) (Ciscato website excerpt
indicating shipbuilding manufacturer certifications, and production of, *e.g.*, blocks, shafts,
valves, and tubes, but not FEBs); Final IDM at 15 n.100 (Appx0003293). Petitioners explained,
moreover, that Ciscato was an otherwise inferior source of CV profit data given its production of
"stampings" and its focus on products "intended mainly for steel, mining and power generation,
naval and earthmoving plants," rather than hydraulic pumps used in the oil and gas industry.
Petitioners' Case Br. at Appx0087347 (discussing Lucchini's CV Profit Submission at Ex. CV-3
at Appx0002057 and Mgmt. Rpt. at Appx0002088). Petitioners furthermore identified evidence
from Ciscato's website of non-forged and otherwise dissimilar products, such as stamped
separators, stamped bowl bodies, stamped bowl lanterns, gears, flanges, pistons, wicket gates,
valves, wheels, rods, and 20-ton "big discs." Petitioners' Case Br. at Appx0087347 (discussing
Petitioners' CV Profit Rebuttal Submission at Exs. 2-A, 2-B (Appx0002512-0002524)).

Indeed, as Petitioners observed, Ciscato was subject to Commerce's antidumping duty
order on carbon steel flanges from Italy, Petitioners' Case Br. at Appx0087348 (discussing
Petitioners' CV Profit Rebuttal Submission at Ex. 2-C (Appx0002525-0002527)), and had
obtained shipbuilding product certifications in Japan, the Netherlands, and Korea, Petitioners'
Case Br. at Appx0087348 (discussing Petitioners' CV Profit Rebuttal Submission at Ex. 2-D

(Appx0002528-0002534)).  Even Lucchini's information concerning Ciscato's alleged

"shipments to the United States" reflected sales under HTS 7019.19, which covers "glass fibers"

such as "glass wool."  Petitioners' Case Br. at Appx0087348 (discussing Lucchini's CV Profit

Submission at Ex. CV-2 (Appx0002036-0002042); Petitioners' CV Profit Rebuttal Submission

at Ex. 2-F (Appx0002539-0002558)).  In short, whereas Commerce identified <u>no</u> evidence of

FEB production by Ciscato, Petitioners pointed to substantial record evidence of product

differences, none of which Commerce addressed.  As the Supreme Court has held, where "the

agency has not considered all relevant factors…the proper course, except in rare circumstances,

is to remand to the agency for additional investigation and explanation."  *Fla. Power & Light*,

470 U.S. at 744.  Commerce's *Final Results* should, therefore, be remanded.

       3.    *The Customer Specificity Factor Favors OMR and Metalcam Over Ciscato*

The customer base for FEBs are original equipment manufacturers ("OEMs") operating

within the oil and gas industry.  *See, e.g.*, Lucchini AQR at Appx0080065 (LMA "made all

{sales of FEBs} directly to unaffiliated end-users (OEMs)"); Lucchini's Response to the

Supplemental A/C Questionnaire (July 27, 2022) at Ex. SUPPAC-2 ([

      ]) (Appx0082601-0082604); *id.* at Ex. SUPPAC-3

([          ]) (Appx0082722-

0082724).  Industry-specific market trends affect the profit potential at all levels of the oil and

gas supply chain.  While all open-die forgings are not equal from a commercial standpoint, the

administrative record does not even indicate that Ciscato sold forgings to customers within the

oil and gas industry.  To the contrary, as described above, Ciscato is unique among the sources at

issue in that it produces a variety of products, many of which are not even forged.  Nothing in the

record demonstrates that sales of forged products to the oil and gas industry represent a

meaningful proportion of Ciscato's 2021 turnover.  Rather, Ciscato describes its operations as

"in the field of forging, rolling and stamping of special steels and superalloys, with the production of parts intended mainly for steel, mining and power generation, naval and earthmoving plants."  *See* Lucchini's CV Profit Submission at Ex. CV-3 at Appx0002088; *see also id.* at Ex. CV-7 at Appx0002413 (describing Ciscato's "activity to include the sectors of construction, foodstuffs, petrochemicals, heavy machinery, earth-moving equipment, transport and defence," but not oil and gas).

By contrast, ample record evidence demonstrated that Metalcam [                    ] had sales of FEBs to oil and gas industry customers.  *See, e.g.*, Petitioners' CV Profit Submission at Ex. 2-B at Appx0085865 (indicating that the oil and gas sector is the "main outlet market" for Metalcam and its affiliates); *see also id.* at Appx0085808 (describing Metalcam as catering "above all" to Oil and Gas sector companies); *id.* at Appx0085876 (describing Metalcam as exposed to "risk of sector concentration and customer concentration in the Oil & Gas sector"); Respondent Selection Memorandum (Mar. 23, 2022) at Appx0080009 (identifying Metalcam as an FEB producer).  Indeed, [

].

Although these deficiencies supply an alternative basis for Commerce to exclude Ciscato's financial data from the final CV profit calculations, Commerce's *Final Results* never addressed the customer specificity factor—much less Ciscato's shortcomings relative to competing datasets. *See* Final IDM at Appx0003292-0003293; Final Cost Calculation Memorandum at Appx0087646. For failure to address a significant argument against the use of Ciscato's data, Commerce's inclusion of Ciscato is unsupported by substantial evidence. *See, e.g.*, *NMB Sing.*, 557 F.3d at 1320 (Commerce "must include 'an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review.'") (quoting 19 U.S.C. § 1677f(i)(3)(A)); *NTSF Seafoods Joint Stock Co. v. United States*, 2022 WL 1375140, at *22 (Ct. Int'l Trade Apr. 25, 2022) ("Not addressing the conflicting evidence on the record fails the substantial evidence test because it does not consider record evidence contrary to Commerce's determination.") (quoting *New Am. Keg v. United States*, 2021 WL 1206153, at *13 (Ct. Int'l Trade Mar. 23, 2021)); Petitioners' Case Br. at Appx0087349-0087350 (raising argument). Commerce's *Final Results* should be remanded to address this shortcoming.

4. *Without Explanation, Commerce Relied on Partially Translated Financial Statements from Ciscato*

Commerce failed to engage with Petitioners' argument that Ciscato's financial statement was insufficiently translated. *See* Petitioners' Case Br. at Appx0087348. Specifically, it was not possible to determine what proportion of Ciscato's sales are attributable to stampings and other non-forged products that are not remotely similar to FEBs. Ciscato's breakdown of product revenues is divided among "Fucinati" (in Italian), "Printed" (seemingly in English, but of unclear meaning), and "More" (seemingly in English, but again of unclear meaning). *See* Lucchini CV Profit Submission at Ex. CV-3 at Appx0002077. As Petitioners explained, this defect provided

30

further grounds for Commerce to reject Ciscato's data in favor of other, more reliable information available on the record.

Commerce's regulations require non-English documents be "accompanied by an English translation of the entire document" unless that requirement is specifically waived. 19 C.F.R. § 351.303(e). Lucchini obtained no such waiver, and Commerce has rejected possible CV profit and SG&A expense data for incomplete translations in the past. *See, e.g.*, *Mid Continent*, 941 F.3d at 540-42 (affirming rejection on this basis, given that the "absence of complete translations precludes the Department from fully evaluating the appropriateness of the financial information set forth."); *see also, e.g.*, *Dongkuk S&C Co. v. United States*, 600 F. Supp. 3d 1331, 1339 (Ct. Int'l Trade 2022) ("Commerce generally relies on financial statements which have completed and fully translated audited financial statements and accompanying notes on the record."). Here, however, Commerce broke with that practice.

"When an agency changes its practice, it is obligated to provide an adequate explanation for the change." *SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983)). But because Commerce's *Final Results* ignored Petitioners' critique, Commerce failed to provide any explanation for accepting incompletely translated financial statements. *See* Final IDM at Appx0003292-0003293. Commerce's unexplained departure from its regulations and practice necessitates remand. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001), *aff'd*, 332 F.3d 1370 (Fed. Cir. 2003).

## III. Commerce Misapplied the Statute and Failed to Identify Substantial Evidence for its Market Price Benchmark of FEB-Grade Stainless Steel Ingots

FEB-grade stainless steel ingots comprise [                  ] Lucchini's total FEB

production expenses.  *See* Lucchini DQR at Appx0082153.  Lucchini obtained [    ] such ingots

from affiliated parties.  *See id.* at Appx0082155.  The antidumping statute specifically authorizes

Commerce to disregard the transfer price if it "does not fairly reflect the amount usually reflected

in sales of merchandise under consideration in the market under consideration."  19 U.S.C. §

1677b(f)(2).  To conduct this analysis, Commerce requires a market price benchmark against

which to compare the affiliate transfer price.  Here, Commerce provided Lucchini five separate

chances to provide such a benchmark, but Lucchini failed to do so.  Then, after Petitioners

submitted market price benchmarks, Lucchini manufactured a sixth opportunity to disclose new

information unrelated to Petitioners' submission in "rebuttal."  Without explanation and without

even acknowledging Petitioners' protests, Commerce rejected the only product-specific

benchmark on the record, accepted Lucchini's untimely new information, and used it to

manufacture a new benchmark price that yielded a 0.00% adjustment.  Commerce's errors of law

in considering only Italian market prices (**Section III.A.1**), its failure to rationally explain its

choice among the benchmark prices on the record (**Section III.A.2**), its arbitrary administration

of deadlines for factual information (**Section III.B.1**), and its application of a [         ]

adjustment without accounting for [                  ] (**Section III.B.2**), each

necessitate remand for Commerce to correct its calculations.

### A. Commerce's Analytical Framework for Rejecting the Only Product-Specific Benchmark on the Record Was Legally Erroneous, and Commerce's Failure to Assess the Relative Importance of Product Specificity Renders its Analysis Unsupported by Substantial Evidence

Where, as here, a respondent has purchased inputs from its affiliate, the statue instructs

Commerce to consider whether the transfer price "fairly reflect{s} the amount usually reflected

in sales of merchandise under consideration in the market under consideration."  19 U.S.C. §

1677b(f)(2).  Transfer prices failing this test are deemed outside the ordinary course of trade

under 19 U.S.C. § 1677(15)(B) "because of the unreliability of certain cost elements."  S. Rep.

103-412 at 61 (1994).  Thus, Commerce is "allow{ed} to disregard certain transactions between

affiliated companies and to value costs in the transaction based on fair market value…." *Viraj*

*Grp. v. United States*, 476 F.3d 1349, 1356–57 (Fed. Cir. 2007).  Commerce has the "legal

authority to use the highest of transfer price, cost of production, or market value to value the"

FEB-grade ingots that Lucchini purchased from its affiliate. *Mannesmannrohren-Werke AG v.*

*United States*, 77 F. Supp. 2d 1302, 1307 (Ct. Int'l Trade 1999).

> Commerce's practice in applying this rule is, in relevant part, as follows:

> First, it looks at whether respondent purchased the input from an unaffiliated
> supplier; if unavailable, it looks to sales of the input between an affiliate supplier
> and an unaffiliated party, and as a final resort, to a reasonable source for market
> value available on the record.

*Best Mattresses Int'l Co. Ltd. v. United States*, 622 F. Supp. 3d 1347, 1383 (Ct. Int'l Trade 2023)

(quoting *Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1359, 1372 (Ct. Int'l Trade

2019)) (emphasis supplied); *PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252,

1282 (Ct. Int'l Trade 2023) ("Commerce looks to any purchases of the same inputs or services

by the respondent from an unaffiliated supplier and any sales by the supplier of the same inputs

or services to an unaffiliated buyer") (emphasis supplied); *see also* Final IDM at 21 n.121

(Appx0003299) (quoting *Best Mattresses*).  Notably, the first two steps expressly target the

specific product, but do not express any preference for a particular market. *See Best Mattresses*,

622 F. Supp. 3d at 1383.  Indeed, the affiliated supplier and/or unaffiliated purchaser may be

located in another country. *See id*. (concerning one such situation); *PT. Zinus*, 628 F. Supp. 3d at

1282 (same).  Here, given the absence of data for the first or second option (*i.e.*, purchases of the

33

input from an unrelated supplier or sales of the input by the affiliate to an unrelated buyer),

Commerce relied upon the "final resort," selecting among (1) [          ] U.S. purchases of

the exact same FEB grade stainless steel ingot; (2) sales of a non-FEB grade, non-stainless ingot

to [      ] by Lucchini's affiliate; and (3) Eurostat data for imports of stainless steel billet and

ingot.  *See* Final IDM at Appx0003298.

      Commerce rejected Option 1—the only product-specific benchmark on the record—in

favor of Option 2, a market-specific benchmark for a different product.  *See* Final IDM at

Appx0003298-0003301. Commerce purported to "analyze{} each of the sources {for market

price} to ascertain which source best represents the market price of stainless steel ingots in the

market under consideration during the POR."  *Id.* at Appx0003298.  Commerce began by

"determin{ing} the most appropriate market under consideration" to be Italy; *id.* at

Appx0003298-0003299; eliminated Option 1 on this basis without further discussion, *see id.* at

Appx0003299, and preferred Option 2 over Option 3 because it reflected products closer to (yet

different from) those purchased by Lucchini, *see id.* at Appx0003299-0003300.

1.    *The Authorities on which Commerce Relied Do Not Support Commerce's Rigid Analysis; the Exclusion of [          ] U.S. Purchase Data Without Further Analysis Was Legally Erroneous*

      Commerce's overarching framework was erroneous and prevented it from grappling with

the merits of Option 1's precise product-specificity (*i.e.*, the <u>identical</u> input), as compared to the

merits of Option 2's market-specificity.  As an initial matter, Commerce invoked 19 U.S.C. §

1677b(f)(1)(A) as support, quoting its general preference for "the records of the {respondent}, if

such records are kept in accordance with {home market GAAP} and reasonably reflect the costs

associated with the production and sale of the merchandise."  Final IDM at Appx0003299.  But

as this Court has held, if either precondition (GAAP compliance or reasonably reflecting costs) is

not satisfied, then the general preference no longer applies.  *See LG Chem, Ltd. v. United States*,

534 F. Supp. 3d 1386, 1397 (Ct. Int'l Trade 2021) ("Once Commerce concludes that a producer's records do not satisfy one of these conditions…the statute relieves it of any further obligation to use those records in adjusting costs."). Indeed, 19 U.S.C. § 1677b(f)(2) constitutes an example of when a respondent's costs do not "reasonably reflect the costs associated with the production…of the merchandise," so it was illogical of Commerce to cite the "rule" to narrow the "exception." Nor did Commerce explain why a generalized preference for using "the records of the {respondent}"—which reflect FEB-grade stainless steel ingot purchases—would favor market-specificity to the exclusion of product-specificity. *See* Final IDM at Appx0003298-0003299.

Commerce additionally mischaracterized its practice. Commerce quoted *Best Mattresses*, *see* Final IDM at 21 n.121 (Appx0003299), which describes Commerce as preferring "respondent purchase{s of} the input from an unaffiliated supplier," followed by "sales of the input between an affiliate supplier and an unaffiliated party," *Best Mattresses*, 622 F. Supp. 3d at 1383 (emphasis supplied); *see also PT. Zinus*, 628 F. Supp. 3d at 1282 (describing the same framework as concerning "the same inputs or services"). Commerce cited this as an endorsement of selecting "prices in Italy," Final IDM at Appx0003299, despite *Best Mattresses* holding the opposite, concluding that "whatever the choice, Commerce may select a market that allows for a 'reasonable source for market value,'" and remanding Commerce's erroneous "decision to interpret 'market under consideration' to mean only the 'country under consideration,'" *Best Mattresses*, 622 F. Supp. 3d at 1384; *see also Diamond Sawblades Mfrs. Coal. v. United States*, 38 Ct. Int'l Trade 1545, 1548 n.4 (2014) (Commerce may ultimately "rely on…'any reasonable method' to confirm that the affiliated prices reflect arm's length

*Confidential Information Removed*
*from Brackets*

transactions"), *aff'd sub nom Diamond Sawblades Mfrs. Coal. v. Hyosung D & P Co.*, 809 F.3d

626 (Fed. Cir. 2015).

Commerce's analysis of only "two potential market price sources" (*i.e.*, Option 2 and

Option 3) based on its "determin{ation} that the Italian market was the appropriate market,"

Final IDM at Appx0003299, despite the non-Italian price (Option 1) being the only price on

record for the identical input Lucchini purchased, was contrary to law.  Neither authority on

which Commerce relied supports such a narrow framework for benchmark selection under the

"final resort."  The statute references "the amount usually reflected in sales of merchandise under

consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2).  If there is any

preference at all, it is for the first mentioned—"merchandise under consideration"—as reflected

in Commerce's "first" and "second" preference of market benchmark source.  *See PT. Zinus*, 628

F. Supp. 3d at 1282 (describing the respondent's purchases or affiliate's sales of "the same inputs

or services" from/to non-affiliates, wherever located).

> 2. *Even if a Preference for Italian Prices Were a Reasonable Tiebreaker, Commerce*
> *Nevertheless Erred in Failing to Consider the Merits of a Product-Specific*
> *Benchmark*

As Commerce recognized, the administrative record did not contain an Italian market

price specific to stainless steel ingots (much less of FEB-grade), despite Commerce having

provided Lucchini five opportunities to supply such information.  *See* Final IDM at

Appx0003298 (describing available sources).  But Commerce also recognized that there were

markets for the specific input at issue outside of Italy.  *See* Final IDM at Appx0003299 ("record

evidence demonstrates that there are producers throughout Europe, including Italy, and

elsewhere offering" FEB-grade stainless steel ingots).  As Petitioners explained, [

] stainless steel is a commodity product that is widely available in semi-finished forms in

a variety of markets.  *See* Petitioners' Rebuttal Factual Information Concerning FEB Ingot

Market Prices at Ex. 3 (compiling examples of sellers in Europe and elsewhere offering semi-finished [                ] stainless steel, including ingots and billet, for sale.) (Appx0087150-0087230); Petitioners' Factual Information Concerning FEB Ingot Market Prices at Ex. 4 (providing examples of such sales) (Appx0087087-0087103).  Therefore, the affiliate from which Lucchini acquired its FEB-grade stainless steel ingots <u>could</u> have sold such products to unaffiliated customers outside of Italy (*e.g.*, to [                ]).  Furthermore, [

] purchase data reflect only the cost of the commodity ingot itself, absent ancillary expenses such as transportation, *see* Petitioners' Factual Information Concerning FEB Ingot Market Prices at Appx0086912, Ex. 4-B (Appx0087090-0087103), which would neutralize any material variation in prices between the Italian and U.S. markets.  Commerce did not address this, and instead summarily deemed all markets other than Italy "not appropriate."  *See* Final IDM at Appx0003300.

Even assuming, *arguendo*, that a preference for Italian prices might be a reasonable tiebreaker between two otherwise equal options, this was no such situation.  Commerce's elevation of Italian origin to a *sine qua non* for benchmark selection was not reasonable or even consistent with the remainder of its analysis.  For example, when comparing the Italian prices on the record, Commerce expressed a preference for the more product-specific option, rejecting Eurostat data because, *inter alia*, of its relatively "broad nature," *i.e.*, the "inclu{sion of} a broad range of products which vary widely in terms of their physical characteristics…"  Final IDM at Appx0003299-0003300; *see also* Section III.B.2, *infra* (discussing product-specific nature of Commerce's adjustment to the benchmark).  This consideration is reasonable—but it was required <u>throughout</u> Commerce's analysis—insofar as the statutory analysis for disregarding costs incurred in affiliated party transactions concerns "the amount usually reflected in sales of

merchandise under consideration in the market under consideration."  19 U.S.C. § 1677b(f)(2)

(emphasis supplied).

At minimum, Commerce's failure to address the relative merit of Option 1 being the only

exact match for the "merchandise under consideration" renders its analysis unsupported by

substantial evidence because "the agency has not considered all relevant factors."  *Fla. Power &*

*Light*, 470 U.S. at 744.  Indeed, whereas Commerce extensively discussed the lack of "evidence

of {Option 2}'s chemical composition because Lucchini chose not to supplement its response

with {such} information" and the lack of <u>any</u> Italian market price specific to any stainless steel

grade(s) of ingot (including Option 2), Final IDM at Appx0003300, this begs an explanation as

to why Commerce did not select Option 1, an exact match and the only option for which

chemical composition information was available.  Petitioners even supplied evidence of wide

variation in alloy surcharges (a gap exceeding $3,500/MT at the high end) applied to different

grades of stainless steel during each month of the POR.  Petitioners' Factual Information

Concerning FEB Ingot Market Prices at Ex. 1-B, 1-C (see monthly surcharges per ton listed

under "Austenitic" heading) (Appx0086943-0086988).  Moreover, Lucchini itself considered

that the unique properties of [                    ] stainless steel, including its [

], rendered other ingots (even other stainless steel ingots) non-comparable.  Lucchini's

Post-Preliminary Response to Request for FEB Ingot Market Price Data at Appx0087109-

0087110; *see also* Lucchini's "Rebuttal" Factual Information Concerning FEB Ingot Market

Prices at Appx0087244, Appx0087247-0087248 (asserting that "stainless steel comprises a wide

variety of different grades in terms of chemistry and prices" and that "ingots comprise a wide

variety of products with significantly different costs and prices depending on the form, shape,

manufacturing process, mechanical properties and chemistry.").  Although Petitioners pressed

NONCONFIDENTIAL VERSION

these arguments in their administrative case brief, *see* Petitioners' Case Br. at Appx0087362, Commerce did not address either, nor did Commerce identify any evidence of the magnitude of market price variations for a given grade between the Italian and U.S. markets, *see* Final IDM at Appx0003298-0003301.

The statute instructs Commerce to analyze whether Lucchini's transfer price for FEB-grade stainless steel ingots "fairly reflect{s} the amount usually reflected in sales of merchandise under consideration in the market under consideration." 19 U.S.C. § 1677b(f)(2). Commerce expressed a preference for the "market under consideration" without rationally explaining why it was reasonable on this record to elevate market-specificity over the selection of a price for the "merchandise under consideration." Indeed, Commerce identified no evidence of meaningful variations in market prices for this commodity between the U.S. and Italian markets. Moreover, [                ]'s FEB-grade [          ] stainless steel ingot purchase data were exclusive of transportation costs. By contrast, Petitioners cited substantial evidence of price differences up to $3,500/MT among different grades of steel ingot.[5] Commerce's selection of Option 2 as a benchmark in lieu of Option 1 is therefore unsupported by substantial evidence for failure to "address{} relevant arguments{} made by interested parties." *NMB Sing.*, 557 F.3d at 1320.

---

[5] Theoretically, Commerce could obtain some of the benefit of a product-specific price and some of the benefit of a market-specific price by averaging Option 1 and Option 2. There is no evidence Commerce considered this. *See* Final IDM at Appx0003290-0003293. Petitioners do not consider that such an approach would be reasonable on this administrative record, given the absence of evidence of market price variation for a given grade between the U.S. and Italian markets and the record evidence of large market price variations between different grades.

**B.    Commerce's Acceptance of Lucchini's Untimely Information Contravened Commerce's Instructions and Regulations, and Commerce's One-Sided Adjustment to the Benchmark Value Was Distortive and Unsupported by Substantial Evidence**

Were this Court to sustain Commerce's decision to use only Option 2 in calculating a benchmark, remand remains necessary for Commerce to remove its illogical, distortive adjustment to the Option 2 benchmark.  The adjustment itself is based upon untimely new factual information that Lucchini proffered under the guise of a "rebuttal" to Petitioners' Factual Information Concerning FEB Ingot Market Prices.  Commerce acted arbitrarily and unfairly in accepting Lucchini's untimely submission in contravention of Commerce's regulations, prejudicing Petitioners by denying them any opportunity to respond.  (**Section III.B.1**).  Even if Lucchini's untimely factual information were accepted, the adjustment Commerce fashioned was distortive and unreasonable.  Commerce reduced the benchmark price based on logistical considerations, yet failed to account for the [

].  The adjusted benchmark was thus unreasonably low, and Commerce's analysis is unsupported by substantial evidence.  (**Section III.B.2**).

1.    *Commerce Acted Contrary to Law and Prejudiced Petitioners in Accepting Lucchini's Untimely Sixth Market Price Submission*

Commerce built a rebuttal opportunity into its post-preliminary request for FEB-grade stainless steel ingot prices, so that parties could "rebut, clarify or correct factual information submitted on the market price of stainless steel ingots."  Post-Preliminary Request for FEB Ingot Market Price Data at Appx0002929.  Petitioners' original submission contained Eurostat import data and information concerning the operations of one of Lucchini's unaffiliated customers, but did not discuss or provide any factual information concerning Lucchini's ingot purchases or the logistics associated with FEB acquisition.  *See* Petitioners' Factual Information Concerning FEB Ingot Market Prices at Appx0086911, Ex. 1-A (Appx0086917-0086942).  All such data had been

*Confidential Information Removed
from Brackets*

submitted weeks prior <u>by Lucchini</u>, on November 18, 2022.  *See* Lucchini 2SDQR at Ex. SD2-7.a (Appx0086330-0086333).

Thus, when Lucchini's "rebuttal" submission consisted almost entirely of new factual information concerning assertedly unique logistical arrangements affecting <u>Lucchini's</u> purchases of FEB-grade stainless steel ingots from its affiliate, *see* Lucchini's "Rebuttal" Factual Information Concerning FEB Ingot Market Prices at Appx0087249-0087254, Exs. 2-4 (Appx0087265-0087290), Petitioners immediately requested that Commerce enforce its instructions and regulations concerning the submission of factual information, and reject these untimely portions of Lucchini's submission, *see* Petitioners' Request to Reject Untimely Rebuttal at Appx0087305-0087309.  Because Commerce failed to respond, Petitioners were denied certainty as to the contents of the administrative record during briefing and further denied the opportunity guaranteed by regulation to respond to any "other" new factual information accepted onto the record.  *See* 19 C.F.R. § 351.301(c)(5).  Left with no other option, Petitioners pressed their request that Commerce reject Lucchini's untimely information in their case brief. Petitioners' Case Br. at Appx0087355-0087358.  Commerce again failed to address this issue in its *Final Results*, *see* Final Results at Appx0003298-0003301, but nevertheless utilized Lucchini's untimely modification of <u>its own</u> prior reporting to devise an "adjustment" to the benchmark which reduced the price differential [                              ].

Commerce's "adjustment" of the benchmark was only possible with the new factual information Lucchini proffered as "rebuttal."  Had Commerce applied its regulations instead of ignoring Petitioners' arguments, the factual information would have been rejected as untimely, precluding any "adjustment."  *See* 19 C.F.R. § 351.302(d)(1)(i) (Commerce "will not consider" "{u}ntimely filed factual information"); *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United*

*States*, 589 F. Supp. 3d 1195, 1207 (Ct. Int'l Trade 2022) ("Commerce was <u>required</u> by its

regulation to reject the untimely submissions") (emphasis supplied); *Husteel Co. v. United

States*, 98 F. Supp. 3d 1315, 1343 (Ct. Int'l Trade 2015) (holding that "under the applicable

regulation" evidence unreasonably accepted as rebuttal factual information "should have been

rejected as untimely").  Although Petitioners explained Lucchini's untimeliness at length,

Commerce ignored the following issues.

"Rebuttal evidence is generally understood to be 'evidence offered to disprove or

contradict the evidence presented by an opposing party.'" *Husteel*, 98 F. Supp. 3d at 1341

(quoting *Black's Law Dictionary* (10th ed. 2014)).  Pages 9-14 and Exhibits 2-4 of Lucchini's

"rebuttal" did not address—much less "disprove or contradict"—any factual information

"submitted" in Petitioners' original response to Commerce's request for FEB-grade stainless

steel ingot prices.  Whereas Petitioners submitted "data and metadata sourced from Eurostat

concerning the price per kilogram of stainless steel in ingots or other primary forms (HTS

7218.10.00) that were imported into Italy during the POR," Petitioners' Factual Information

Concerning FEB Ingot Market Prices at Appx0086911, Lucchini responded with [

]  "Invoices [                            ]" (Exhibit 2), what Lucchini called its

"internal manufacturing procedures [                                ]" (Exhibit 3), and

"Additional costs for [                ] manufacturing" (Exhibit 4), Lucchini's "Rebuttal" Factual

Information Concerning FEB Ingot Market Prices at Appx0087249-0087254, Exs. 2-4

(Appx0087265-0087290).  This information has nothing whatsoever to do with factual

information submitted by "an opposing party," *i.e.*, Petitioners.

Lucchini's Exhibit 2 deals solely with [                                    ].

*See id.* at Ex. 2 (Appx0087265-0087283).  Moreover, the "distinction" that Lucchini attempts to

draw in its narrative between [                    ] lacks any foundational support in the record. *See id.* at Appx0087249-0087254. Exhibit 2 includes [            ] invoice that mentions [

                    ]. *Id.* at Ex. 2 (Appx0087273); *id.* at Ex. 3 (Appx0087285). Nor does anything in the Coalition's original submission speak to the [

            ] the Eurostat ingots or those purchased by [            ], or the [

        ] of either. Lucchini's Exhibit 2 is therefore not "rebutting" anything.

Lucchini's Exhibit 3 is even less relevant. It specifically addresses [

    ].[6] *Id.* at Ex. 3 (Appx0087284-0087288). But Lucchini itself reported that [

                    ]. *See* Lucchini DQR at Ex. D-2.1 (Appx0082216); Lucchini 1SDQR at Appx0084176. [

                    ]. And, most fundamentally, [

            ] in no way rebut Petitioners' Eurostat or [                ] stainless steel ingot market prices. Commerce's request and Petitioners' original response concerned "the market price of <u>stainless steel ingots</u>," not the [

        ]. *See* Commerce's Post-Preliminary Request for FEB Ingot Market Price Data at

---

[6] Lucchini's translation also seems inaccurate. Lucchini translates [

                    ]. *Id.* at Ex. 3 at Appx0087285, Appx0087288. It is thus entirely unclear to what extent [
                    ].

Appx0002929; Petitioners' Factual Information Concerning FEB Ingot Market Prices at Appx0086910-0086912.

Lucchini's Exhibit 4 is essentially a [                                    ] contained in Exhibits 2 and 3 and is likewise well outside the bounds of what Commerce requested and unrelated to Petitioner's submitted data.  There is nothing in Petitioners' original submission that concerns the [

                                                                    ].  Lucchini made no attempt to identify what aspect of Petitioners' original submission Exhibit 4 could possibly be construed as rebutting.  *See* Lucchini's "Rebuttal" Factual Information Concerning FEB Ingot Market Prices at Appx0087249-0087254, Ex. 4 (Appx0087289-0087290).

Rather than address factual information Petitioners had originally submitted, Lucchini's "rebuttal" was an attempt to move the goalposts of what might constitute an appropriate market price benchmark by belatedly revealing new facts about the logistics of <u>Lucchini's</u> purchases of FEB-grade stainless steel ingot from its affiliate.  Because Lucchini could not prevent Petitioners from providing market prices, and because Lucchini evidently could not identify any meaningful rebuttal to Petitioners' market prices, it instead changed its own reporting at the eleventh hour.  Strikingly, Lucchini made no mention of these supposedly fundamental logistical distinctions in its original submission, despite specifically addressing the very same Eurostat data it thereafter purported to rebut.  *Compare* Lucchini's Post-Preliminary Response to Request for FEB Ingot Market Price Data at Appx0087110 (Jan. 31, 2023) (no mention of [                            ], despite discussion of Eurostat data), *with* Lucchini's "Rebuttal" Factual Information Concerning FEB Ingot Market Prices at Appx0087249-0087254 (first mention of [                            ], purportedly in rebuttal to Eurostat data).  Commerce's acceptance of Lucchini's belated

disclosure in a post-preliminary "rebuttal" submission to which Petitioners had no opportunity to respond is incompatible with fair administration of the administrative review.  *See, e.g.*, *Husteel*, 98 F. Supp. 3d at 1342 ("fairness suggests that all parties should have an opportunity to respond to this kind of information").  Lucchini squandered its chances—it had <u>five</u>—to provide a usable market price benchmark, and it was only after Petitioners finally placed a benchmark on the record that Lucchini went back and recharacterized its affiliated party transactions, well after all possible deadlines for such information had passed.  *See* 19 C.F.R. §§ 351.301(c)(1)(i)-(ii), (c)(5).  Meanwhile, Commerce's request for ingot price information provided Petitioners no opportunity for sur-rebuttal, *see* Post-Preliminary Request for FEB Ingot Market Price Data at Appx0002929, which would have been available if Commerce had instead construed Lucchini's "rebuttal" a request to submit "other" new factual information (albeit an untimely one), *see* 19 C.F.R. § 351.301(c)(5)(ii).

Moreover, Lucchini could have provided the information in question, which concerned [                     ] logistical arrangements, in response to a prior questionnaire. *See, e.g.*, Initial Questionnaire at Appx0001108 (Q.2) (requesting description of entire production process); *id.* (Q.5) (requesting "<u>all</u> significant inputs used to produce the merchandise under consideration, including…labor, energy, subcontractor services, research and development, etc."); *id.* at Appx0001110 (Q.8) (requesting information [                     ]); Commerce 1SDQ at Appx0082998-0083000 ([          ]) (requesting information on [                                    ]); *id.* at Appx0083000-0083001 ([          ]) (requesting information on [

                                    ]…").  Had Lucchini introduced the supposedly crucial [                              ] distinction at any of these earlier stages, Petitioners would have

had the opportunity to submit rebuttal information of their own, *see* 19 C.F.R. §

351.301(c)(1)(v), whereupon Commerce could have clarified matters and filled remaining gaps

through further supplemental questionnaires.  Instead, Lucchini denied Petitioners and

Commerce the opportunity to do so.  Commerce's lack of response to Petitioners' requests to

reject caused further prejudice "because the information was improperly submitted as rebuttal

evidence and Commerce failed to rule on the request to reject it, {leaving plaintiffs} to guess

whether Commerce would accept or reject the information and speculate as to how Commerce

would use the evidence." *Husteel*, 98 F. Supp. 3d at 1344.

"Commerce, like other agencies, must follow its own regulations." *Torrington Co. v.*

*United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996).  Here, Commerce's acceptance of Lucchini's

non-rebuttal information violated both the instructions of Commerce's request for information

and Commerce's regulations concerning untimely submissions.  This is contrary to law and

arbitrary, and the Court should remand this matter with instructions to remove the untimely

factual information from the record.  At minimum, remand is necessary for Commerce to address

the foregoing arguments concerning Lucchini's untimeliness.  *See NMB Sing.*, 557 F.3d at 1320.

2. *Even if Lucchini's Untimely Information Were Accepted on the Record,*
*Commerce's Adjustment Was Unreasonable, Distortive, and Reaffirms the*
*Importance of Selecting a Product-Specific Benchmark*

Commerce's adjustment was also substantively unreasonable and underscores the flaws

in Commerce's framework for selecting among benchmark sources.  According to Lucchini's

description of its [                    ] logistical arrangements, certain aspects involved [

], while other aspects involved [

].  *See* Lucchini's "Rebuttal" Factual Information

Concerning FEB Ingot Market Prices at Appx0087251. Commerce purported to reduce the

benchmark price to account for "certain technical and logistical aspects" that "extend beyond the

*Confidential Information Removed from Brackets*

affiliate's manufacturing process," *see* Final IDM at Appx0003301, yet in reality its adjustment

only accounted for Lucchini's supposed [                    ], *see* Final Cost Calculation

Memorandum at Attachment 2 (Appx0087650) (citing Lucchini's "Rebuttal" Factual

Information Concerning FEB Ingot Market Prices at Appx0087253). Commerce did not account

for the [                              ], which Lucchini described, but made no attempt to

quantify in its post-preliminary submission. *See* Lucchini's "Rebuttal" Factual Information

Concerning FEB Ingot Market Prices at Appx0087251 ([

]).[7]  That Commerce adjusted for purported [              ]—but

not [                          ]—was unreasonable and distorted the benchmark in violation

of Commerce's "primary objectives" of "accuracy and fairness." *Mid Continent*, 941 F.3d at 542.

Moreover, Commerce's special effort to attempt to transform a <u>non</u>-FEB, <u>non</u>-stainless

steel ingot benchmark price into a quasi-[                    ] price underscores the

incoherence of Commerce's framework for selecting among the benchmark data sources in the

first instance.  By adjusting the non-FEB, non-stainless [              ] transactions,

Commerce sought to create a benchmark that "matched" Lucchini's purchases of FEB-grade

ingots from its affiliate with respect to [                          ].  Yet, the reason

that Lucchini's [              ] were allegedly [          ] was because [

].

---

[7] This was one obvious area where Petitioners could have, if given the opportunity, sought
rebuttal information [                                        ].

Lucchini's "Rebuttal" Factual Information Concerning FEB Ingot Market Prices at Appx0087251 (internal citations omitted).  But if such details warrant adjusting the benchmark price to "ensure{} that the comparison was made on an apples-to-apples basis," Final Cost Calculation Memorandum at Appx0087647, then it follows *a fortiori* that Commerce should have started from a product-specific price like the [               ] prices for FEB-grade ingots. Commerce's application of [                    ] adjustment to a non-FEB, non-stainless ingot price—after rejecting an available FEB ingot price—was unreasonable and cannot be sustained.

## CONCLUSION

For the reasons explained above, Petitioners request that this Court hold Commerce's *Final Results* unlawful and otherwise unsupported by substantial evidence and remand the *Final Results* with instructions that Commerce revise its calculation of Lucchini's CV SG&A expenses and profit, as well as its calculation of a market price for FEB grade ingots, and recalculate Lucchini's dumping margin.

*        *        *

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP

*Counsel to Ellwood City Forge Company,
Ellwood Quality Steels Company,
Ellwood National Steel Company, and
A. Finkl & Sons*

March 6, 2024

**Certificate of Compliance with Chambers Procedures 2(B)(1)**

The undersigned hereby certifies that the foregoing memorandum of law contains 13,729 words, exclusive of the caption block, table of contents, table of authorities, signature block, certificates of counsel, and square brackets and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order in this action, ECF Doc. 17 (Dec. 21, 2023), and Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ Myles S. Getlan
    Myles S. Getlan