## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____

)
ELLWOOD CITY FORGE CO., *et al.*,        )
)
       Plaintiffs,        )
)
       v.        )        Court No. 23-00191
)
UNITED STATES,        )
)
       Defendant.        )
_____)

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## <u>PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

 

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

HENDRICKS VALENZUELA        STEPHEN C. TOSINI
Of Counsel        Senior Trial Attorney
                Department of Justice
U.S. Department of Commerce        Civil Division
Office of the Chief Counsel for        Commercial Litigation Branch
Trade Enforcement & Compliance        PO Box 480, Ben Franklin Station
1401 Constitution Ave., NW        Washington, D.C. 20044
Washington, D.C. 20230        Tel.: (202) 616-5196
                Email: Stephen.Tosini@usdoj.gov

May 24, 2024        Attorneys for Defendant

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

_____
                                                    )
ELLWOOD CITY FORGE CO., *et al.*,                   )
                                                    )
            Plaintiffs,                             )
                                                    )
            v.                                      )          Court No. 23-00191
                                                    )
UNITED STATES,                                      )
                                                    )
            Defendant.                              )
_____)

## <u>ORDER</u>

Upon review of plaintiffs' motion for judgment on the administrative record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the motion is denied and, it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____                              _____
        New York, NY                                        JUDGE

## TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 1

    I.    Administrative Determination Under Review ......................................... 1

    II.    Statement of the Issues................................................................ 2

STATEMENT OF FACTS ..................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................... 5

ARGUMENT ........................................................................................................ 6

    I.    Standard Of Review ..................................................................... 6

    II.    Commerce's Selection Of Financial Statements For Use In Its CV Profit And Selling Expenses Calculation Was Supported By Substantial Evidence And In Accordance With Law ........................ 7

        A.    Framework For Calculating Constructed Value Profit and Selling Expenses ........................................................... 7

        B.    Commerce Reasonably Included Financial Statements from Cogne and Ciscato In Its Final Determination ............................. 9

            1.    Ciscato........................................................... 11

            2.    Cogne ............................................................ 15

    III.    Commerce's Major Input Analysis Is Supported By Substantial Evidence And In Accordance With Law ........................................ 17

        A.    Framework For Major Input Analysis..................................... 17

        B.    Commerce's Use Of Lucchini's Affiliate Sales To An Unaffiliated Party For Its Major Input Analysis Is Support By Substantial Evidence .......... 18

CONCLUSION.................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

## <u>CASES</u>

*Albemarle Corp. v. United States*,
   821 F.3d 1345 (Fed. Cir. 2016)..................................................................... 11

*Ass'n of Am. Sch. Paper Suppliers v. United States*,
   791 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ........................................... 14

*Best Mattress Int'l Co. Ltd. v. United States*,
   622 F.Supp.3d 1347 (Ct. Int'l Trade 2023) ................................... passim

*Best Mattresses Int'l Co. v. United States*,
   No. 21-00281, 2024 WL 2206461 (Ct. Int'l Trade May 16, 2024) ......................................... 21

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938)....................................................................................... 6

*Consolo v. Federal Maritime Comm'n*,
   383 U.S. 607 (1966)....................................................................................... 6

*CVB, Inc. v. United States*,
   675 F.Supp.3d 1324 (Ct. Int'l Trade 2023) ............................................. 15

*Diamond Sawblades Mfrs. Coal. v. United States*,
   2014 WL 5463307 (Ct. Int'l Trade 2014)................................................. 19

*Diamond Sawblades Mfrs. Coal. v. Hyosung D & P Co.*,
   809 F.3d 626 (Fed. Cir. 2015)..................................................................... 19

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)....................................................................... 6

*Husteel Co. v. United States*,
   98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ............................................. 24

*Husteel Co. v. United States*,
   180 F. Supp. 3d 1330) (Ct. Int'l Trade 2016) .......................................... 12

*Huvis Corp. v. United States*,
   570 F.3d 1347 (Fed. Cir. 2009).................................................................. 23

*Hyundai Steel Co. v. United States*,
   639 F. Supp. 3d 1325 (Ct. Int'l Trade 2023) ........................................ 7, 8

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*,
   589 F. Supp. 3d 1195 (Ct. Int'l Trade 2022) ..................................................... 24

*Mid Continent Steel & Wire, Inc. v. United States*,
   203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ................................................. 9, 11

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019)............................................................... passim

*Nippon Steel Corp. v. U.S.*,
   458 F. 3d 1345 (Fed. Cir. 2006).............................................................. 6

*Nucor Corp. v. United States*,
   286 F.Supp.3d 1364 (Ct. Int'l Trade 2018) ............................................. 11

*PAM, S.p.A. v. United States*,
   582 F.3d 1336 (Fed. Cir. 2009)............................................................. 6

*PT. Zinus Glob. Indonesia v. United States*,
   628 F. Supp. 3d 1252 (Ct. Int'l Trade 2023) .................................... 20, 21

*Rebar Trade Action Coal. v. United States*,
   398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ......................................... 19

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d. 1312 (Fed. Cir. 2006)............................................................ 2

*Snyder v. Dep't of Navy*,
   854 Fed. Cir. 1366 (Fed. Cir. 2017) ..................................................... 15

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013).............................................................. 22

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) ............................................................................... 6
19 U.S.C. § 1673 ............................................................................................... 7
19 U.S.C. § 1677b ............................................................................................. 20
19 U.S.C. § 1677b(a)(1)(B)(i) ........................................................................... 7
19 U.S.C. § 1677b(a)(4) ................................................................................. 2, 7
19 U.S.C. § 1677b(e)(2)(A) ........................................................................... 7, 8
19 U.S.C. § 1677b(e)(2)(B) ............................................................................... 8
19 U.S.C. § 1677b(e)(2)(B)(iii) ...................................................................... 3, 9
19 U.S.C. § 1677b(f)(3) .......................................................................... 4, 17, 18
19 U.S.C. § 1677f(i)(3)(A) ............................................................................... 11
19 U.S.C. § 1862.............................................................................................. 20

## REGULATIONS

19 C.F.R. § 351.302 ............................................................................................... 23
19 C.F.R. § 351.302(d)(1)(i) ................................................................................ 23
19 C.F.R. § 351.302(d)(2) ..................................................................................... 24
19 C.F.R. § 351.303(e) ..................................................................................... 14, 15
19 C.F.R. § 351.404 ............................................................................................... 2
19 C.F.R. § 351.407(b) ....................................................................................... 18
19 C.F.R. § 351.407(b)(2) ............................................................................... 18, 20

## ADMINISTRATIVE DETERMINATION

*Forged Steel Fluid End Blocks From Italy*,
  85 Fed. Reg. 79,996 (Dep't of Commerce Dec. 11, 2020) ......................... 16

*Forged Steel Fluid End Blocks From Italy: Final Results of Antidumping Duty Administrative
Review; 2020-2021*,
  88 Fed. Reg. 55,010 (Dep't of Commerce Aug. 14, 2023) ...................... 1, 5

*Forged Steel Fluid End Blocks From Italy: Preliminary Results and Rescission of Antidumping
Duty Administrative Review in Part; 2020–2021*,
  88 Fed. Reg. 7,686 (Dep't of Commerce Feb. 6, 2023) ............................. 2

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*,
  H.R. Doc. No. 103-316, vol. 1, at 840 (1994),
  reprinted in 1994 U.S.C.C.A.N. 4040, 4176 (SAA) ............................. 8, 11

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE CO., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Court No. 23-00191 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits its opposition to the motion for judgment on the agency record (Ellwood Br.), ECF Nos. 18 and 19, filed by the plaintiffs, Ellwood City Forge Company, *et al*. (collectively, Ellwood), challenging the Department of Commerce's (Commerce) final results in the first administrative review of the antidumping duty order on forged steel fluid end blocks from Italy.  Commerce reasonably weighed the evidence and applied its lawful methodologies in calculating Lucchini Mame Forge S.p.A.'s (Lucchini) dumping margin and, thus, the Court should sustain the final results.

**STATEMENT PURSUANT TO RULE 56.2**

**I.    Administrative Determination Under Review**

The administrative determination under review is *Forged Steel Fluid End Blocks From Italy: Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 55,010 (Dep't of Commerce Aug. 14, 2023) (final results) and accompanying Issues and Decision Memorandum (IDM), (Appx3279-3303).  The period of review is July 23, 2020, through December 31, 2021.  *Id.*

II.    **Statement Of The Issues**[1]

1.    Whether Commerce's selection of financial statements to use in its constructed

value (CV) profit and selling expenses calculations is supported by substantial evidence.

2.    Whether Commerce's major input analysis is supported by substantial evidence.

## STATEMENT OF FACTS

Commerce initiated the first administrative review of the antidumping duty order on fluid

end blocks from Italy, selected Lucchini as the mandatory respondent and received timely

questionnaire responses from Lucchini. *Forged Steel Fluid End Blocks From Italy: Preliminary*

*Results and Rescission of Antidumping Duty Administrative Review in Part; 2020–2021*, 88 Fed.

Reg. 7,686 (Dep't of Commerce Feb. 6, 2023), Appx2930-31, and accompanying Preliminary

Decision Memorandum (PDM) at 2, Appx2917.  Commerce issued supplemental questionnaires

to Lucchini and received timely responses.  PDM at 2, Appx2917.

"Lucchini reported that its home market does not provide a viable basis for calculating

normal value, *i.e.*, the aggregate volume of its home market sales of the foreign like product is

not five percent or more of the aggregate volume of U.S. sales, and that it did not make third-

country sales during the POR."  *Id.* at 9, Appx2924.  Commerce thus based normal value on

constructed value (CV) under 19 U.S.C. § 1677b(a)(4) and 19 C.F.R. 351.404.  *Id.*

Accordingly, Commerce requested that interested parties submit constructed value profit

and selling expense information.  In response, Lucchini submitted financial statements and

websites for: (1) Asoforge S.R.L. (Asoforge); (2) FOC Ciscato S.p.A. (Ciscato); (3) Fomec

S.p.A. (Fomec); and (4) and OFAR S.p.A. (OFAR), as potential sources of data.  Lucchini's

---

[1] Ellwood has abandoned counts three and four of its complaint, so we do not address
them here.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d. 1312, 1319 (Fed. Cir.
2006) ("arguments not raised in the opening brief are waived.").

Comments on CV Profit and Selling Expenses (Sept. 23, 2022), Appx1906.  Ellwood submitted

information from (1) Officina Meccanica Roselli O.M.R. S.r.L. (OMR); (2)  Metalcam S.p.A.

(Metalcam); and (3) Cogne Acciai Speciali S.p.A. (Cogne), as potential sources of data.

Petitioners' CV Profit Comments (Sept. 23, 2022), Appx1514-19.

Ellwood filed pre-preliminary comments in which it contended that "Commerce must

calculate Lucchini's CV profit using data sources provided by" it because Ellwood's "sources

{are} superior to the alternatives advocated by Lucchini."  Petitioners' Pre-Preliminary

Comments at 1-2, Appx2841-42.

Commerce calculated a preliminary dumping margin for Lucchini of 2.21 percent.

Preliminary Results, Appx2930.  Commerce explained that: (1) the constructed value calculation

is based on the sum of Lucchini's respective cost of materials and fabrication employed in

producing the subject merchandise, plus amounts for respective general and administrative and

financial expenses, constructed value profit and selling expenses, and United States packing

costs.  PDM at 11-12.  And in accordance with 19 U.S.C. § 1677b(e)(2)(B)(iii), after considering

the financial statements of Italian producers of comparable merchandise, Commerce calculated

constructed value profit using the financial statements for six Italian producers of forged

products: OMR, Metalcam, Cogne, Ciscato, Fomec and OFAR.  PDM at 11-12, Appx2926-27.

However, Commerce excluded Asoforge from its calculation because Asoforge's website

indicated it solely produced forged bars, which Commerce considered "more akin to the input

used to make the subject merchandise" and therefore did not consider the company to produce

comparable merchandise.  *Id.* at 12, Appx2927.

With respect to the second issue that Ellwood raises (major input rule), Commerce did

not adjust cost of production in the preliminary results for steel ingots purchased from affiliated

suppliers but explained that it would request additional information regarding the market price of ingots.  PDM at 11, Appx2926.  The parties timely responded and submitted rebuttals in response to Commerce's request for this market price information.  IDM at 2, Appx3280.

For the final results, to calculate constructed value profit, Commerce used the simple average of the profit rates from four companies (Metalcam, OMR, Cogne and Ciscato) rather than the six companies preliminarily used, explaining that it has a "practice of selecting the financial statements of companies involved in the production and sale of identical merchandise over the financial statements of companies which are involved in the production and sale of comparable merchandise solely."  IDM at 12-15, Appx3290-93.  Commerce determined that (1) Metalcam was identified as a producer of fluid end blocks in Commerce's respondent selection memorandum and that its financial statements indicated that it had substantial revenue from sales in its home market of Italy; (2) OMR is an Italian producer with significant sales in its home market and has a manufacturing facility that produces fluid power equipment; (3) Cogne's FY 2021 financial statements indicated it had revenue attributable to home market sales and its website indicated it was a forging company that produced blocks for tools; and (4) Ciscato's FY 2021 financial statements indicated it had revenue attributable to sales in its domestic market and that its website indicated it was a forging company that produced blocks.  IDM at 14-15, Appx3292-93.  Regarding OFAR and Fomec, while record evidence indicated that they produced comparable merchandise, there was no evidence that either produced identical merchandise, thus Commerce did not include their data in its calculation.  *Id.* at 15, Appx3293.

Additionally, to determine the value of stainless steel ingots purchased from Lucchini's affiliated supplier, Commerce applied the major input rule under 19 U.S.C. § 1677b(f)(3).  IDM at 19-23, Appx3297-3301.  Commerce analyzed the record to determine "which source best

represents the market price of stainless steel ingots in the market under consideration."  IDM at
20, Appx3298.  Commerce determined that an Italian market price would be more reflective of
arm's length prices and what Lucchini would have paid if it had not sourced the materials from
its affiliated supplier.  *See id.* at 21, Appx3299.  Accordingly, of the three potential sources on
the record, Commerce focused on the two Italian market price sources: (1) Eurostat data; and (2)
certain sales made by Lucchini's affiliate to Company B, to determine whether either reflected
the arm's length value of ingots which were either identical or comparable to those consumed in
the production of subject merchandise.  *Id.*  However, Commerce determined that the broad
nature of the Eurostat data, coupled with the fact that the Eurostat data included freight and
insurance costs, made it a less appropriate source of market price information than the
information pertaining to Lucchini's affiliate's sales to an unaffiliated customer.  *Id*. at 22,
Appx3300.  Commerce also addressed the need to ensure that the comparison between the
transfer price to the market price is made on an apples-to-apples basis and determined to
construct an appropriate surrogate market price "using the ingots sold by Lucchini's affiliate to
Company B and adjusted the price using the financial information pertaining to the unique
technical and logistical aspects of the ingots consumed in the production of subject
merchandise."  *Id* at 23, Appx3301.

In the *Final Results*, Commerce calculated a weighted-average dumping margin of 2.97
percent for Lucchini.   88 Fed. Reg. 55,010, Appx3304*.*

## SUMMARY OF ARGUMENT

The final results are supported by substantial evidence and in accordance with law.  First,
Commerce's selection of Ciscato and Cogne financial statements, along with Metalcam and
OMR, to calculate constructed value profit is supported by substantial evidence because they
were part of the best information available and met Commerce's preference for using financial

statements of producers of identical merchandise.  Second, Commerce's major input analysis that

relied on benchmark selection of Lucchini's affiliate's sales price to an unaffiliated customer,

adjusted to reflect an apples-to-apples comparison, is also supported by substantial evidence and

reflective of Commerce's preference to use affiliate's sales prices to unaffiliated customers.

## ARGUMENT

### I.    Standard Of Review

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court

of International Trade must sustain 'any determination, finding or conclusion found' by

Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in

accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996)

(quoting 19 U.S.C. § 1516a(b)(1)(B)).

A party challenging a determination under the substantial evidence standard "has chosen

a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345,

1352 (Fed. Cir. 2006) (citation omitted).  That is because "{s}ubstantial evidence" is defined as

"more than a mere scintilla" or "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir.

2009) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Thus, a Court must

sustain the agency's determination if it is reasonable and supported by the record as a whole,

even if some evidence detracts from the conclusion. *Nippon Steel Corp. v. United States*, 458

F.3d 1345,1352 (Fed. Cir. 2006).  Even if one can draw two inconsistent conclusions from the

evidence contained in the record, this does not mean that Commerce's findings are not supported

by substantial evidence. *Id.*; *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966).

## II.    Commerce's Selection Of Financial Statements For Use In Its CV Profit And Selling Expenses Calculation Was Supported By Substantial Evidence And In Accordance With Law

Commerce's determination to use financial statements of OMR, Metalcam, Cogne and Ciscato to calculate constructed value profit is supported by substantial evidence.  Ellwood does not challenge Commerce's overall methodology but instead contends that Commerce wrongly weighed the evidence because substantial evidence does not support inclusion of financial statements from two of the four companies in the profit calculation.  Contrary to Ellwood's assertion at page 19 of its brief that Commerce wrongly included data from Cogne and Ciscato, Commerce complied with the statute and explained its reasoning for how it weighed the record evidence when it determined to utilize data from OMR, Metalcam, Cogne, and Ciscato.  IDM at 8-15, Appx2986-93.  Because Commerce's methodology was supported by substantial evidence, it should be sustained.

### A.    Framework For Calculating Constructed Value Profit and Selling Expenses

"Antidumping duties are calculated as the difference between the normal value of subject merchandise and the export price or the constructed export price of the subject merchandise." *Hyundai Steel Co. v. United States*, 639 F. Supp. 3d 1325, 1331 (Ct. Int'l Trade 2023); 19 U.S.C. § 1673.  While normal value is typically determined from the seller's home market prices of the subject merchandise, 19 U.S.C. § 1677b(a)(1)(B)(i), if "Commerce determines that normal value cannot be calculated reliably using home market or third-country sales, Commerce may use the subject merchandise's constructed value as an alternative to normal value." *Hyundai Steel Co.,* 639 F. Supp. 3d at 1331; 19 U.S.C. § 1677b(a)(4).  When calculating costs as part of constructed value, Commerce must include selling, general and administrative expenses, and profits.  19 U.S.C. § 1677b(e)(2)(A).  Commerce's longstanding preferred method for calculating

constructed value is to "utilize the respondent's actual selling, general, and administrative expenses, and profits in the respondent's home market or a third-country market." *Hyundai Steel Co.*, 639 F. Supp. 3d at 1331; 19 U.S.C. § 1677b(e)(2)(A).

If those data are unavailable, Commerce may select one of three alternative methods to determine selling, general and administrative expenses, and profit: "(i) the actual amounts incurred and realized" by the respondent for the same general category of products as the subject merchandise; (ii) the "weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i))"; and (iii) "any other reasonable method" not exceeding profit "normally realized by exporters or producers (other than the exporter or producer described in clause (i))." 19 U.S.C. § 1677b(e)(2)(B). The statute does not establish a hierarchy for selecting among alternatives for calculating constructed value profit. Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 840 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176 (SAA). Moreover, "each of the three alternative methods, like the preferred method, calls for consideration of profits and SG&A expenses – though each method specifies a different source for that data." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 535 (Fed. Cir. 2019) (*Mid Continent Steel II*). As explained in the SAA, "Commerce will determine on a case-by-case basis the profits 'normally realized' by other companies on merchandise of the same general category." SAA at 841.

In this proceeding, Commerce used the third alternative methodology "based on any other reasonable method." PDM at 11, Appx2926; *see also* IDM at 12-15, Appx3290-93. Ellwood "accept[s]" this choice of methodology. Ellwood Br. at 21.

When Commerce determines CV profit and selling expenses in accordance with 19

U.S.C. § 1677b(e)(2)(B)(iii), it considers four factors:

1. the similarity between potential surrogate company's business operations and products and the respondent's business operations and products;

2. the extent to which a potential surrogate company has sales in the United States and the home market;

3. the contemporaneity of the surrogate data to the period of investigation; and

4. the similarity of the customer base between a potential surrogate company and the respondent.

PDM at 11-12, Appx2926-27; *see also Mid Continent Steel II*, 941 F.3d at 543 (sustaining use of

four factors as "reasonable"). Moreover, Commerce recognized the statutory language indicates

"a preference that the profit and selling expenses reflect: (1) production and sales in the foreign

country; and (2) the foreign like product." IDM at 13, Appx3291. "The goal in calculating

{CV} profit is to approximate the home market profit experience of the respondents." *Mid*

*Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1310 (Ct. Int'l Trade 2017)

(*Mid Continent Steel I*).

## B. Commerce Reasonably Included Financial Statements from Cogne and Ciscato In Its Final Determination

Commerce reasonably relied on the four financial statements as the best fit for calculating

constructed value profit and expenses. Commerce considered financial statements from seven

companies (Asoforge, Ciscato, Fomec, OFAR, OMR, Metalcam and Cogne) as potential data

sources. *See generally* PDM at 12, Appx2927; IDM at 13-14, Appx3292-93. And Commerce

preliminarily used the statements of six of those companies. PDM at 12, Appx2927. Commerce

explained that this information met its criteria because "it is contemporaneous, represents Italian

producers of comparable merchandise (including fluid end blocks and, thus, reflective of business operations and products similar to the respondent under investigation), and it appears to predominantly reflect sales (and thus profits) in the Italian market." *Id.*

In its final results, Commerce "used the simple average of the profits rates calculated for OMR, Metalcam, Cogne, and Ciscato," explaining that it used the financial statements of the four companies because they are Italian producers involved in the production and/or sale of the merchandise under consideration and have sales revenue in the domestic market (Italy). IDM at 12-15, Appx3290-93. Commerce explained that this decision was based on a "practice of selecting the financial statements of companies involved in the production and sale of identical merchandise over the financial statements of companies which are involved in the production and sale of comparable merchandise solely." IDM at 14, Appx3292; *see also* Lucchini Final Cost Memo at 1 (Aug. 3, 2023), Appx3272 (explaining that it "continued to use the profit rates of the remaining 4 companies because record evidence indicates that they are Italian producers involved in the production and/or sale of the merchandise under consideration and have sales revenue attributable to the domestic market."). Commerce weighed the evidence and reasonably chose surrogates for profits that can "be expected to build into a fair sales price for the particularmerchandise." *Mid Continent Steel II*, 941 F.3d at 542.

Ellwood agrees with Commerce's overarching methodology, decisions to reject data from Asoforge, Fomec and OFAR, and use data from Metalcam and OMR. It contends only that the inclusion of data from Cogne and Ciscato "was inconsistent with {Commerce's} treatment of Fomec and OFAR." Ellwood Br. at 22. Contrary to its earlier claim that Cogne's data was among the "*superior*" sources, Appx2842, Ellwood maintains that use of Cogne's and Ciscato's data was an "unreasonable inclusion of *inferior* data." Ellwood Br. at 22. Ellwood invites the

Court to reweigh the evidence but it "is apparent that Commerce weighed the evidence, and the {C}ourt {should} decline{} to reweigh it." *Nucor Corp. v. United States*, 286 F.Supp.3d 1364, 1380 (Ct. Int'l Trade 2018). Ellwood seeks to drive up constructed value profit by eliminating all potential surrogate financial statements, except those of the two companies (OMR and Metalcam) with the highest profit rates. However, Commerce's goal is to calculate profit rates approximating the home market profit experience of the respondents as instructed by *Mid Continent Steel I*, 203 F. Supp. 3d at 1310, and Commerce reasonably used four financial statements that satisfied its selection criteria. *See* Lucchini Final Cost Memo at Attachment I, Appx3276; *Albemarle Corp. v. United States*, 821 F.3d 1345, 1354 (Fed. Cir. 2016) (overturning methodological choice because "accuracy and fairness must be Commerce's primary objectives").

As explained in further detail below, Commerce's determination to include financial statements of Ciscato and Cogne in its profit ratio is supported by substantial evidence, and Commerce addressed all "material" arguments. *See* 19 U.S.C. § 1677f(i)(3)(A); *see also* SAA at 892 (explaining that existing law "does not require that an agency make an explicit response to every argument made by a party" but "instead requires that issues material to the agency's determination be discussed so that the path of the agency may reasonably be discerned").

### 1. **Ciscato**

Ellwood's arguments against the inclusion of Ciscato financial data focus on factors one and four of Commerce's four-factor test – that evidence regarding Ciscato's product offerings and customer base did not support its inclusion. Ellwood Br. at 24-29. Additionally, Ellwood contends that Commerce erred by relying on "insufficiently translated" financial statements because of a single untranslated word. *Id.* at 30. Ellwood is wrong.

Commerce explained that it had analyzed record evidence, including certain business proprietary information and interested party submissions, to determine whether each of the companies is involved in the production and sale of identical merchandise. IDM at 14, Appx3292. For Ciscato, Commerce evaluated the company website and financial statements, and determined that it is a forging company which produces blocks (that is, identical merchandise), and that it had revenue attributable to sales in the domestic market. IDM at 15, Appx3293; *see also* Lucchini's Comments on CV Profit and Selling Expenses at Exhibit 2, Appx2036-47; and Exhibit 7, Appx2420-25.

Regarding factor one, substantial evidence supports Commerce's determination that Ciscato is involved in the production and sale of identical merchandise. Commerce explained that while "it prefers to use the financial statements of producers of identical merchandise … there may be varying degrees to which a potential profit sources reflects the foreign like product." IDM at 13, Appx3291. Accordingly, Commerce "weigh{ed} the quality of the data against these factors." *Id*. This Court has recognized that there are times when Commerce must choose a source for CV profit from a pool of imperfect choices and explained that it will not undermine Commerce's decision so long as it is reasonable. *Id.* (citing *Husteel Co. v. United States*, 180 F. Supp. 3d 1330, 1338-39) (Ct. Int'l Trade 2016)).

Ellwood applies an overly restrictive definition of "identical merchandise" which excludes forged blocks from consideration of "identical merchandise" without any record citation. *See* Ellwood Br. at 26 ("Yet, the 'blocks' produced by Cogne and Ciscato were merely 'comparable' merchandise, just like the products made by OFAR and Fomec"). Ellwood does not refute that Ciscato is a forging company that produces blocks, but instead argues, again without record support, that Commerce's embrace of Cogne and Ciscato based on generalized

"block" production contravenes its preference for "identical merchandise" and is inconsistent

with its rejection of OFAR and Fomec.  Ellwood Br. at 26.  However, Commerce did not

determine that OFAR and Fomec were forging companies that produced blocks, rather,

Commerce found that while record indicates that they are producers of comparable merchandise,

there is no record evidence to indicate that either produced identical merchandise.  IDM at 15,

Appx3293.  While OFAR and Fomec's company websites indicate that they are forging

companies which serve customers in the Oil and Gas markets, neither indicates that they produce

blocks.  *See* Lucchini's Comments on CV Profit and Selling Expenses at Exhibit 8 (FOMEC

Website) (references to head cylinders, safety-system pinions, valve bodies, square and round

bars and plates, and special shaped flanges, but not blocks), Appx2433, and Exhibit 9 (OFAR

Website) (describing OFAR as "a worldwide leader in open die forging industry," but not

mentioning blocks), Appx2453.  Thus, Commerce's rejection of OFAR and Fomec financial data

is consistent with Commerce's acceptance of Ciscato's financial data.

      Next, on factor four, Ellwood maintains that the customer specificity factor does not

favor including Ciscato because "the administrative record does not even indicate that Ciscato

sold forgings to customers within the oil and gas industry."  Ellwood Br. at 28-29 (citing

Lucchini's Comments on CV Profit and Selling Expenses at Exhibit 7, Appx2413) ("describing

Ciscato's 'activity to include the sectors of construction, foodstuff, petrochemicals, heavy

machinery, earth-moving equipment, transport and defence,' but not oil and gas").  However,

Ellwood cherry picks excerpts from this exhibit while ignoring the rest of the record evidence.  If

one reads beyond the first page of that exhibit, on the page titled "Production Capabilities," the

exhibit demonstrates that Ciscato does offer open die forged blocks to the oil & gas markets.  *See*

Lucchini's Comments on CV Profit and Selling Expenses at Exhibit 7, Appx2425.  Further

below, in the same exhibit, in the webpage titled "Oil & Gas," it describes how Ciscato is "the benchmark" for many national and international companies in the oil and gas sector, indicating that it supplies products, including "forgings for blocks" to these companies. *Id.* And, in its financial statement Ciscato states that "{i}n terms of your company's areas of interest, the year that ended *saw the upswing in the Oil & Gas sector, in which Foc Ciscato has distinct experti*se." Lucchini's Comments on CV Profit and Selling Expenses at Exhibit 2, Management Report at 2, Appx2089 (emphasis added). Thus, Ellwood's claim that the record "does not even indicate" Ciscato serves customers in the oil and gas industry is inaccurate.

Lastly, Ellwood contends that Commerce wrongly relied on an "insufficiently translated" financial statement from Ciscato. Ellwood Br. at 30. For support, Ellwood identifies *one* Italian word – "Fucinati" – and two "seemingly English" words – "printed" and "more." *Id.* (emphasis added). The governing regulation, 19 C.F.R. § 351.303(e), states that "a document submitted in a foreign language must be accompanied by an English translation of the entire document *or of only pertinent portions*, where appropriate, unless the Secretary waives this requirement for an individual document." (emphasis added). In *Mid Continent Steel II*, the Federal Circuit upheld Commerce's rejection of partially translated financial statements where "Commerce found that the entire audit report, several pages of financial statements, and all but one footnote were left untranslated." 941 F.3d 530, 540. And at the other end of the spectrum, the Court has recognized that Commerce does not have a practice of "rejecting financial statements where *any* information is missing, regardless of its nature." *Ass'n of Am. Sch. Paper Suppliers v. United States*, 791 F. Supp. 2d 1292, 1298 (Ct. Int'l Trade 2011) (emphasis in original) (accepting statements "not so incomplete as to warrant rejection").

Ellwood's making a Federal case over one untranslated word needlessly burdens the Court and Executive Branch. Although the word "Fucinati" does appear untranslated one time, the same word was translated earlier in the same exhibit to mean "forgings." *Compare* Lucchini's Comments on CV Profit and Selling Expenses at Exhibit 2, Appx2057 (Ciscato translated financials) ("UNI EN ISO 9001:2015 Production of steel *forgings* and stampings – LRQA body") *with* Exhibit 3, Appx2118 (Ciscato untranslated financials) ("UNI EN ISO 9001:2015 Produzione di *fucinati* e stampati in acciaio – Organismo LRQA") (emphasis added). Ellwood is only able to identify *one* Italian word out over three dozen pages of financial statements, in contrast to *Mid Continent Steel II*, where entire pages, and all but one footnote were left untranslated. 941 F.3d at 540. Ellwood identifies no vital untranslated information. One word, which was translated earlier in the document, can hardly be defined as a missing "pertinent portion" of the document. 19 C.F.R. § 351.303(e).

Although Commerce did not explicitly grapple with this argument about a single untranslated word, this is an obvious situation where an agency "is not require{d}. . . to address every argument raised by a party or explain every possible reason supporting its conclusion." *Snyder v. Dep't of Navy*, 854 Fed. Cir. 1366, 1373 (Fed. Cir. 2017) (citation omitted). And Ellwood cannot plausibly show any prejudice. *See CVB, Inc. v. United States*, 675 F. Supp.3d 1324, 1343 (Ct. Int'l Trade 2023) ("The touchstone of the harmless error inquiry is prejudice. If the errors did not change the ultimate result of the agency action, they are harmless.").

### 2. **Cogne**

As previously noted, Ellwood asked that Commerce "calculate Lucchini's CV profit using data sources provided by" it, *including Cogne*, because Ellwood's "sources {are} *superior* to the alternatives advocated by Lucchini." Petitioners' Pre-Preliminary Comments at 1-2,

Appx2841-42 (emphasis added); Appx2867 (arguing that "Cogne's 2021 financial statement data are a final usable alternative for calculating CV profit").  Ellwood's current argument *against* the inclusion of Conge's financial data focuses on factor one – the similarity between surrogate's products and respondent's products.  *See* Ellwood Br. at 24-27.

Notably, it was after Commerce released its preliminary constructed value calculation which included a profit rate of 5.82 for Cogne, a rate below the preliminary average profit rate, that Ellwood did an about face by objecting to the use of Cogne's data.  *See* Preliminary CV Calc Memo at Attachment 3 (Jan. 31, 2023), Appx3276.  To support its argument that Commerce should no longer include Cogne in its CV profit calculation, Ellwood claimed that record evidence did not identify Cogne as a producer of fluid end blocks during the relevant period. Ellwood Br at 26.  However, Ellwood relies on record evidence relevant only to sales of *inputs* for fluid end blocks – *not fluid end blocks* themselves.  Ellwood Br. at 26 (citing Lucchini's Response to Request for Market Price Information for Stainless Steel Ingots (Feb. 10, 2023) at Ex. 1 (Appx87116-21))*.*  Importantly, the passage on which Ellwood relies was in response to a request regarding the sale of inputs – not blocks.  Lucchini's Response to Request for Market Price Information for Stainless Steel Ingots (Feb. 10, 2023) at Ex. 1, Appx87121.  This does not upset Commerce's determination that production of blocks for tools was production of identical merchandise, and reasonably determined that Cogne's company website indicates that the company is a forging company which produces blocks for tools.  IDM at 14-15, Appx3292-93; *see also* Petitioners' CV Profit Comments at Exhibit 3-C, Appx1901.  This is also consistent with the original investigation, in which Commerce determined that Cogne was a "producer of open die forged products (including fluid end blocks)." *Forged Steel Fluid End Blocks From Italy*, 85 Fed. Reg. 79,996 (Dep't of Commerce Dec. 11, 2020) and accompanying IDM at 15.  Although

Ellwood may disagree with Commerce's finding that forged blocks for tools are identical merchandise, it cites no support for its claim that "generalized 'block' production contravenes {Commerce's} stated preference for 'identical merchandise.'"  Ellwood Br. at 26.

In sum, Ellwood's strained objection to data that Ellwood itself placed on the record fails to upset Commerce's reasonable determination.

## III. Commerce's Major Input Analysis Is Supported By Substantial Evidence And In Accordance With Law

Commerce used a constructed market price based on ingots sold by Lucchini's affiliate to Company B and adjusted the price using the financial information pertaining to the unique technical and logistical aspects of the ingots consumed in the production of subject merchandise to conduct its major input analysis pursuant to 19 U.S.C. § 1677b(f)(3).  IDM at 23, Appx3301. Ellwood contends that Commerce misapplied the statute and failed to identify substantial evidence for its market price benchmark of stainless steel ingots.  Ellwood Br. at 32.  However, because Commerce's determination was supported by substantial evidence and in accordance with law, this Court should sustain Commerce's major input analysis.

### A. Framework For Major Input Analysis

Commerce reasonably applied the major input rule to determine an accurate constructed value for Lucchini's subject merchandise.  In addressing transactions between affiliated parties involving major inputs, the statute recognizes that the transaction price might not reasonably reflect the actual value of the major input and, thus, Commerce "may determine the value of the major input on the basis of the information available regarding such cost of production."  19 U.S.C. § 1677b(f)(3).  Commerce's regulations, in turn, direct that Commerce normally will determine the value of a major input purchased from an affiliated person based on the "higher of: (1) the price paid by the exporter or producer to the affiliated person for the major input; (2) the

amount usually reflected in the sales of the major input in the market under consideration; or (3) the cost to the affiliated person of producing the major input."  19 C.F.R. § 351.407(b).

> **B.**    **Commerce's Use Of Lucchini's Affiliate Sales To An Unaffiliated Party For Its Major Input Analysis Is Support By Substantial Evidence**

Commerce analyzed each of the sources identified by interested parties to determine which source best represents the market price of stainless steel ingots to calculate an amount under section 351.407(b)(2).  IDM at 19-23, Appx3297-3301.  Ellwood disagrees with how Commerce weighed the evidence and argues that Commerce "failed to identify substantial evidence for its market price benchmark for FEB-grade stainless steel ingots."  Ellwood Br. at 32.  Commerce weighed the record evidence in light of the statutory preferences and selected a reasonable benchmark for stainless steel ingots.  IDM at 19-23, Appx3297-3301.

The statute directs only that Commerce values major inputs "on the basis of the information available regarding such cost of production."  19 U.S.C. § 1677b(f)(3).  Commerce's practice to establish a market price is to first use the prices paid by the respondent to an unaffiliated supplier for the input, and if such a price is not available, it will use the prices charged by the affiliated supplier to unaffiliated customers.  IDM at 19-20, Appx3297-98.  If neither of the preferred approaches are available, Commerce considers other market values and evidence of the most appropriate market price source.  *Id.* at 20, Appx3298; *see also Best Mattress Int'l Co. Ltd. v. United States*, 622 F.Supp.3d 1347, 1383 (Ct. Int'l Trade 2023).

Commerce explained in the preliminary results that it intended to "request additional information from Lucchini and the petitioner regarding the market prices of ingots" and did not make an adjustment at that time.  PDM at 10-11, Appx2925-26.  Commerce issued a letter to all

interested parties[2] requesting "new factual information concerning the market price of stainless steel ingots." *See* Request for Market Price Information for Stainless Steel Ingots, Appx2929. Because stainless steel ingots are a major input obtained from an affiliated supplier, a market price was necessary to perform the arms-length analysis. *Id.*

Commerce received timely responses to its request for stainless steel ingot information from both Lucchini and petitioners, as well as rebuttals one week later.  IDM at 2, Appx3280. Lucchini reported that it was unable to obtain a market price for the specific grade of stainless steel ingots consumed in the production of subject merchandise.  IDM at 20, Appx3298. Ellwood however submitted three potential sources: (1) Company A's United States purchases of the specific stainless steel grade consumed in the production of subject merchandise; (2) Eurostat data inclusive of Italian imports during the relevant period; and (3) Lucchini's affiliate, Company B, sales of stainless steel ingots to unaffiliated parties.  *Id.*  Commerce analyzed each potential market price benchmark to determine which source best represents the market price of stainless steel ingots in the market under consideration.  *Id*.  Commerce reasonably determined that for purposes of this review, the third option, Lucchini's affiliate's sales to an unaffiliated customer was "preferable because it is illustrative of the affiliate's sales prices which aligns with Commerce's preferences."  IDM at 22, Appx3300; *see also Best Mattress*, 622 F. Supp.3d at 1384 (explaining Commerce's practice) (citing *Rebar Trade Action Coal. v. United States*, 398 F. Supp. 3d 1359, 1372 (Ct. Int'l Trade 2019); *Diamond Sawblades Mfrs. Coal. v. United States*, No. 06–00248, 2014 WL 5463307, at *2 n.2 (Ct. Int'l Trade Oct. 29, 2014), *aff'd sub nom. Diamond Sawblades Mfrs. Coal. v. Hyosung D & P Co*., 809 F.3d 626 (Fed. Cir. 2015)).

---

[2] Ellwood portrays the facts as "Commerce provided Lucchini five separate chances to provide such a benchmark, but Lucchini failed to do so."  Ellwood Br. at 32.  Commerce never determined that Lucchini failed to cooperate and Ellwood does not raise such a claim.

First, Commerce considered the facts that Lucchini's affiliated supplier is located in Italy, and record evidence indicated that there was an Italian market for stainless steel ingots of the same or similar grade as those consumed in the production of subject merchandise.  IDM at 21, Appx3301.  Therefore, Commerce determined that an appropriate Italian market price would be more reflective of arm's length prices and what Lucchini would have paid if it had not sourced the materials from its affiliated supplier.  *Id*.  Ellwood first alleges that Commerce erred when it determined that Italian market prices most accurately reflected the market under consideration. Ellwood Br. at 34-36 (arguing that relevant authorities do not support Commerce's "rigid" preference for Italian market prices and proposing use of United States purchase data instead). However, Ellwood never explains why the United States would be the correct "market under consideration" in the context of the major input rule, which appears in the section of the statute that is titled "Normal Value," such that United States purchase data would have been the appropriate benchmark in calculating normal value.  *Id.*; *see generally* 19 U.S.C. § 1677b. Indeed, having normal value based on United States market prices – which have absorbed the President's import measures on steel under 19 U.S.C. § 1862 – would turn the dumping calculation on its head.  Nonetheless, because the phrase "market under consideration" is purposefully broad to ensure that Commerce may select a market that allows for a reasonable source of market value, Commerce reasonably determined that an Italian market price would be more reflective of an arm's length price – for an Italian manufacturer to pay for a major input. 19 C.F.R. § 351.407(b)(2); *see* IDM at 21, Appx3301; *Best Mattress*, 622 F.Supp.3d at 1384.

Moreover, Ellwood's reliance on *Best Mattress* and *PT. Zinus* at pages 33 of its brief is misplaced.  In *Best Mattress*, the Court remanded for Commerce to consider whether "market under consideration" could include the market of the affiliated supplier.  622 F. Supp.3d at 1382-

83 (explaining that "under *Chevron* step two, Commerce's interpretation of 'market under consideration' to mean the country subject to investigation as opposed to the country of the affiliated supplier was unreasonable").  But here, the Italian market is the correct choice under either alternative, the country subject to investigation or the country of the affiliated supplier, because Lucchini's affiliated supplier is also located in Italy.  IDM at 21, Appx3301.  And in any event, on remand in *Best Mattress*, Commerce continued to use the same "market under consideration" and the Court sustained that determination.  *Best Mattresses Int'l Co. v. United States*, No. 21-00281, 2024 WL 2206461, at *4 (Ct. Int'l Trade May 16, 2024).  Similarly, *PT. Zinus Glob. Indonesia v. United States*, 628 F. Supp. 3d 1252, 1282 (Ct. Int'l Trade 2023), is not even a major input rule case.

Next, Ellwood maintains that Commerce "erred in failing to consider the merits of a product-specific benchmark."  Ellwood Br. at 36.  To the contrary, after finding the Italian market appropriate, Commerce analyzed which of the two remaining market price sources, Eurostat data or Lucchini's affiliate sales to Company B, best reflected arm's length value of ingots which were either identical or comparable to those consumed in the production of subject merchandise.  IDM at 21, Appx3301.  Commerce detailed how the Eurostat data reflects all imports into Italy under Harmonized Tariff Schedule (HTS) subheading 7218.10.00 and thus, includes a broad range of products which vary widely in terms of their physical characteristics and likely prices.  *Id.*  Additionally, Commerce noted that the Eurostat data is reported on a CIF basis thus is inclusive of freight and insurance, whereas the ingots Lucchini consumed in the production of subject merchandise are purchased from a domestic affiliated supplier.  *Id.*

Turning to Lucchini's affiliate sales to Company B, Commerce found that Ellwood employed a reasonable filter of Lucchini's affiliate's sales to identify ingot grades which could

potentially be compared to the grade consumed in the production of subject merchandise.  IDM at 21-22, Appx2299-3300.  Commerce acknowledged that the record lacked evidence of the specific ingots grade used by Lucchini to produce subject merchandise because Lucchini chose to code it as "customer proprietary standard."  IDM at 22, Appx3300.  However, Commerce reasonably determined that Lucchini's affiliate's sales of a grade of ingot to a customer which produces products to the same specification as subject merchandise is an appropriate proxy for market prices charged by Lucchini's Italian affiliated supplier to unaffiliated customers.  *Id*.

After selecting a reasonable benchmark, Commerce attempted to ensure that the comparison of the transfer price to the market price is made on an apples-to-apples basis.  IDM at 22-23, Appx3300-01.  Commerce considered the record evidence of certain technical and logistical aspects of the sales transactions between Lucchini's affiliated supplier and Lucchini that warranted adjustment.  *Id.*; *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("an overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible").  Commerce explained that the record contained sufficient information to permit Commerce to construct an appropriate surrogate market prices using the ingot sales to Company B selected as a benchmark and financial information which quantified the cost differences attributable to the unique technical logistical aspects of the stainless steel ingots consumed in the production of subject merchandise.  *Id.* at 23, Appx3301.  Specifically record evidence demonstrates that Lucchini purchases Type X ingots from its affiliated supplier and Lucchini submitted documentation to support the corresponding cost differences between Type X and Y ingots, so Commerce adjusted the cost of the ingots sold to Company B by Lucchini's affiliate to remove that cost difference.  Final Cost Memo at 2, Appx87647.  Indeed, the Court of Appeals for the Federal Circuit has

sustained similar use of a constructed market price for purposes of applying the major input rule. IDM at 23 (citing *Huvis Corp. v. United States*, 570 F.3d 1347, 1353-55 (Fed. Cir. 2009)), Appx3301; *see also Huvis*, 570 F.3d 1350-55 (sustaining Commerce's use of facts available on the record to construct a market price, in applying the major input rule, because it provided "a more complete analysis under the major input rule, and result{ing} in a more accurate calculation of {respondent's} dumping margin").  Ellwood does not cite this important case.

Commerce constructed a reasonable market price using the ingots sold by Lucchini's affiliate to Company B as a benchmark and adjusted the price using the financial information pertaining to the technical and logistical aspects of the ingots consumed in the production of subject merchandise.  IDM at 23, Appx3301.  Because Commerce determined that the transfer price paid by Lucchini to its affiliated supplier exceeded both the affiliate's cost of production and the constructed market price, Commerce determined that no additional adjustment to Lucchini's reported ingot costs was warranted.  Lucchini Final Cost Memo at 2, Appx87647.

Ellwood's contention, Ellwood Br. at 32, 41, that Lucchini's February 17, 2023 rebuttal submission should have been rejected as untimely new factual information pursuant to 19 C.F.R. § 351.302(d)(1)(i) is immaterial and unsupported by the record.  Lucchini's submission did not meet the definition of untimely filed new factual information under 19 C.F.R. § 351.302, which covers "untimely filed or *unsolicited* material." (emphasis added).  Commerce had set the deadline for "{r}ebuttal comments, *and information* to rebut, clarify or correct factual information submitted on the market price of stainless steel ingots" of February 17, 2023, Appx2929 (emphasis added)[3], and thus, the rebuttal submission was not "untimely filed" under

---

[3]  Commerce extended the deadlines in its January 31 letter, Appx2929, by three days. *See* Appx2932-33.

the regulations.  Moreover, Ellwood was provided an opportunity to comment on it, as it did, in

its case brief.  *See* Petitioners' Case Brief at 30, Appx3206.  Ellwood's cited cases stand in stark

contrast to the facts here.  *See Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 589

F. Supp. 3d 1195, 1207 (Ct. Int'l Trade 2022) (rejection of comments filed "*more than two*

*months after the deadline*"); *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1343 (Ct. Int'l

Trade 2015) (factual information not submitted in response to agency's invitation).

Lucchini's rebuttal submission was timely filed to rebut petitioners' data and allegation

regarding Commerce's major input analysis.  *See generally* Lucchini's Rebuttal Ingot Market

Price Information (Feb. 17, 2023), Appx3123-24.  While Commerce did not explicitly address

Ellwood's request to reject the submission as untimely, the relevant regulation only requires that

Commerce "to the extent practicable" provide a "written notice stating the reasons for *rejection*,"

but does not require such explanations for acceptance of timely filed information.  19 C.F.R.

§ 351.302(d)(2) (emphasis added).  For example, Commerce did not need to explain its reasons

for acceptance of Ellwood's response to Commerce's request for market price information.  To

require Commerce to explain why every timely submission is timely would impose an

unnecessary administrative burden, and is not required by the statute or regulations.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny Ellwood's motion for

judgment on the agency record, and sustain Commerce's final determination in all respects, and

enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

24

                                          PATRICIA M. McCARTHY
                                          Director

                                          /s/  FRANKLIN E. WHITE, JR.
                                          Assistant Director

HENDRICKS VALENZUELA                      /s/  STEPHEN C. TOSINI
Of Counsel                                Senior Trial Attorney
                                          Department of Justice
U.S. Department of Commerce               Civil Division
Office of the Chief Counsel for           Commercial Litigation Branch
Trade Enforcement & Compliance            PO Box 480, Ben Franklin Station
1401 Constitution Ave., NW                Washington, D.C. 20044
Washington, D.C. 20230                    Tel.: (202) 616-5196
                                          Email: Stephen.Tosini@usdoj.gov

May 24, 2024                              Attorneys for Defendant

25

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(2), the undersigned certifies that Defendant's Corrected Response to Plaintiff's Motion for Judgment on the Administrative Record contains 7,182 words as computed by our word processing system, excluding those portions that do not count toward the word limitation. Our filing thus complies with the Court's Chambers Procedures.

<u>/s/ Stephen C. Tosini</u>

26