UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | | |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Court. No. 23-00191 |
| v. | ) ) | **NONCONFIDENTIAL VERSION** |
| UNITED STATES, | ) ) ) | Proprietary Information Removed from Brackets on pages i, 12-13, 17, and 19-22. |
| Defendant. | ) ) | |

**REPLY IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300
(202) 567-2301
*mgetlan@cassidylevy.com*

*Counsel to Ellwood City Forge Company,*
*Ellwood Quality Steels Company,*
*Ellwood National Steel Company, and*
*A. Finkl & Sons*

Dated:  June 28, 2024

NONCONFIDENTIAL VERSION                                 *Confidential Information Removed from Brackets*

## **Table of Contents**

Page

ARGUMENT ........................................................................................................... 2

I.  The Government's Response Confirms that Commerce's Inclusion of Ciscato and
    Cogne in the CV Profit Calculation Is Unlawful and Unsupported by Substantial
    Evidence ........................................................................................................ 2

    A.  The Scope Language, Dictionary Definitions, and Commerce's Own
        Administrative Statements in this Administrative Review All Establish that
        "Identical" Means "the Same as" In-Scope Merchandise, Not Merely "Similar" .......... 3

        1.  The Scope Language Establishes that FEBs Are Far More Specific than
            Mere Forged Blocks ...................................................................... 4

        2.  Dictionary Definitions and Commerce Practice Confirm that "Identical"
            Means "The Same," Not Merely "Similar" ......................................... 5

        3.  Commerce's Own Statements in this Administrative Review Confirm that
            "Identical Merchandise" Meant In-Scope FEBs ................................ 6

    B.  Having Established that "Identical Merchandise" Means "FEBs," the
        Government Offers No Meaningful Defense to Plaintiffs' Claims ............... 8

    C.  *Post-Hoc* Reasoning Cannot Sustain Commerce's Administrative
        Determination ............................................................................ 11

        1.  Evidence from the Original Antidumping Investigation Is Not on this
            Record and Did Not Concern 2021 ................................................ 11

        2.  Cogne Sells Ingots, but [                                      ] for Sale ....... 12

        3.  Ciscato's Translation Error Materially Affects Its Data Quality; Accepting
            the Government's *Post Hoc* Translation Merely Confirms the Issue
            Plaintiffs Suspected ................................................................. 13

        4.  Counsel Is not the Factfinder Regarding Ciscato's Customer Base .............. 15

II.  The Government Offers No Defense of Commerce's Flawed Application of the
     Transactions Disregarded Rule; Waiver May Apply ......................................... 16

    A.  The Government Misconstrues Plaintiffs' Arguments Rather than Address
        Commerce's Failure to Weigh the Merits of a Product-Specific Benchmark ......... 18

    B.  The Government's Absolutist Defense of the Acceptance of Lucchini's
        Untimely Submission Invites a Free-For-All of Administrative Submissions ........... 21

**NONCONFIDENTIAL VERSION**

C.    Like Commerce, the Government's Empty Characterization of Commerce's Benchmark Adjustment as "Apples-to-Apples" Fails to Address the Substance of Plaintiffs' Critique ................................................................................... 22

CONCLUSION ............................................................................................................................. 23

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677b(e) ..................................................................................................4

19 U.S.C. § 1677b(f) ...............................................................................................16

19 U.S.C. § 1677b(f)(2) ......................................................................................16-17

19 U.S.C. § 1677b(f)(3) ......................................................................................16-17

19 U.S.C. § 1677e .....................................................................................................23

19 U.S.C. § 1677f(i)(3)(A) .......................................................................................21

Regulations

19 C.F.R. § 351.303(e)..............................................................................................13

Court Decisions

*Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241 (Ct. Int'l
Trade 2021)........................................................................................................4, 7

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)  ...........................11

*Dubin v. United States,* 599 U.S. 110 (2023)..............................................................3

*Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009)....................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
(1983) ...................................................................................................................11

*Power Integrations, Inc. v. Lee*, 797 F.3d 1318 (Fed. Cir. 2015)................................11

*Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329 (Ct. Int'l
Trade 2018)...........................................................................................................17

*Res-Care, Inc. v. United States*, 735 F.3d 1384 (Fed. Cir. 2013) ..................................5

*Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272 (Ct.
Int'l Trade 2020)...................................................................................................12

*Tri Union Frozen Products, Inc. v. United States*, 163 F. Supp. 3d 1255
(2016)....................................................................................................................12

*United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320 (Fed. Cir. 2013) ......................................................................................................................17

Administrative Determinations

*Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review, 2012-2013*, 79 Fed. Reg. 51,309 (Aug. 28, 2014) ....................................................................................................12

*Certain Paper Shopping Bags from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 45,839 (May 24, 2024)..........................................................................................................5

*Forged Steel Fluid End Blocks From Italy: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 79,996 (Dec. 11, 2020)................................ 11-12

*Hardwood and Decorative Plywood From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 58,273 (Sept. 23, 2013)...........................................................................................................6

*Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 87 Fed. Reg. 13,968 (Mar. 11, 2022) ............................................................ 5-6

Court Rules

USCIT Rule 56.2 ..........................................................................................................1

USCIT Rule 56.2(c) ....................................................................................................17

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs Ellwood City Forge Co., Ellwood Quality Steels Co., Ellwood National Steel Co., and A. Finkl & Sons (together collectively, "Plaintiffs") submit the following brief in reply to the Government's opposition to Plaintiffs' motion for judgment on the agency record. Defendant's Response in Opposition to Plaintiffs' Motion for Judgment on the Agency Record, ECF Doc. 20 (May 24, 2024) ("Def. Br."); *see also* Memorandum of Law in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, ECF Doc. 18 (Mar. 6, 2024) ("Plaintiffs' Br.").

Commerce calculated a constructed value that was depressed by Commerce's arbitrary inclusion of non-FEB producers' data in the SG&A expense and profit amounts. Commerce's application of the Transactions Disregarded Rule was furthermore unlawful and unsupported by substantial evidence for Commerce's failure to meaningfully explain why it rejected the only grade-specific price benchmark on the administrative record. The Government's response repeatedly resorts to mischaracterizing Plaintiffs' argument, fails to address Plaintiffs' substantive points and otherwise confirms that Commerce did not consider the actual issues raised administratively by Plaintiffs. Moreover, by relying solely on public summaries, the Government avoids acknowledging proprietary details relevant to Commerce's analysis. The Court should not entertain defense counsel's repeated efforts to cure Commerce's deficient determination with flawed, *post hoc* rationales. That counsel resorted to such an approach underscores Plaintiffs' position that Commerce never weighed the evidence relevant to Plaintiffs' contentions in the first instance. Remand remains necessary to address the flaws which render Commerce's determination unlawful and unsupported by substantial evidence.

# ARGUMENT

**I.    The Government's Response Confirms that Commerce's Inclusion of Ciscato and Cogne in the CV Profit Calculation Is Unlawful and Unsupported by Substantial Evidence**

Plaintiffs' opening brief advanced three main lines of argument against Commerce's inclusion of financial data from Ciscato and Cogne in constructed value ("CV") selling, general, and administrative ("SG&A") expense and profit calculations: (1) Commerce misapplied the preference for producers of "identical" merchandise by diluting superior data from FEB producers (OMR and Metalcam) with inferior data from non-FEB producers (Ciscato and Cogne), and relatedly failed to address Plaintiffs' administrative arguments that Ciscato and Cogne were not FEB producers; (2) Commerce failed to address Plaintiffs' administrative arguments against accepting Ciscato's financial statements despite material problems with its translations that were relevant to Commerce's four-factor analysis; and (3) Commerce failed to address Plaintiffs' administrative arguments concerning whether Ciscato sold forgings to oil and gas customers.

Plaintiffs begin from the premise that, but for the deficiencies described above, all four competing sources for CV profit and SG&A expense data were otherwise materially equivalent. The government does not dispute this premise.  Neither Commerce's administrative determination nor its response before the court contains any suggestion that either Ciscato or Cogne was <u>superior</u> to OMR or Metalcam with respect to <u>any</u> of the factors that Commerce weighed in selecting among sources for CV profit and SG&A expense data. Consequently, remand is necessary if the court agrees with Plaintiffs that any one of the deficiencies described above rendered Ciscato's and/or Cogne's data inferior to that of OMR and Metalcam, or that Commerce failed to administratively address evidence that Ciscato's and/or Cogne's data were inferior to the other CV profit and expense data.

**A.  The Scope Language, Dictionary Definitions, and Commerce's Own Administrative Statements in this Administrative Review All Establish that "Identical" Means "the Same as" In-Scope Merchandise, Not Merely "Similar"**

Both the statute and Commerce's standard practice in selecting among sources of CV SG&A and profit data establish a preference for producers of "identical merchandise."  *See* Plaintiffs' Br. at 20-23. The government acknowledges Commerce's "preference for using financial statements of producers of identical merchandise." Def. Br. at 5-6. Yet, nothing in the administrative record establishes that Ciscato or Cogne produced FEBs during the period covered by their financial data. The Government does not dispute this. *See* Def. Br. at 11-17. Instead, the Government relies entirely on the eyebrow-raising theory that Commerce's preference for "identical merchandise" in fact denotes a preference for "similar merchandise" other than FEBs, even when data for FEB producers are available. *See* Def. Br. at 12 (arguing that Plaintiffs' definition of "identical merchandise" is "overly restrictive").

Contrary to the government's suggestion, diluting FEB producers' data with data from non-FEB producers was manifestly <u>not</u> choosing "the best fit" for constructing SG&A expense and profit of FEB production.  Def. Br. at 9.  *First*, the scope language governing this antidumping proceeding establishes that "forged steel fluid end blocks" are a distinct product that is not coextensive with generic "forged blocks" as a whole.  *Second*, dictionary definitions and Commerce practice establish that the word "identical" does not denote mere "similarity" or "comparability." Where, as here, "the Government argues for a result that the English language tells us not to expect, ... we must be very wary of the Government's position." *Dubin v. United States*, 599 U.S. 110, 124 (2023). *Finally*, consistent with the foregoing, Commerce's own statements in this administrative review—including those cited by the Government—equate "identical merchandise" with "merchandise under consideration," *i.e.*, FEBs.  Indeed, Commerce's administrative statements mirror the Government's recent litigating position in

3

*Ancientree Cabinet*, wherein the Court "agree{d} with Commerce that the websites of…the two manufacturers Ancientree argues produce identical merchandise, do not prove they produce furniture identical to the in-scope wooden cabinets and vanities." *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1257 (Ct. Int'l Trade 2021) (emphasis supplied). The court should therefore reject the Government's specious defense to the most fundamental of Plaintiffs' claims.

    1.    *The Scope Language Establishes that FEBs Are Far More Specific than Mere Forged Blocks*

Commerce's stated preference for deriving CV profit and SG&A expense data from "producers of identical merchandise" is devoid of meaning unless it contemplates merchandise that is "identical" to something. *See* Final IDM at Appx0003291. Commerce's preference for identicality does not exist in a vacuum. And because the entire point of the constructed value exercise is to calculate the home market value of merchandise being sold in the U.S., *see* 19 U.S.C. § 1677b(e), the target merchandise is the class of product described in the scope language of the antidumping proceeding.

Here, as reflected in Commerce's Final IDM, the scope language specifically covers "fluid end blocks, whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps." Appx0003280. The scope language goes on to specify chemistry requirements for iron, nickel, copper, chromium, and molybdenum. *Id.* at Appx0003280-0003281. It mentions illustrative steel standards including Grades 15-5 and 17-4. *Id.* at Appx0003281. Thereafter, the scope language establishes specific height, width, and length ranges, as well as minimum tensile strength and hardness. *Id.* Given these restrictions, the in-scope merchandise to which Commerce is attempting to select something "identical" for purposes of constructing home market value does not encompass forged steel blocks of just any

chemistry, size, or physical characteristics. Indeed, the Government's attempts to equate forged steel FEBs with "blocks" and its bewilderment as to the source of "record support" for Plaintiffs' interpretation of "identical," *see* Def. Br. at 12, bespeak a fundamental confusion about the scope of the antidumping order Commerce administers, and further underscores the need for remand.

2.   *Dictionary Definitions and Commerce Practice Confirm that "Identical" Means "The Same," Not Merely "Similar"*

Dictionaries confirm that "identical" is distinct from merely "similar." When presented with a word requiring interpretation, courts often resort to dictionary definitions. *See, e.g.*, *Res-Care, Inc. v. United States*, 735 F.3d 1384, 1388 (Fed. Cir. 2013) (the Federal Circuit "may refer to dictionary definitions to determine the ordinary meaning of an undefined statutory term."). Here, such an exercise establishes that "Identical" ordinarily means "1: similar or alike *in every way*" or "2: being the very same; selfsame," "Identical: Adj," *CollinsDictionary.com* (last accessed June 3, 2024) (emphasis supplied); *see also* "Identical: Adj," *Dictionary.com* (last accessed June 3, 2024) (same), as well as "1: being the same" or "2: having such close resemblance as to be essentially the same," "Identical: Adj," *Merriam-Webster.com* (last accessed June 3, 2024).

This straightforward understanding is confirmed by Commerce's statements in other cases. In *Paper Bags from Vietnam*, Commerce confronted a virtually identical situation and rejected financial statements for companies that produce "comparable merchandise, but which are not covered by the scope of this investigation," selecting instead a company that "produces identical merchandise." *Certain Paper Shopping Bags from the Socialist Republic of Vietnam*, 89 Fed. Reg. 45,839 (May 24, 2024), IDM at Comment 1. Similarly, in *Light-Walled Rectangular Pipe from the PRC*, Commerce selected certain financial statements for use in surrogate value calculations "because they are from a company that produces identical merchandise — which

Commerce prefers when available on the record (*i.e.*, welded rectangular steel pipe) — <u>to the products under the scope</u>." *Light-Walled Rectangular Pipe and Tube From the People's Republic of China*, 87 Fed. Reg. 13,968 (Mar. 11, 2022) (AD AR Final), IDM at Comment 2 (emphasis supplied, second em dash supplied).  And again, in *Plywood from the PRC*, Commerce explained: "The scope of this investigation covers an extremely broad range of merchandise, and <u>all merchandise falling within that scope</u> is identical merchandise unless it is graded for structural uses or falls under another exclusion…." *Hardwood and Decorative Plywood From the People's Republic of China*, 78 Fed. Reg. 58,273 (Sept. 23, 2013) (LTFV Final), IDM at 66 (emphasis supplied) (classifying companies as producers of "comparable merchandise" where the record evidence was insufficient to permit a finding that they produced merchandise that was "identical").

Given the foregoing, it is untenable for the Government to suggest that interpreting "identicality" to mean in-scope "FEBs" rather than mere "forged blocks" is "overly restrictive." *See* Def. Br. at 12. Plaintiffs are simply requesting that Commerce's determination reflect its stated preference for "identical merchandise," consistent with the dictionary definition and Commerce practice (including the Government's papers in other actions before this court).

3. *Commerce's Own Statements in this Administrative Review Confirm that "Identical Merchandise" Meant In-Scope FEBs*

Commerce's own statements in the administrative determination underlying this appeal further preclude the Government's attempts to belatedly transmogrify "identical" into "similar" and broaden Commerce's preference well beyond its ordinary meaning. The Government itself equates Commerce's statement in its public IDM that financial statements of companies that produce "identical merchandise" are selected over those that produce "comparable merchandise," IDM at 14 (Appx0003292), with Commerce's statement in its accompanying

confidential cost memo that it had selected the four producers in question on the theory that they

were "involved in the production and/or sale of the merchandise under consideration," Final Cost

Memo at 1 (Appx0087646).  *See* Def. Br. at 10. And Commerce's IDM equated the terms

"identical merchandise" and "merchandise under consideration" a second time as well:

> Commerce has a practice of selecting the financial statements of companies
> involved in the production and sale of identical merchandise over the financial
> statements of companies which are involved in the production and sale of
> comparable merchandise solely. Accordingly,…we have reevaluated the proposed
> surrogate financial statements to distinguish between those companies involved in
> the production and sale of the merchandise under consideration and those involved
> in the production and sale of comparable merchandise solely.

Final IDM at Appx0003292 (emphases supplied). Meanwhile, standard language in Commerce's

initial questionnaire made clear at the outset of the administrative review that "merchandise

under consideration" refers to products falling within the scope language of this antidumping

order.  *E.g.*, Initial Questionnaire at D-1 n.20 (Appx0001106) ("Throughout the questionnaire,

whenever we refer to the merchandise under consideration (MUC) we are referring generally to

all products within the scope of the review that your company sold in any market."); *see also* A-3

(Q.1.i) (Appx0001022) ("If you sold merchandise that falls under the description of the

merchandise under consideration (as described in Appendix III)…"); Appendix III

(Appx0001157-0001158) (reproducing scope language).

    Commerce's own statements thus corroborate the plain meaning of the phrase "identical

merchandise," as applied by Commerce in other proceedings. And the Government has defended

before this court this common sense understanding that the term "identical" merchandise equates

to "in-scope" merchandise.  In *Ancientree Cabinet*, the Court "agree{d} with Commerce that the

websites of…the two manufacturers Ancientree argues produce identical merchandise, do not

prove they produce furniture identical to the in-scope wooden cabinets and vanities." *Ancientree*

*Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1257 (Ct. Int'l Trade 2021) (emphasis supplied). The Government makes no explanation for its about-face in this proceeding.

Here, Commerce recognized the statutory preference for selecting a data source that reflected production of in-scope products, *i.e.*, "identical merchandise." Despite this preference, Commerce made no finding that Ciscato or Cogne produced <u>FEBs</u> during the period covered by their data. *See* Final IDM at Appx0003292-0003293. Therefore, Commerce erred as a matter of law by including data from two producers—Ciscato and Cogne—that did not make "identical merchandise" during the relevant period.

**B.    Having Established that "Identical Merchandise" Means "FEBs," the Government Offers No Meaningful Defense to Plaintiffs' Claims**

The government suggests, as it often does before the U.S. Court of International Trade, that Plaintiffs are asking this Court to reweigh record evidence. *See, e.g.*, Def. Br. at 7, 10-11. This rote defense is unsupported by the record. Despite Plaintiffs having pounded the fact that FEBs are not generic forged blocks for several pages in their administrative case brief, *see* Plaintiffs' Administrative Br. at Appx0087343-0087348, the government identifies no instance where Commerce addressed how generic forged blocks were "identical" to FEBs, or otherwise discussed how a generic group of products could satisfy Commerce's preference for "identical merchandise." Instead, as described above, the government *acknowledges* the lack of record discussion and relies entirely on the theory that Commerce implicitly concluded that "identical" (FEBs) in fact means "similar" (generic forged blocks). *See, e.g.*, Def. Br. at 12-13.

But glossing over the dispositive crux of Plaintiffs' argument against including Cogne's and Ciscato's financial statement is not consistent with the substantial evidence standard. Nothing in Commerce's conclusory narrative demonstrates that it ever "weighed the evidence" concerning the distinctions between FEBs and generic forged blocks in the first place. *See* Final

IDM at Appx0003292-0003293 (simply observing that Cogne "produces blocks for tools" and that Ciscato "is a forging company which produces blocks"). This is all the more inadequate given that the plain meaning of "identical" is clearly contrary to how the Government claims it was implicitly applied in this case.

To distract from Commerce's failure to either understand or engage with the substance of Plaintiffs' argument, the Government resorts to mischaracterizing Plaintiffs' administrative submissions. The Government states, incorrectly, that Plaintiffs requested Commerce include Cogne in its CV profit calculation. *See, e.g.*, Def. Br. at 15. In fact, Plaintiffs acknowledged at the outset that Cogne was <u>inferior</u> to both OMR and Metalcam, *see* Plaintiffs' CV Profit Submission at Appx0085701-0085706 (describing Cogne as "relatively less probative than Metalcam's financial statements, in that there is no direct evidence that Cogne itself produces FEBs" and also describing OMR as the most probative data source of the three); and expressly stated that Commerce should use Cogne's data <u>only</u> "{i}f, for some reason, OMR's and Metalcam's data are both deemed unusable," Plaintiffs' Pre-Prelim Comments at Appx0086576; *see also id.* at Appx0086595 (acknowledging that Cogne is less probative and the absence of evidence that it produced FEBs during the time period at issue); Plaintiffs' Administrative Brief at Appx0087339 (stating that Commerce "erred in including the relatively less probative financial data of Cogne…in the CV profit calculation."); *id.* at Appx0087342-0087343 ("there is no evidence on the record of this administrative review establishing that Cogne…produced even a single FEB during 2021"). Plaintiffs made no "about face" after Commerce's preliminary determination, Def. Br. at 16; rather, Plaintiffs advocated a clear position that accounted for the uncertainty in how Commerce would treat any of the potential data sources in its preliminary results and, once presented with the *Preliminary Results*, maintained its position that data for

Cogne were inferior to that of OMR and Metalcam and should not be utilized in the final results.[1]

As an aside, the Government furthermore observes that the CV profit sources advocated by Plaintiffs—*i.e.*, the only two record sources from producers of "identical merchandise"— feature "the highest profit rates." Def. Br. at 11. This is true, but rather than undermine Plaintiffs' position, it simply highlights the harm caused by Commerce's unlawful and unreasoned inclusion of CV profit sources for producers of merely similar merchandise. It is unsurprising that sales of highly engineered, specialized in-scope FEBs are likely to earn higher profits than sales of generic forged blocks, a dynamic which the Government fails to appreciate. The statute does not permit Commerce to arbitrarily depress CV profit rates by diluting superior data from producers of identical merchandise with inferior data from producers of similar merchandise. Yet, the Government's fixation on the profit rate, rather than the characteristics of the producer, suggests that is precisely what occurred.

Finally, with respect to Ellwood's subsidiary arguments concerning Commerce's reliance on a material omission in the translation of Ciscato's financial statement which left it unclear what proportion of Ciscato's sales comprised entirely dissimilar non-forged products, the Government acknowledges, as it must, that Commerce "did not explicitly grapple with this argument." Def. Br. at 15. The same is true with respect to the issue of Ciscato's customer base. The Government acknowledges it is part of Commerce's four-factor analysis, *see* Def. Br. at 9, but the subject is not addressed in Commerce's administrative determination, IDM at

---

[1] Implicitly recognizing this, the government stops short of advancing any sort of estoppel argument. Such an argument would obviously fail, insofar as Plaintiffs' position before this court is entirely consistent with their administrative arguments.

Appx0003290-0003293, despite Plaintiffs' administrative arguments, Plaintiffs' Administrative

Br. at Appx0087349.

In sum, with respect to both the absence of FEB production by Cogne and Ciscato and

other infirmities affecting Ciscato's data, Commerce did not address Plaintiffs' arguments.

Therefore, substantial evidence does not support Commerce's administrative determination and

remand is necessary.

### C.   *Post-Hoc* Reasoning Cannot Sustain Commerce's Administrative Determination

Consequent to Commerce's failure to address Plaintiffs' argument administratively, the

Government is unable to identify substantive rationale in support of Commerce's determination.

Instead, the Government relies extensively on *post hoc* reasoning and theories based on counsel's

independent review of record evidence that Commerce itself never addressed. It is axiomatic that

the Court "ha{s} no warrant to 'accept appellate counsel's post hoc rationalizations for agency

action,' *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), or to supply a

reasoned justification for an agency decision that the agency itself has not given, *Motor Vehicle*

*Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)." *Power Integrations, Inc.*

*v. Lee*, 797 F.3d 1318, 1326 (Fed. Cir. 2015) (internal citations cleaned up).

#### 1.   *Evidence from the Original Antidumping Investigation Is Not on this Record and Did Not Concern 2021*

Whereas Commerce concluded only that Cogne "produces blocks for tools" based on the

record of this administrative review, IDM at Appx0003293, the Government characterizes this as

somehow "consistent with" Commerce's findings based on the record of the original

investigation, *viz.*, that Cogne produced "open die forged products (including fluid end blocks),"

Def. Br. at 16 (citing *Forged Steel Fluid End Blocks From Italy*, 85 Fed. Reg. 79,996 (Dep't of

Commerce Dec. 11, 2020) and accompanying IDM at 15 ("Investigation IDM")). Commerce

itself drew no such connection. *See* AR1 IDM at Appx0003292-0003293.

   In addition to being *post hoc*, the rationale is flawed. Each segment of a proceeding is

distinct. Commerce's determination must be supported by substantial evidence on the record of

this administrative review. *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272,

1285 n.22 (Ct. Int'l Trade 2020) ("each administrative review is a separate segment of an

antidumping proceeding and each with its own, unique administrative record. A determination

must be supported by substantial evidence based on that administrative record.") (internal

citations omitted); *see also Tri Union Frozen Products, Inc. v. United States*, 163 F. Supp. 3d

1255, 1292 (2016) ("Commerce's reliance upon previous determinations that have helped

develop its practice ... does not, as a result, incorporate the sources or information from the

record of that proceeding to the instant review").  The evidence on which Commerce relied in the

investigation, *see* Investigation IDM at 15 n.106, is not part of this administrative record.[2]

Moreover, the investigation evidence spoke to Cogne's production activities in 2018, *see id.* at

15 & n.106, and could not constitute substantial evidence that Cogne's 2021 data reflected FEB

production, *see* AR1 IDM at Appx0003293.

   2.   *Cogne Sells Ingots, but [                              ] for Sale*

   Counsel for Defendant attempts to step into Commerce's shoes and address [

_____

[2] Commerce itself requires that IDMs be placed on the administrative record when relied upon as
evidence of a factual proposition.  *See Certain Frozen Warmwater Shrimp from India*, 79 Fed.
Reg. 51,309 (Aug. 28, 2014) (AD AR Final), IDM at Comment 8 (characterizing citations that
"contained new data submitted for the purpose of the facts contained therein" as new factual
information).

]. The Government characterizes it as irrelevant because it pertains "only to sales of <u>inputs</u> for fluid end blocks — <u>not fluid end blocks</u> themselves." Def. Br. at 16.  But at a bare minimum the fact that Cogne [

] Cogne does produce and offer [        ] ingots for sale. Plaintiffs' CV Profit Submission at Ex. 3-C (Appx0086088); *see also* Lucchini's Ingot Market Price Response (Feb. 10, 2023) at Ex. 1 (Appx0087116-0087121) ([

]). Nothing in the administrative record corroborates Government counsel's leap of logic that Cogne may have sold FEBs [

], *see* Def. Br. at 16, and Commerce itself proffered no such analysis.

3.   *Ciscato's Translation Error Materially Affects Its Data Quality; Accepting the Government's* Post Hoc *Translation Merely Confirms the Issue Plaintiffs Suspected*

Constrained by Commerce's failure to address the material translation issue affecting Ciscato's financial statements, Government counsel first proffers a misleading, incomplete quotation of Commerce's regulation, then attempts to minimize the problem, and finally purports to *sua sponte* cure Lucchini's noncompliant document by proffering a partial translation before the court. *See* Def. Br. at 14-15. None of this has any basis in Commerce's administrative determination. Contrary to the Government's position that Commerce's regulations permit parties to freely proffer partial translations, the very next sentence of the regulation (omitted by Defendant) states: "A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department." *Compare* 19 C.F.R. § 351.303(e) (2020), *with* Def. Br. at 14. The Government makes no assertion that Lucchini either sought or obtained pre-approval.

The Government next fixates on the number of words at issue, without addressing their significance. *See* Def. Br. at 14. Plaintiffs highlighted these particular words because they directly concern the first and fourth factors of Commerce's CV profit source analysis—the similarity of the merchandise under consideration to the products and customer base reflected in Ciscato's profit data. *See* Plaintiffs' Br. at 13-14, 30. Unlike the other potential sources of CV profit on the record, Ciscato has a line of non-forged "stamping" products. *See* Plaintiffs' Br. at 13, 27. Were a large proportion of Ciscato's revenue attributable to non-forged products "intended mainly for steel, mining and power generation, naval and earthmoving plants," Lucchini CV Profit Submission at Appx0002088, that would tend to make Ciscato a relatively less appropriate proxy for FEB profit data than OMR, Metalcam, and even Cogne. In theory, the relevant facts could be gleaned by the "breakdown of revenues from sales and services according to activity categories" in Ciscato's financial statements, but those headings were untranslated. *See* Lucchini CV Profit Submission at Appx0002077. Regardless of the number of words covered by such headings, this precluded Commerce from reaching a conclusion concerning Ciscato's sales revenue grounded in substantial evidence.

The Government finally pivots to unilaterally curing Lucchini's defect by proffering counsel's own translation. *See* Def. Br. at 15. The government purports to derive the meaning of the standalone term "fucinati" from an English translation of a different sentence featuring that term, without explaining how it accounted for any variations in grammar, word order, and usage. *See id.* Moreover, the government's approach produces inconsistent results. The table also features the standalone term "stampati" in Italian, rendered as "printed" in English. *Compare* Lucchini CV Profit Submission at Appx0002077, *with id.* at Appx0002133. "Stampati" likewise appears in the Italian sentence on which the government purports to rely, yet the English

translation of that sentence does <u>not</u> include the term "Printed." *See* Def. Br. at 15. Evidently, there is some distinction in how the term "stampati" is rendered in the table and the government's reference sentence, and it is unclear on what basis the government has decided that no such distinction affects the term "funcinati" in these two locations. Even if one were to ignore all of these complications and accept Government counsel's *post hoc* translation services, the translated text would then <u>confirm</u> that 43 percent of Ciscato's sales revenues were from <u>non-forged</u> products—making Ciscato's data a less reasonable proxy for FEB profit rates than OMR or Metalcam, or even Cogne. *See* Lucchini CV Profit Submission at Appx0002077. Yet, Commerce's final determination never addressed <u>any</u> of this. Not the translation error, and not the proportion of non-forged sales revenue. Remand is required to address these issues that bear directly on Commerce's selection among CV profit sources.

4. *Counsel Is Not the Factfinder Regarding Ciscato's Customer Base*

Commerce's IDM never addresses the customer base to which Ciscato caters. *See* IDM at Appx0003290-0003293. Plaintiffs pointed out that the record contains no evidence that Ciscato sold forgings, much less forged blocks, to customers within the oil and gas industry, and cited Ciscato's own characterization of its operations as focused on other industries. Plaintiffs' Br. at 28-29. By contrast, OMR and Metalcam produced FEBs and thus necessarily sold those products to the relevant customer base. In response, the Government cites a Ciscato webpage <u>offering</u> certain products for sale to the oil and gas industry. *See* Def. Br. at 13-14.[3] The Government also cites Ciscato's financial statement, which mentions oil and gas only once,

---

[3] These include "Y Blocks" and "Wedge Blocks" which Defendant seems to conflate with generic forged blocks. *Compare* Def. Br. at 14 (referencing the phrase "forgings for blocks," which in fact starts a nine-part list), *with* Lucchini CV Profit Submission at Appx0002425 (identifying "Wedge Blocks" and "Y Blocks" as the specific blocks in question). For the avoidance of doubt, none of these products are merchandise under consideration, *i.e.*, FEBs.

noting an "upswing" in that sector (among others), but making no statement about Ciscato's

period sales to that sector. *See* Def. Br. at 14; Lucchini CV Profit Submission at Appx0002049-

0002108. Notwithstanding any "upswing," oil and gas is omitted from the main customer

industries listed on both the preceding page of Ciscato's financial statements and on its website.

*Compare* Lucchini CV Profit Submission at Appx0002089 (noting upswing in sector), *with id.* at

Appx0002088 (listing major customer industries, which do not include oil and gas); *and id.* at

Appx0002413 (same). And if nearly half of Ciscato's sales were of stampings, *see* Section I.C.3,

*supra*, then even if one were to assume that Ciscato made sales to oil and gas customers, it may

have been limited to stampings. Despite defense counsel's best effort to supply Commerce's

missing record analysis, there remains nothing concrete linking Ciscato's 2021 sales data to sales

of forgings to oil and gas customers.  At minimum, Commerce must weigh the ambiguities in the

record in the first instance.

## II.   The Government Offers No Defense of Commerce's Flawed Application of the Transactions Disregarded Rule; Waiver May Apply

Subsection 1677b(f) of the normal value statute provides for a number of "special rules"

used in calculating constructed value. 19 U.S.C. § 1677b(f).  One of these is the "Transactions

Disregarded Rule" described in subsection 1677b(f)(2); another is the "Major Input Rule"

described in subsection 1677b(f)(3). *Id.* §§ 1677b(f)(2)-(3). Commerce's administrative

determination applied both the Transactions Disregarded Rule and the Major Input Rule to

Lucchini's purchases of ingots from affiliates. Final Cost Memorandum at Appx0087647

(discussing the results of comparing Lucchini's affiliate ingot transfer price to "both the

affiliate's COP and the constructed market price"); *see also id.* at Appx0087650 (supporting

calculations demonstrating a comparison to both a "market price" and the affiliate's production

costs). Plaintiffs' administrative submissions and their opening brief before this Court took no

issue with Commerce's application of the Major Input Rule, and focused exclusively on flaws in Commerce's application of the Transactions Disregarded Rule and subsection 1677b(f)(2). Specifically, Plaintiffs argued that Commerce's decision to overlook a grade-specific market benchmark as well as its adjustment to its non-grade-specific benchmark were distortive and unsupported by substantial evidence. *See* Plaintiffs' Pre-Prelim Comments at Appx0086608-0086611; Plaintiffs' Administrative Br. at Appx0087352-0087371; Plaintiffs' Br. at 7 n.2, 32-48. Yet, and without a word of explanation, Defendant's response discusses only the Major Input Rule, subsection 1677b(f)(3) of the statute, and Commerce's Major Input Rule regulation. *See* Def. Br. at iii, 17-24.

Given the Government's fundamental failure to respond, this Court may reasonably consider Commerce to have waived any defense to Plaintiffs' arguments. *See, e.g.*, *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *Qingdao Qihang Tyre Co. v. United States*, 308 F. Supp. 3d 1329, 1337 (Ct. Int'l Trade 2018) ("Defendant waived any objection on this ground by not including it in its Rule 56.2 response brief.") (citing USCIT R. 56.2(c)). Likely, Defendant's failure to grasp Plaintiffs' argument is derivative of Commerce's flawed IDM, which correctly summarized Plaintiffs' argument as invoking subsection 1677b(f)(2), yet only discussed subsection 1677b(f)(3). *Compare* IDM at Appx0003293, *with id.* at Appx0003297-0003301. Similarly, the Government relies on Commerce's public characterization of the products (*e.g.*, "stainless steel ingots," rather than [                    ]) and processes (*e.g.*, "certain technical and logistical aspects," rather than [                         ]) at issue, without recognizing and responding to the substance of Plaintiffs' claims and supporting proprietary evidence. *See* Def. Br. at 19, 22. In

any event, even setting aside these basic issues, none of the Government's arguments establish that Commerce's approach was lawful and supported by substantial evidence.

### A. The Government Misconstrues Plaintiffs' Arguments Rather than Address Commerce's Failure to Weigh the Merits of a Product-Specific Benchmark

The Government's lead defense is an attempt at burden-shifting, claiming that Plaintiffs "never explain why the United States would be the correct 'market under consideration' in the context of the major input rule." Def. Br. at 20. **That is not Plaintiffs' argument.**[4] The alternatives at hand were <u>not</u> FEB-grade ingots from (A) Italy or (B) the United States, such that choosing one over the other is merely a matter of selecting the best market. Moreover, the statute and Commerce practice in applying the Transactions Disregarded Rule prefer that benchmark prices be for the same input. *See* Plaintiffs' Br. at 32-36. And, to be clear, given the chemistry and physical requirements for FEBs it is impossible to produce an FEB from just any stainless steel ingot. Yet, Commerce summarily rejected (A) <u>FEB</u>-grade ingots from a U.S. producer in order to select (B) <u>non-FEB</u> grade ingots from an Italian producer. As Plaintiffs argued, Commerce erred in doing so without explaining why it treated market-specificity as more important than product specificity, and without addressing record evidence that differences in grade—even among stainless steel products—could yield massive differences in price. *See* Plaintiffs' Br. at 32-39. Such deficiencies render Commerce's determination unsupported by substantial evidence.

The Government attempts to mask Commerce's incomplete analysis by skipping ahead to what Commerce considered about <u>other</u> sources <u>after</u> summarily rejecting U.S. prices for grade

---

[4] Indeed, Plaintiffs specifically acknowledged that, if selecting among two otherwise equal price alternatives, a preference for Italian prices could, in theory, be a reasonable tiebreaker. Plaintiffs' Br. at 36.

[          ] ingot. *See* Def. Br. at 21-22.  Again, **this is not Plaintiffs' argument**. Had

Commerce first adduced a lawful, evidence-based rationale for rejecting grade [          ] ingot

prices, it could have then proceeded to weigh the relative merits of the remaining benchmark

sources. Plaintiffs' appeal concerns Commerce's failure to satisfy this precondition, not its

treatment of the remaining benchmark sources. *See* Plaintiffs' Br. at 32-39. Indeed, to the extent

that Commerce's preference for pricing data for a narrower group of products[5] over Eurostat data

has any bearing on this appeal, *see* Def. Br. at 21-22, it only underscores the arbitrariness of

Commerce's failure to engage with Plaintiffs' arguments about the relative merits of perfect

product specificity reflected in U.S. prices for grade [          ] ingot.

     Furthermore, Plaintiffs consider that this administrative record does not permit

Commerce to lawfully treat market-specificity as more important than product-specificity.

Commerce identified nothing to support its implicit conclusion that market prices in Italy for a

commodity-grade [          ] ingot were materially different than market prices in the United

States for that same grade of ingot. Indeed, as the Government admits, Commerce identified

"record evidence of an Italian market for stainless steel ingots of the same or similar grade as

those consumed in the production of subject merchandise." Def. Br. at 36 (citing IDM at

Appx0003299). Yet, other than Lucchini's affiliate (which did not sell the grade [          ] to

any non-affiliates), *see* Lucchini's First Supplemental Section D Questionnaire Response (Sept.

---

[5] The Government is vague about the grade of ingot sold by Lucchini's affiliate, *see, e.g.*, Def.
Br. at 22, because Lucchini declined to report the grade in question, Lucchini's Second
Supplemental Section D Questionnaire Response at Ex. SD2-7.a
(Appx0086330-0086333) (Data File) (identifying the relevant [
       ]). What is known for certain is that the grade used as a benchmark is <u>not</u> FEB
grade. Lucchini itself argued that the two were dissimilar. *See* Lucchini Pre-Prelim Rebuttal at
Appx0086659.

*Confidential Information Removed from Brackets*

8, 2022) at Appx0084140, the only record evidence of an "Italian market" for grade [          ]

ingots concerned [                         ], *see* Plaintiffs' Ingot Price RFI at Appx0087124,

Appx0087231-0087238, and <u>non-Italian</u> producers, *see id.* at Appx0087124, Appx0087150-

0087230 (identifying producers of grade [          ] ingots and other primary forms in the United

States, Austria, India, Germany, and the People's Republic of China). Commerce made no

finding that prices in those other markets were distorted. See IDM at Appx0003299.

      To the contrary, Commerce's finding of an "Italian" market was based solely on

availability from producers located <u>outside</u> Italy (including the United States). *See* IDM at

Appx0003299 (citing Plaintiffs' Ingot Price RFI at Appx0087124, Appx0087150-0087238). As

such, prices on the "Italian" market should not materially differ from market prices elsewhere.[6]

Yet, Commerce arbitrarily deemed actual prices paid [                         ] unacceptable. *See*

IDM at Appx0003299. Notwithstanding Lucchini's strategic choice to repeatedly and

inaccurately deny that grade [          ] ingots could be purchased in Italy, *see* Plaintiffs' Br. at

40-46, Commerce evidently resolved to reward Lucchini's dilatory tactics by summarily

rejecting the market price Plaintiffs offered once permitted to do so. Nothing in Commerce's

IDM or the Government's response demonstrates that Commerce ever considered how the record

evidence established (1) whether and how much Italian prices were likely to differ from prices

elsewhere for commodity grade [                ] ingots, or (2) whether and how much prices for a

---

[6] Government counsel asserts, without citing any record support, that U.S. prices for this product were affected by 232 tariffs. Def. Br. at 20. This is entirely *post hoc*, as Commerce itself made no such assertion. *See* IDM at Appx0003297-0003301. Moreover, the commodity nature of this product, which record evidence demonstrates is available from producers in multiple countries, suggests that U.S. prices would hew closely to world market standards.

different grade of ingot were likely to differ from prices for the same grade of ingot. These questions are outcome-determinative and Commerce must address them.

**B.    The Government's Absolutist Defense of the Acceptance of Lucchini's Untimely Submission Invites a Free-For-All of Administrative Submissions**

Regarding Commerce's acceptance of Lucchini's untimely and unsolicited new factual information and subsequent use of the same to distort the benchmark price, the Government merely confirms that nothing in Commerce's determination speaks to this issue. Def. Br. at 24. Counsel offers the *post hoc* suggestion that Lucchini's data were somehow solicited by Commerce, but fails to address Plaintiffs' point that Lucchini's so-called "rebuttal" submission did not in fact "rebut" anything in Plaintiffs' earlier filing. *Compare* Def. Br. at 23-24, *with* Plaintiffs' Br. at 40-46. Rather, absent any request from Commerce, Lucchini unilaterally revised its reporting [

]. *See* Plaintiffs' Br. at 40-46. Thus, the situation at bar is on all fours with cases such as *Jiangsu* and *Husteel*. *See id.* at 41-42.

The Government does not dispute that Plaintiffs made a reasonable argument that Lucchini's submission was untimely and unsolicited. *See* Plaintiffs' Administrative Br. at Appx0087356, Appx0087386-0087394. Were Plaintiffs' argument accepted, Commerce's regulations would require rejection of Lucchini's submission. 19 C.F.R. § 351.302(d). This would materially impact the administrative record by eliminating the source of Commerce's distortive adjustment to the benchmark ingot price, resulting in a different outcome for the Transactions Disregarded Rule. As such, this was a "relevant argument{}" to which Commerce was obliged to respond. 19 U.S.C. § 1677f(i)(3)(A). Yet, Commerce "did not explicitly address {Plaintiffs} request to reject the submission." Def. Br. at 24. The Government's response is striking—Commerce "did not need to explain its reasons" for permitting a submission that

flaunted Commerce's regulations. Def. Br. at 24. This is antithetical to reasoned administrative decision-making and, if accepted, would render Commerce's filing regulations a dead letter. Plaintiffs urge this Court not to embrace the Government's extreme view.

### C. Like Commerce, the Government's Empty Characterization of Commerce's Benchmark Adjustment as "Apples-to-Apples" Fails to Address the Substance of Plaintiffs' Critique

Turning to the substance of Commerce's benchmark adjustment, the Government repeats the phrase "apples-to-apples" three times, yet fails to address — at all — Plaintiffs' argument that the adjustment did not achieve this intention because it applied [        ] specific to [

                        ] FEB ingots to a non-FEB ingot, while also failing to account for associated [                                                  ]. *Compare* Def. Br. at 5-6, 22, *with* Plaintiffs' Br. at 46-48. Empty recitations do not a reasoned decision make. Taking the Government's metaphor, the crux of the problem was that Commerce started by comparing an apple (an FEB-grade ingot) and an orange (a non-FEB grade ingot). Adjusting the orange to account for [                                ] exclusive to apples does not make the orange more like an apple and may, in fact, further distort the comparison. *See* Def. Br. at 22. Compounding the problem, Commerce's adjustment failed to account for [

                  ] that preceded the [                     ].

The Government next cites *Huvis*, claiming it is "important" to the resolution of this case. *See* Def. Br. at 23 (citing *Huvis Corp. v. United States*, 570 F.3d 1347 (Fed. Cir. 2009)).  It is not clear why. To the extent Defendant is asserting that Commerce can in theory adjust benchmarks when applying the Transactions Disregarded Rule where necessary information is not available on the record, Plaintiffs agree and made no argument to the contrary. The problem requiring remand is that Commerce's specific adjustment was distortive and nothing in Commerce's

NONCONFIDENTIAL VERSION

determination recognizes or accounts for those distortions. Otherwise, *Huvis* bears no material resemblance to the facts at bar.[7]  Here, Commerce made no assertion that its price adjustment was an application of the "facts otherwise available" provision, nor did it identify what record evidence was "not available." *Compare Huvis*, 570 F.3d at 1349 (applying 19 U.S.C. § 1677e), *with* IDM at Appx0003297-0003301 (not doing so). Most critically, its adjustment yields a benchmark price that is <u>less</u> accurate, not more. And neither Commerce's administrative determination nor the government's response brief identify where Commerce recognized or explain how Commerce accounted for the flaws at the root of this inaccuracy.

## CONCLUSION

For the reasons explained above, Plaintiffs request that this Court hold Commerce's *Final Results* unlawful and otherwise unsupported by substantial evidence and remand the *Final Results* with instructions that Commerce revise its calculation of Lucchini's CV SG&A expenses and profit, as well as its calculation of a market price for FEB grade ingots, and recalculate Lucchini's dumping margin.

*       *       *

---

[7] The Government does not discuss the facts of *Huvis*.  *See* Def. Br. at 23. There, Plaintiff criticized the adjusted benchmark by arguing that it must be inaccurate because it was lower than certain other prices on the record. *See* 570 F.3d at 1353-54. Here, no such argument has been made.  Rather, Plaintiffs argue that Commerce's adjustment is substantively unreasonable because it relies on a flawed premise, regardless of the resulting price.

Respectfully submitted,

/s/ Myles S. Getlan

Myles S. Getlan
Thomas M. Beline
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP

*Counsel to Ellwood City Forge Company,*
*Ellwood Quality Steels Company,*
*Ellwood National Steel Company, and*
*A. Finkl & Sons*

June 28, 2024

**Certificate of Compliance with Chambers Procedures 2(B)(1)**

The undersigned hereby certifies that the foregoing memorandum of law contains 6,874 words, exclusive of the caption block, table of contents, table of authorities, signature block, certificates of counsel, and square brackets and therefore complies with the maximum 7,000 word count limitation set forth in the Scheduling Order in this action, ECF Doc. 17 (Dec. 21, 2023), and Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ Myles S. Getlan
Myles S. Getlan