Slip Op. 26-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS,**<br><br>              Plaintiffs,<br><br>v.<br><br>**UNITED STATES,**<br><br>              Defendant. | **Before: Timothy M. Reif, Judge**<br><br>**Court No. 23-00191** |

## <u>OPINION</u>

[Sustaining in part and remanding in part Commerce's *Final Results*.]

Dated: April 28, 2026

<u>James E. Ransdell</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., argued for plaintiffs Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons.  Also on the brief were <u>Myles S. Getlan</u> and <u>Thomas M. Beline</u>.

<u>Isabelle Aubrun</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  On the briefs were <u>Stephen Carl Tosini</u>, Senior Trial Attorney, <u>Biran M. Boyton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director.  Of counsel was <u>Hendricks Venezuela</u>, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance, of Washington, D.C.

\*        \*        \*

Reif, Judge:  This action concerns the final results of the U.S. Department of Commerce ("Commerce") in the administrative review of the antidumping ("AD") order on forged steel fluid end blocks ("FEB") from Italy for the period of review ("POR") July 23, 2020, through December 31, 2021.  *Forged Steel Fluid End Blocks from Italy: Final*

*Results of the Antidumping Duty Administrative Review; 2020-2021* ("*Final Results*"), 88

Fed. Reg. 55,010 (Dep't of Commerce Aug. 14, 2023), PR 157, and accompanying

Issues and Decision Memorandum ("IDM") (Dep't of Commerce Aug. 3, 2023), PR 153;

*see also Forged Steel Fluid End Blocks from Italy: Preliminary Results and Rescission*

*of Antidumping Duty Administrative Review in Part*; *2020-2021* ("*Preliminary Results*"),

88 Fed. Reg. 7686 (Dep't of Commerce Feb. 6, 2023), PR 123, and accompanying

Preliminary Decision Memorandum ("PDM") (Dep't of Commerce Jan. 30, 2023), PR

119-20.

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood

National Steel Company, and A. Finkl & Sons (collectively, "plaintiffs") challenge certain

aspects of the *Final Results* in a motion for judgment on the agency record with respect

to Commerce's data choice for constructed value selling, general, and administrative

("SG&A") expense and profit, as well as Commerce's valuation of defendant's major

input purchased from an affiliated supplier.  *See* Compl. at ¶¶ 55-62, ECF No. 8; *see*

*also* Mem. of Law in Supp. Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Pls. Br.") at 12-

17, ECF No. 18.

For the reasons discussed below, the court sustains in part and remands in part

Commerce's *Final Results*.

## BACKGROUND

On March 9, 2022, Commerce initiated an antidumping administrative review

concerning FEBs from Italy.  *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 87 Fed. Reg. 13,252 (Dep't of Commerce Mar. 9, 2022).

On March 23, 2022, Commerce selected Lucchini as the sole mandatory respondent in the administrative review.  Mem. from Andre Gziryan, re: Forged Steel Fluid End Blocks from Italy 2020-2021: Respondent Selection (Mar. 23, 2022) at 2, PR 15.

On March 28, 2022, Commerce issued the initial AD questionnaire to Lucchini. Letter from Minoo Hatten, Program Manager AD/CVD Operations, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Mar. 28, 2022) ("Initial Questionnaire"), PR 16-17.

Between April and May 2022, Lucchini submitted questionnaire responses to Commerce.  See Antidumping Duty Administrative Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Section A Questionnaire Response (April 18, 2022), CR 9-40; Antidumping Duty Administrative Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Section C Questionnaire Response (May 11, 2022), CR 41-66; and Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Section D Questionnaire Response (May 25, 2022), PR 42-43.

In their responses, "Lucchini reported that its home market does not provide a viable basis for calculating normal value, i.e., the aggregate volume of its home market sales of the foreign like product is not five percent or more of the aggregate volume of U.S. sales, and that it did not make third-country sales during the POR."  PDM at 9. Commerce thus based normal value on constructed value (CV) under 19 U.S.C. § 1677b(a)(4) and 19 C.F.R. 351.404.  Id.

Between July 11, 2022, and January 18, 2023, Commerce issued six supplemental questionnaires requesting that interested parties submit constructed value profit and selling expense information.  *See* Letter from Minoo Hatten, Program Manager AD/CVD Operations, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Jul. 11, 2022), CR 89; Letter from Taija A. Slaughter, Supervisory Accountant, E&C, Office of Accounting, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Aug. 15, 2022), CR 102; Letter from Taija A. Slaughter, Supervisory Accountant, E&C, Office of Accounting, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Oct. 28, 2022), CR 173; Letter from Taija A. Slaughter, Supervisory Accountant, E&C, Office of Accounting, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Dec. 16, 2022), CR 198; Letter from Andre Gziryan, Acting Program Manager AD/CVD Operations, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Dec. 27, 2022), CR 207; Letter from Minoo Hatten, Program Manager AD/CVD Operations, to Robert L. LaFrankie, Lucchini Mamé Forge S.p.A. (Jan. 18, 2023), CR 219.

Lucchini submitted timely responses between July 2022 and January 2023.  *See* Antidumping Duty Administrative Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A.'s Response to the Supplemental A/C Questionnaire (Jul. 27, 2022), CR 90-100; Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Supplemental Section D Questionnaire Response (Sept. 8, 2022), CR 103-56; Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Response to the Third Supplemental Questionnaire (Oct. 25, 2022), CR 171-72; Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Second Supplemental Section D Questionnaire

Response (Nov. 18, 2022), CR 174-97; Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Response to the Third Section D Supplemental Questionnaire (Dec. 23, 2022), CR 199-206; Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Response to the Fifth Supplemental Questionnaire (Jan. 3, 2023), CR 208-11; Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Response to the Sixth Supplemental Questionnaire (Jan. 23, 2023), CR 223-25.

Between June 9 and October 11, 2022, plaintiffs submitted comments regarding Lucchini's questionnaire responses.  *See* Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Comments Concerning Deficiencies in Lucchini Mamé Forge S.p.A.'s Sales Reporting and Documentation in Response to Commerce's Initial Questionnaire (June 8, 2022), CR 87; Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Comments Concerning Deficiencies in Lucchini Mamé Forge S.p.A.'s Response to Section D of Commerce's Initial Questionnaire (June 28, 2022), CR 88; Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Factual Information to Rebut, Clarify, or Correct Aspects of Lucchini's Response to Commerce's Supplemental Sections A, C, and E Questionnaire (Aug. 8, 2022), CR 101; Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Factual Information to Rebut, Clarify, or Correct Aspects of Lucchini's Response to Commerce's Supplemental Section D Questionnaire (Sept. 19, 2022), CR 157-61; and Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Comments Concerning Deficiencies in Lucchini Mamé Forge S.p.A.'s First Supplemental Section D Questionnaire Response (Oct. 11, 2022), CR 169.

On September 23, 2022, Lucchini submitted financial statements and websites for: (1) Asoforge S.R.L. (Asoforge); (2) FOC Ciscato S.p.A. (Ciscato); (3) Fomec S.p.A. (Fomec); and (4) and OFAR S.p.A. (OFAR), as potential sources of data.  *See* *Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini Mamé Forge S.p.A. Comments and Information on Constructed Value Profit and Selling Expenses* (Sept. 23, 2022) ("Lucchini's CV Profit and Selling Expenses Submission") at 3, PR 73-80.

On the same day, plaintiffs submitted information from (1) Officina Meccanica Roselli O.M.R. S.r.L. (OMR); (2) Metalcam S.p.A. (Metalcam); and (3) Cogne Acciai Speciali S.p.A. (Cogne), as potential sources of data.  *See* Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Constructed Value Profit and Selling Expense Submission (Sept. 23, 2022) ("Plaintiffs' CV Profit and Selling Expenses Submission"), PR 81-83.

On October 4, 2022, plaintiffs and Lucchini provided rebuttal CV comments.  *See* Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Constructed Value Profit and Selling Expense Rebuttal Submission (Oct. 4, 2022), PR 86; *see also* Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Rebuttal to Plaintiffs' Comments on CV Profit and Selling Expenses (Oct. 4, 2022), PR 87-88.

On September 16, 2022, Commerce extended the deadline for the preliminary results until January 31, 2023.  *See* PDM at 3.

On January 9, 2023, plaintiffs filed pre-preliminary comments.  Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Comments in Advance of Commerce's Preliminary Results (Jan. 9, 2023), PR 106.

On January 20, 2023, Lucchini filed pre-preliminary comments addressing plaintiffs' January 9, 2023 comments.  Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Rebuttal to the Petitioner's Comments in Advance of Commerce's Preliminary Results (Jan. 20, 2023), CR 221- 22.

Because Lucchini reported on January 31, 2023, that it had sourced stainless steel ingots consumed in the production of the merchandise under consideration from an affiliated supplier, Commerce issued a letter to interested parties requesting market price information for stainless steel ingots.  *See* letter from Taija A. Slaughter, Supervisory Accountant E&C, Office of Accounting, to all interested parties (Jan. 31, 2023) ("Commerce January 31 Request for Information"), PR 122.

On February 6, 2023, Commerce published the *Preliminary Results* wherein Commerce calculated a preliminary dumping margin for Lucchini of 2.21 percent.  *See Preliminary Results* at 7686.

On February 10, 2023, plaintiffs and Lucchini timely responded to Commerce's request for information on market price information for stainless steel ingots.  Letter from plaintiffs, "Forged Steel Fluid End Blocks from Italy: FEB Fair Trade Coalition's Response to Request for Market Price Information for Stainless Steel Ingots" (Feb. 10, 2023) ("Ellwood February 10 Submission"), PR 124; Letter from Lucchini "Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Response to

Request for Market Price Information for Stainless Steel Ingots" (Feb. 10, 2023), PR 125.

On February 17, 2023, plaintiffs and Lucchini submitted rebuttal information and comments regarding market price information for stainless steel ingots.  Letter from plaintiffs "Forged Steel Fluid End Blocks from Italy: Information to Rebut, Clarify, or Correct Lucchini's Response to Request for Market Price Information for Stainless Steel Ingots" (Feb. 17, 2023), PR 126; Letter from Lucchini "Antidumping Duty Review of Forged Steel Fluid End Blocks from Italy: Lucchini's Rebuttal to Petitioners' Market Price Information for Stainless Steel Ingots," ("Lucchini's February 17, 2023 Submission") (Feb. 17, 2023), CR 240-42, PR 127-28.

On August 14, 2023, Commerce issued the *Final Results*, where Commerce calculated a weighted-average dumping margin of 2.97 percent for Lucchini.  *See Final Results* at 55010.

Commerce calculated constructed value profit by using the simple average of the profit rates from four companies (Metalcam, OMR, Cogne and Ciscato) rather than the six companies it preliminarily used.  IDM at 13-15.

In rejecting data from FOMEC and OFAR, Commerce stated that "while record evidence indicates that they are producers of comparable merchandise, there is no record evidence to indicate that either company produces identical merchandise." *Id*. at 15.

To determine the value of stainless-steel ingots purchased from Lucchini's affiliated supplier, Commerce relied on the Italian market price as the arm's length

prices and what Lucchini would have paid if it had not sourced the materials from its affiliated supplier. *Id*. at 21.

On September 13, 2023, plaintiffs filed a summons. Summons, ECF No. 1.

On October 13, 2023, plaintiffs filed their complaint. Compl.

On March 6, 2024, plaintiffs moved for judgment on the agency record pursuant to USCIT Rule 56.2. Pls. Br.

On May 24, 2024, defendant filed its response brief. Def.'s Resp. to Pls.' Mot. for J. on the Agency R. ("Def. Br."), ECF No. 20.

On June 28, 2024, plaintiffs filed their reply brief. Pls. Reply Br. in Supp. of Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 22.

On January 10, 2025, the Court heard oral argument. Oral Arg. Tr., ECF No. 36.

On July 7, 2025, pursuant to 28 U.S.C. § 253(c) and CIT Rule 77(e)(4), the instant action was reassigned. Order of Reassignment, ECF No. 39.

On February 19, 2026, the Court heard oral argument again, due to the reassignment. Oral Arg. Tr., ECF No. 46.

## JURISDICTION AND STANDARD OF REVIEW

28 U.S.C. § 1581(c) grants to this Court "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930." Section 516A of the Tariff Act of 1930 provides that in an action under 19 U.S.C. § 1516a(a)(2), the court will hold unlawful any determination, finding or conclusion that is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."[1]  19

U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence constitutes "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion," but it requires "more than a mere

scintilla."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol.

Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).

For a reviewing court to "fulfill [its] obligation" to ascertain whether a

determination of Commerce is supported by substantial evidence and in accordance

with law, Commerce is required to "examine the record and articulate a satisfactory

explanation for its action."  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376

(Fed. Cir. 2016) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716

F.3d 1370, 1378 (Fed. Cir. 2013)).

Even so, the court will "uphold a decision of less than ideal clarity if the agency's

path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Ark.-Best

Freight Sys.*, 419 U.S. 281, 286 (1974)); *see also NMB Sing. Ltd. v. United States*, 557

F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions;

while its explanations do not have to be perfect, the path of Commerce's decision must

be reasonably discernable to a reviewing court.").

"[T]he Court will not disturb an agency determination if its factual findings are

reasonable and supported by the record as a whole, even if there is some evidence that

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2018 edition.

detracts from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citing *Heveafil Sdn. Bhd. v. United States*, 25 CIT 147, 149 (2001)), aff'd sub nom. *Shandong Huarong Gen. Grp. Corp. v. United States*, 60 F. App'x 797 (Fed. Cir. 2003).

Moreover, the Court is not required to invalidate a decision of Commerce if Commerce failed to explicitly address a party's non-dispositive argument so long as the Court can reasonably discern the path of Commerce's decision.  *NMB Sing.*, 557 F.3d at 1323 (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1357 (Fed. Cir. 2005) and *State Farm*, 463 U.S. at 43).

In addition, the court will hold unlawful any determination that is "arbitrary and capricious."  *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374, 1377 (Fed. Cir. 2012).  "An agency acted in an arbitrary and capricious manner if it 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Linyi Chengen Imp. and Exp. Co. v. United States*, 43 CIT __, __, 391 F. Supp. 3d 1283, 1292 (2019) (quoting *State Farm*, 463 U.S. at 43).

Moreover, "it is well-established that 'an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.'"  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration in original) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).  To demonstrate that Commerce's actions were arbitrary and capricious, a plaintiff "must show that Commerce consistently followed a contrary practice in similar circumstances

and provided no reasonable explanation for the change in practice." *Consol. Bearings*

*Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

## DISCUSSION

**I.     Legal framework**

19 U.S.C. § 1673 provides that antidumping duties shall be imposed if:

(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and (2) the Commission determines that (A) an industry in the United States (i) is materially injured . . . , or (B) the establishment of an industry in the United States is materially retarded, or (C) an industry in the United States is threatened with material injury, by reason of imports of that merchandise . . . .

Section 1677b(a)(1)(B)(i) provides that normal value is "the price at which the

foreign like product is first sold . . . for consumption in the exporting country, in the usual

commercial quantities and in the ordinary course of trade . . . ."

When Commerce establishes that normal value cannot be determined using

home-market or third-country sales, the statute provides that "the normal value of the

subject merchandise may be the constructed value of that merchandise . . . ." *Id.* at §

1677b(a)(4).

The methods for calculating constructed value are set out in the statute. *See id.*

at § 1677b(e). The preferred method directs Commerce to use "the actual amounts

incurred and realized by the specific exporter or producer being examined." *Id.* at §

1677b(e)(2)(A).

If "actual data are not available with respect to the amounts described in

subparagraph (A)," Commerce may select one of three alternative methods. *Id.* at §

1677b(e)(2)(B). The statute does not establish a hierarchy for selecting among the

alternative methods.  *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 535 (Fed. Cir. 2019) (citing *SKF USA*, 263 F.3d at 1374).  In this case, Commerce selected the third alternative method, which permits Commerce to use "any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers . . ." for sales "of merchandise that is in the same general category of products as the subject merchandise."  19 U.S.C. § 1677b(e)(2)(B)(iii).

"Each of the three alternative methods, like the preferred method, calls for consideration of profits and SG&A expenses—though each method specifies a different source for that data."  *Mid Continent Steel*, 941 F.3d at 535 (Fed. Cir. 2019).

When Commerce determines CV profit and SG&E expenses in accordance with the third alternative method, 19 U.S.C. § 1677b(e)(2)(B)(iii), Commerce typically considers four factors: "(1) the similarity of the surrogate company's business and products to the respondent's business and products; (2) the extent to which the surrogate company's sales reflect sales in the respondent's home market; (3) the contemporaneity of the data; and (4) the similarity of the surrogate company's customer base to the respondent's customer base."  *See Mid Continent*, 941 F.3d at 542-43 (sustaining Commerce's use of the four factors as "reasonable"); *see also Your Standing Int'l, Inc. v. United States*, 49 CIT __, __, 755 F. Supp. 3d 1373, 1379 (2025) (describing the use of these factors as "a matter of practice").

Commerce prefers to the extent possible to use the financial statements of producers of identical merchandise rather than those of producers that do not produce identical merchandise.  IDM at 13.

II.      **Whether Commerce's selection of financial statements from Ciscato and Cogne for use in Commerce's CV profit and selling expenses calculation was supported by substantial evidence**

      A.     **Additional Background**

As Commerce found, "Lucchini reported that its home market does not provide a viable basis for calculating normal value."  PDM at 9.

Because Lucchini lacked viable sales of the foreign like product in its home market or in a third-country market, Commerce used constructed value as normal value under 19 U.S.C. § 1677b(e) in calculating Lucchini's antidumping margin.  *Id.* at 8.

Commerce stated that data necessary to calculate constructed value SG&A expenses and profit under the preferred method  — "actual amounts incurred and realized by the specific exporter or producer being examined," 19 U.S.C. § 1677b(e)(2)(A) — were unavailable and therefore selected an alternative method in accordance with 19 U.S.C. § 1677b(e)(2)(B)(iii), i.e., "any other reasonable method." *See* IDM at 12-14.

Commerce relied initially on data from six Italian producers of forged products — OMR, Metalcam, Cogne, FOC Ciscato, Fomec and OFAR — to calculate constructed value profit and SG&A expenses.  PDM at 12.

Commerce later excluded data from two of those producers, Fomec and OFAR. IDM at 15.

Plaintiffs did not challenge Commerce's constructed value profit and SG&A expenses methodology.  Plaintiffs instead challenged the inclusion of financial statements from two of the four remaining companies — Cogne and Ciscato — in the profit calculation.  *See* Pls. Br. at 19; *see also* Def. Br. at 7.

### A.      Analysis

The court concludes that Commerce's inclusion of data from Cogne and Ciscato in its calculation of CV profit and SG&A expenses is not supported by substantial evidence.

Plaintiffs argue that Commerce's inclusion of those Cogne and Ciscato data is not supported by substantial evidence and is contrary to law for three reasons.  First, Commerce "fail[ed] to identify record evidence that either company produced FEBs during the period covered by their financial statements."  Pls. Br. at 25.  Second, Commerce failed to show that Ciscato shared a similar customer base with Lucchini.  *Id*. at 28-29.  Third, Commerce relied on partially translated financial statements from Ciscato which made it "impossible to discern what proportion of Ciscato's sales concerned forged products and what proportion concerned stampings, which is crucial to assessing the similarity (or dissimilarity) of Ciscato's product and customer bases." *Id*. at 14, 30-31.

In the IDM, Commerce identified Cogne as a producer of "blocks for tools" and Ciscato as a producer of "blocks" and, without further explanation, stated that "we have limited our selection of companies included in the CV profit calculation to those which are involved in the production and sale of identical merchandise," concluding, "[a]ccordingly, for the final results, we used the simple average of the profit rates calculated for OMR, Metalcam, Cogne, and Ciscato."  IDM at 14-15.  Commerce did not address plaintiffs' claims as to the similarity of Ciscato's customer base or the reliability or relevance of Ciscato's partially translated financial statements.

The court concludes that Commerce's determination that Ciscato and Cogne produce "identical merchandise" is not supported by substantial evidence — and addresses this issue below.  The court does not address plaintiff's claims as to Ciscato's customer base and financial statements pending Commerce's response to the court's remand as to whether to continue to use data from Ciscato.

This Court has relied previously on in-scope identification in assessing whether merchandise is identical.  *See Ancientree Cabinet Co. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1241, 1256-57 (2021).  In *Ancientree Cabinet*, the Court held that Commerce acted within its discretion by selecting Romania rather than Malaysia as the primary surrogate country in an antidumping investigation.  *See id*.  The Court explained that Commerce's determination that the Malaysian companies did not produce identical merchandise was supported by substantial evidence because plaintiffs failed to show that those companies produced furniture identical to the "in-scope wooden cabinets and vanities."  *See id*.

The Court's conclusion in *Ancientree Cabinet* is instructive.  As in *Ancientree Cabinet*, the relevant comparison is to merchandise within the scope of the review.

In this case, Commerce's scope language states: "[t]he products covered by this Order are fluid end blocks, whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps."  IDM at 2.  The scope language further establishes specific height, width and length ranges, as well as minimum tensile strength and hardness.  *See* IDM at 2-3.  Read together, those specifications indicate that the scope identifies a defined subset of forged steel fluid end blocks, rather than blocks in general.

Commerce's actions during the investigation further buttress the importance Commerce attached to the in-scope frame of reference.  For example, in the initial questionnaire, Commerce stated: "[t]hroughout the questionnaire, whenever we refer to the merchandise under consideration (MUC) we are referring generally to all products within the scope of the review . . . ."  Initial Questionnaire, SECTION D "Cost of Production and Constructed Value," n.20.

Similarly, Commerce excluded OFAR and Fomec after the preliminary results because "while record evidence indicates that they are producers of comparable merchandise, there is no record evidence to indicate that either company produces identical merchandise."  IDM at 15.

By contrast to Commerce's treatment of OFAR and Fomec, Commerce retained two other producers based on its finding that they were producers specifically of fluid end blocks.  *See id.* at 14 ("Metalcam was identified as a producer of fluid end blocks" and OMR "has a manufacturing facility (NACE code = 28) and record indicates that the production of fluid power equipment is categorized under NACE code 28.")  The determination that OMR and Metalcam produce identical merchandise was not contested by plaintiffs.  *See* Pls. Br. at 6.

Even if the court did not apply the in-scope standard, Commerce's findings still lack an explanation of how "blocks" or "blocks for tools" can be considered identical merchandise to fluid end blocks.

Finally, Commerce attempts to justify its selection by relying on *Husteel Co. v. United States*, 40 CIT __, __, 180 F. Supp. 3d 1330, 1346 (2016), where this Court recognized that Commerce may be required to choose from a pool of imperfect sources,

and in that case the court will not undermine such decision so long as it is reasonable. *See* IDM at 13.  That principle permits Commerce to rely on producers of comparable merchandise when producers of identical merchandise are unavailable.  *See Husteel*, 40 CIT at __, 180 F. Supp. 3d at 1344 (upholding Commerce's construction of CV profit rate by averaging profits of two "best available CV profit sources" that were "most similar" to those of two mandatory respondents to investigation).  *Husteel* is inapposite because there, Commerce had to choose between imperfect choices, whereas here, Commerce can rely on financial statements from Metalcam and OMR, which Commerce identified as producers of fluid end blocks, even if Commerce were to exclude Ciscato and Cogne.

In sum, Commerce's determination that Ciscato and Cogne produce identical merchandise is not supported by substantial evidence.  Accordingly, the court remands to Commerce for further explanation or reconsideration.  On remand: (1) Commerce is instructed to explain adequately or reconsider its finding that Ciscato and Cogne produce identical merchandise to Lucchini; and (2) if Commerce continues to rely on Ciscato's financial statements, Commerce is instructed to address plaintiffs' arguments regarding Ciscato's customer base and the partial translations of its financial statements.

III.    **Whether Commerce's decision to use Company B's purchase price as a benchmark price for Lucchini's major input purchased from an affiliated supplier was supported by substantial evidence**

A.    **Legal Framework**

The statute provides "special rules" governing the calculation of constructed value.  19 U.S.C. § 1677b(f).  Those rules include the "Transactions Disregarded Rule" set out in Section 1677b(f)(2) and the "Major Input Rule" set out in Section 1677b(f)(3).

The Transactions Disregarded Rule instructs that a transaction between affiliates may be disregarded if the amount representing a particular element in that transaction "does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."  *Id*. at § 1677b(f)(2).  When the Transactions Disregarded Rule applies, the practice of Commerce is to adjust the price of the transferred input to reflect the market price of that input.  *See Rebar Trade Action Coal. v. United States*, 43 CIT __, __, 398 F. Supp. 3d 1359, 1372 (2019).  Where Commerce disregards a transaction and no other transactions are available for consideration, "the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated."  19 U.S.C. § 1677b(f)(2).

Commerce applies the Transaction Disregarded Rule by considering first whether the respondent purchased the input from an unaffiliated supplier.  IDM at 19.  If no such purchases exist, Commerce considers sales of the input between the affiliated supplier and an unaffiliated party.  *Id*. at 19-20.  As a final resort, Commerce considers a reasonable source for market value available on the record.  *Id*. at 20.  This Court has affirmed Commerce's approach.  *See PT. Zinus Glob. Indonesia v. United States*, 47 CIT __, __, 628 F. Supp. 3d 1252, 1285 (2023) (quoting *Rebar Trade*, 43 CIT at __, 398 F. Supp. 3d at 1372).

The Major Input Rule is triggered when a transaction involves a major input, and Commerce has reason to suspect that the amount representing that input is less than its cost of production.  19 U.S.C. § 1677b(f)(3).  The statute then permits Commerce to determine the value of the input based on "information available regarding such cost of production," provided that such cost is "greater than the amount that would be determined for such input under paragraph [1677b(f)(2)]."  *Id*.

Regulation provides further that, for purposes of the Major Input Rule, Commerce may determine the value of a major input based on the higher of: (1) "[t]he price paid by the exporter or producer to the affiliated person for the major input" (the transfer price); (2) "[t]he amount usually reflected in sales of the major input in the market under consideration" (market price); or (3) "[t]he cost to the affiliated person of producing the major input" (cost of production).  19 C.F.R. § 351.407(b).

The Transaction Disregarded Rule informs Commerce how to determine market price for purposes of comparison under the Major Input Rule.

In *Mannesmannrohren-Werke AG v. United States*, 23 CIT 826, 834 (1999), the Court explained that nothing in the statutory text creates a hierarchical relationship between the Transaction Disregarded Rule and the Major Input Rule, and that neither provision serves as a condition precedent to the other.  When "[r]ead together, these provisions appear to create a statutory scheme in which Commerce is to use the highest of market price, actual transfer price, or cost-of-production in valuing a major input supplied by an affiliated party."  *Id*. at 835.

This Court has explained the circumstances under which Commerce is required to apply those provisions:

> When Commerce considers price data reflecting transactions between an exporter and its affiliated supplier, the agency must apply the Transactions Disregarded Rule, *id*. § 1677b(f)(2), and Major Input Rule, *id*. § 1677b(f)(3), in order to ensure that the price used in the CV calculation most accurately reflects the value of the input. The underlying concern is that simply relying on the transaction purchase price for an input from an affiliated supplier ("transfer price"), without testing it against external measures of value, could be reflective of exporters' cost-sharing arrangements with affiliates or like distortions.

*Best Mattresses Int'l Co. Ltd. v. United States*, 47 CIT __, __, 622 F. Supp. 3d 1347, 1359 (2023).

## B.    Additional Background

Lucchini purchased a particular grade of stainless steel ingots, a major input in the production of the subject merchandise, from an affiliate. IDM at 22. Lucchini reported that it did not purchase that major input from unaffiliated suppliers and that its affiliated supplier did not sell that grade of ingot to unaffiliated customers. *Id.* at 20.

At the time of the preliminary results, the record did not contain a market price for that particular grade of ingot. *Id*. Commerce therefore issued a request for information concerning the market price of comparable stainless steel ingots sold in Italy during the POR. *Id*.

Lucchini responded that it could not identify any such prices. *Id*.

Plaintiffs proposed three alternative sources for a market price: "i) information concerning Company A's purchases in the United States of the specific stainless steel grade consumed in the production of subject merchandise, ii) Eurostat data concerning Italian imports during the POR, and iii) information concerning the products produced by one of Lucchini's affiliate's ingot customers (Company B)." *Id*.

Commerce first determined that "an appropriate Italian market price would be more reflective of arm's length prices and what Lucchini would have paid if it had not sourced the materials from its affiliated supplier rather than third country prices." *Id*. at 21. Commerce therefore narrowed its analysis to the Eurostat data and Lucchini's affiliate's ingot sales to Company B. *Id*.

Commerce determined that "the broad nature of the Eurostat data, coupled with the fact that the Eurostat data are inclusive of freight and insurance costs, makes it a less appropriate source of market price information than the information pertaining to Lucchini's affiliate's sales to an unaffiliated customer." *Id*. at 22. Instead, Commerce found that the affiliate's ingot sales to Company B provided a more suitable benchmark. *Id*.

To conduct its major input analysis Commerce relied on information pertaining to Lucchini's affiliate's sales to Company B as the basis for ingot's market price and adjusted that price using the financial information pertaining to the unique technical and logistical aspects of the ingots Lucchini used in the production of subject merchandise. *Id*. at 23.

### C.    Analysis

The court concludes that Commerce's choice to rely on Lucchini's affiliate's ingot sales to Company B as a source of a market price of ingots, and Commerce's rejection of Company A's purchases in the United States, is not supported by substantial evidence.

Plaintiffs argue that Commerce failed to explain adequately its selection among the benchmark prices on the record when constructing the market price of ingots.  *See* Pls. Br. at 32, 36-37.

Specifically, plaintiffs argue that "Commerce's failure to address the relative merit of Option 1 as the only exact match for the 'merchandise under consideration' renders its analysis unsupported by substantial evidence because 'the agency has not considered all relevant factors.'"  *Id*. at 38 (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  Plaintiffs add that Company A's purchases in the United States were "the only option for which chemical composition information was available."  *Id*.

Commerce reasoned that it had excluded Company A's purchases in the United States because "Lucchini's affiliated supplier is located in Italy and record evidence demonstrates that there is an Italian market for stainless steel ingots of the same or similar grade as those consumed in the production of subject merchandise," adding "[t]hus, we determine that an appropriate Italian market price would be more reflective of arm's length prices and what Lucchini would have paid if it had not sourced the materials from its affiliated supplier rather than third country prices."  IDM at 21.

After Commerce decided not to use Company A's purchases in the United States due to Commerce's preference for relying on information from the Italian market, Commerce stated that it could not confirm whether Company B's purchases from Lucchini's affiliate involved ingots of the same chemical composition as the ingots Lucchini purchased from its affiliate because "the record does not contain evidence of the ingot's chemical composition."  *See id*. at 21-22.

The statute does not specify whether Commerce is required to prioritize market-specificity over product-specificity, or vice versa. In *Best Mattresses*, this Court recognized that "[t]he phrase 'market under consideration,' therefore, is purposefully broad to ensure that, whatever the choice, Commerce may select a market that allows for a reasonable source for market value, to confirm that the affiliated prices reflect arm's length transactions." *Best Mattresses*, 47 CIT at __, 622 F. Supp. 3d at 1384 (internal quotation and citation omitted). This Court recognized further that Commerce "has the flexibility to choose the appropriate market." *Id*.

Per section 1677b(f)(2) Commerce has the discretion to select the market under consideration. That discretion, however, does not relieve Commerce of the obligation to explain its selection in a manner that permits judicial review. *See NMB Sing.*, 557 F.3d at 1319 ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

Here, Commerce assumed, without explanation, that the most appropriate market was Italy, without first considering the types of products offered in each suggested market or addressing whether product comparability might bear on the market-selection inquiry. Commerce also did not explain why Company B's purchases from Lucchini's affiliate more accurately reflect arm's length prices than Company A's purchases in the United States, or why Company A's purchases in the United States, which plaintiffs characterize as the only exact product match, were rejected. *See* Pls. Br. at 38. The absence of such explanation prevents this court from discerning Commerce's analytical pathway.

Because Commerce failed to explain adequately its decision not to use Company A's purchases in the United States, the court remands the issue to Commerce for further explanation or reconsideration.

Further, Commerce cites the Major Input Rule under Section 1677b(f)(3) as the statutory basis for its determination whether to adjust Lucchini's reported ingot costs. IDM at 19-20. After citing the Major Input Rule, however, Commerce set out its practice for establishing market price under the Transactions Disregarded Rule under Section 1677b(f)(2). *Id.*; *see also PT. Zinus*, 47 CIT at __, 628 F. Supp. 3d at 1285 (describing Commerce's sequence for identifying market price when applying the Transactions Disregarded Rule). Although the Major Input Rule may require application of the Transactions Disregarded Rule to determine the input's market price — which is then compared to the transfer price and cost of production — it is not clear whether Commerce followed that process here. The court therefore remands for further explanation or reconsideration as to whether Commerce relied on the Transactions Disregarded Rule or the Major Input Rule in determining not to adjust Lucchini's reported ingot costs.

IV.   **Whether Commerce's adjustment to the surrogate ingot benchmark price was supported by substantial evidence**

A.    **Legal framework**

Section 351.302 of Commerce regulations governs "[e]xtension of time limits; return of untimely filed or unsolicited material." 19 C.F.R. § 351.302.

Section 351.302(b) provides that "[u]nless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established by this part."

Section 351.302(d) provides further that, unless the Secretary extends a time limit, the Secretary will not consider untimely or unsolicited information.

In addition, 19 U.S.C. § 1677f(i)(3)(A) requires that the administering authority include in a final determination "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties."

Section 1677f(i)(3)(A) does not require Commerce to make an explicit response to every argument raised by a party. See *NMB Sing.*, 557 F.3d at 1323 ("§ 1677f(i) does not require us to invalidate a decision of Commerce if Commerce failed to explicitly address a party's non-dispositive argument.").

Instead, Section 1677f(i)(3)(A) requires discussion of issues material to the agency determination so that the path of the agency may be reasonably discerned by a reviewing court. *Id*. at 1319 ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.").

"Further, it is well settled that an agency must explain its action with sufficient clarity to permit 'effective judicial review.'" *Timken*, 421 F.3d at 1355 (citing *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)). Failure to do so requires the agency action be vacated. *Id*.

**B.    Additional background**

On January 31, 2023, Commerce provided the parties with an opportunity to submit new factual information concerning the market price of stainless steel ingots by February 7, 2023. *See* Commerce January 31 Request for Information.

Commerce stated also that "[r]ebuttal comments, and information to rebut, clarify or correct factual information submitted on the market price of stainless steel ingots, are due [on] February 14, 2023."  *Id*.

Commerce explained that this information was necessary because "stainless steel ingots are a major input obtained from an affiliated supplier" and "a market price is required necessary in order to perform the arms-length analysis."  *Id*.

On February 3, 2023, Commerce extended the deadline by which the parties were required to submit both their initial submission of new factual information and their rebuttal comments.  Letter from Minoo Hatten, Program Manager AD/CVD Operations, to all interested parties (Feb. 3, 2023), ECF No. 45.  The new deadlines were February 10, 2023, and February 17, 2023, respectively.  *Id*.

On February 10, 2023, plaintiffs submitted a response to the Commerce request, including exhibits addressing three potential sources of market-price information for stainless steel ingots.  *See* Ellwood February 10 Submission.  One exhibit pertained to Eurostat data concerning the price of stainless steel in ingots or other primary forms imported into Italy during the POR.  *Id*. at 2.

On February 17, 2023, Lucchini submitted its "Rebuttal to Plaintiffs' Market Price Information for Stainless Steel Ingots," which addressed, among other things, the unique logistical arrangements of its purchases of FEB-grade stainless steel ingots from its affiliate.  Lucchini's February 17, 2023 Submission at 6-14.

Commerce stated that it "constructed a market price using the ingots sold by Lucchini's affiliate to Company B and adjusted the price using the financial information

pertaining to the unique technical and logistical aspects of the ingots consumed in the production of subject merchandise."  IDM at 23.

After Commerce applied the adjustment, it "determined that the transfer price paid by Lucchini to its affiliated supplier exceeded both the affiliate's cost of production and the constructed market price," thereby determining that "no additional adjustment to Lucchini's reported ingot costs was warranted."  Def. Br. at 23 (citing Lucchini Final Cost Memo at 2).

Commerce's acceptance of Lucchini's submission and adjustment of the benchmark ingot price reduced the price differential.  *See* Pls. Br. at 41.

### C.    Analysis

The court concludes that neither Commerce's acceptance of Lucchini's February 17 submission nor Commerce's adjustment to the market price of ingots is supported by substantial evidence.

Plaintiffs argue that Commerce's acceptance of Lucchini's submission and Commerce's resulting adjustment to the market price benchmark were contrary to law. *See* Pls. Br. at 40.  Plaintiffs contend first that Lucchini's submission was not rebuttal information and therefore was untimely under 19 C.F.R. § 351.301(c)(5).  *Id*. at 40-41. Plaintiffs assert that, because Lucchini characterized its submission as rebuttal information, it was required to "disprove or contradict" the factual information in plaintiffs' February 10 submission.  *Id*. at 42.  Plaintiffs maintain, however, that Lucchini's submission consisted "almost entirely of new factual information."  *Id*. at 41.  According to plaintiffs, the submission focused on "logistics associated with FEB acquisition," a topic not addressed in plaintiffs' initial submission.  *Id*. at 40.  Plaintiffs add that

"Commerce's 'adjustment' of the benchmark was only possible with the new factual information Lucchini proffered as 'rebuttal.'  Had Commerce applied its regulations instead of ignoring Petitioners' arguments, the factual information would have been rejected as untimely, precluding any 'adjustment.'"  *Id*. at 41.

Commerce described Lucchini's submission as "timely," but did not address whether the content of that submission rebutted, clarified, or corrected plaintiffs' factual information.  IDM at 2.

This Court has recognized that 19 C.F.R. § 351.301(c) does "not define 'factual information to rebut, clarify, or correct,' and thus Commerce's interpretation is given deference as long as it is reasonable."  *Husteel Co. v. United States*, 39 CIT __, __, 98 F. Supp. 3d 1315, 1341 (2015).  "'Rebuttal evidence' is generally understood to be 'evidence offered to disprove or contradict the evidence presented by an opposing party.'"  *Id*. (quoting Black's Law Dictionary (10th ed. 2014)).  In *Husteel*, this Court relied on Commerce's stated rationale for treating the information at issue as rebuttal.  *See id*. at 1338.

Here, unlike in *Husteel*, the court cannot discern whether Commerce's interpretation of Lucchini's submission was reasonable because Commerce did not address whether Lucchini's submission constituted rebuttal information at all.  As noted supra, an agency must "explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."  *NMB Sing*., 557 F.3d at 1319.  Commerce's failure to explain why Lucchini's submission qualified as a rebuttal prevents the court from determining whether Commerce's acceptance of that submission was reasonable.

Plaintiffs argue further that, even if Lucchini's submission were timely, Commerce's adjustment was not supported by substantial evidence.  Pls. Br. at 46-47. Plaintiffs contend that Lucchini's submission described *two* logistical aspects unique to the ingots purchased from its affiliated supplier; however, plaintiffs maintain, Commerce's adjustment accounted for only *one* logistical aspect.  *See id*.

Commerce did not address plaintiffs' argument regarding the reasonableness of the adjustment.  Commerce stated that "[r]ecord evidence demonstrates that there are certain technical and logistical aspects of the sales transactions between Lucchini's affiliated supplier and Lucchini which warrant adjustment to ensure an apples-to-apples comparison."  IDM at 23.  Commerce asserted further that "[t]he record contains sufficient information to permit Commerce to construct an appropriate surrogate market price . . . . "  *Id*.

This court has previously held that "Commerce may apply facts available whenever there is a gap in the record."  *Huvis Corp. v. United States*, 31 CIT 1803, 1807, 525 F. Supp. 2d 1370, 1375 (2007) ("*Huvis I*") (citing *NTN Bearing Corp. of Am. v. United States*, 368 F.3d 1369, 1377 (Fed. Cir. 2004)).  In *Huvis I*, the court held that Commerce's use of facts available to fill missing market price data was supported by substantial evidence.  *Id*. at 1376-77.  In the subsequent remand, the court held that "Commerce adequately explained its decision to change course and use its facts available authority to fill in the record with market price data."  *Huvis Corp. v. United States*, 32 CIT 845, 850 (2008) ("*Huvis II*"), aff'd, 570 F.3d 1347 (Fed. Cir. 2009).

Here, unlike in *Huvis I* and *Huvis II*, Commerce did not explain whether it relied on facts available in applying the adjustment and did not explain why it accounted for

only certain logistical factors identified in Lucchini's submission while disregarding others.

Because Commerce did not explain why it accepted Lucchini's submission or how it determined the scope of its adjustment to the market price of ingots, the court remands to Commerce for further explanation or reconsideration.  On remand: (1) Commerce is instructed to explain or reconsider its acceptance of Lucchini's February 17, 2023 submission; and (2) Commerce is instructed to explain or reconsider any adjustment it has applied or explain any adjustment Commerce applies on remand to its selected surrogate source for determining the market price of ingots.

## CONCLUSION

In conclusion, the court sustains in part and remands in part Commerce's *Final Results*.  For the reasons provided above, it is hereby

**ORDERED** that on remand Commerce shall explain further or reconsider its selection of Cogne and Ciscato for CV profit and SG&A expenses calculations and its choice to rely on non-FEB ingots as the market price benchmark for a major input analysis; it is further

**ORDERED** that Commerce shall file with the court its remand redetermination within 90 days following the date of this Opinion and Order; it is further

**ORDERED** that the moving parties shall have 30 days from the filing of the remand redetermination to submit comments to the court; and it is further

**ORDERED** that should the moving parties submit comments, defendant shall have 15 days from the date of filing of the comments to submit a response.

**SO ORDERED.**

/s/      Timothy M. Reif
Timothy M. Reif, Judge

Dated: April 28, 2026
        New York, New York